## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELIZABETH BROKAMP<br>7807 South Valley Drive<br>Fairfax Station, VA 22039<br><br>*Plaintiff,*<br><br>v.<br><br>DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Case No. 1:20-cv-3574 |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### INTRODUCTION

1.      This First Amendment lawsuit seeks to vindicate the right of Plaintiff Elizabeth Brokamp, a Virginia-licensed professional counselor with more than twenty years of experience, to speak with D.C. residents over internet video. Professional counselors like Elizabeth talk to their clients about their feelings, their relationships, and their lives; Elizabeth does not seek to prescribe medication or provide any service beyond talk therapy. All Elizabeth wants to do is talk.

2.      Because of the COVID-19 pandemic, Elizabeth currently provides all her counseling services over the internet using teletherapy, and Elizabeth has been contacted by D.C. residents seeking to engage her services. However, Elizabeth cannot provide teletherapy to D.C. residents at their homes in the District without violating D.C.'s licensing laws. As a result, although Elizabeth believes D.C. residents would benefit from her services, she has been forced

to turn them away. And these problems will persist even after the pandemic has ended, as Elizabeth intends to continue offering teletherapy services for the indefinite future.

3.      D.C.'s licensing laws restrict Elizabeth's ability to speak with D.C. residents about their professional, educational, personal, or spiritual development—topics one might discuss with a life coach, mentor, self-help guru, religious leader, or close friend. On their face, D.C.'s laws are substantially overbroad. In application, they are also substantially underinclusive, as D.C. generally does not enforce its laws against speakers without professional training and expertise. If Elizabeth were less qualified, she could in practice offer her services as an unlicensed "life coach," but, paradoxically, Elizabeth's training and expertise restrict her ability to talk to D.C. residents without a license. That topsy-turvy regime cannot survive First Amendment scrutiny.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

6.      Plaintiff Elizabeth Brokamp is a United States citizen and a resident of Virginia. Elizabeth is a Virginia-licensed professional counselor with over twenty years of experience. During the COVID-19 pandemic, Elizabeth has moved all of her services online and currently provides counseling out of her home in Fairfax Station, Virginia.

7.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States.

## FACTUAL ALLEGATIONS

### Elizabeth Brokamp's Professional Counseling

8.      Plaintiff Elizabeth Brokamp is a Virginia-licensed professional counselor with over twenty years of experience.

9.      In 1994, Elizabeth earned a Master's Degree in Counseling Psychology from Columbia University. She is currently pursuing a PhD in Counseling from the University of the Cumberlands.

10.      Elizabeth also holds a number of voluntary certifications related to professional counseling, including a certification in tele-mental health from the Center for Credentialing and Education.

11.      As a Virginia-licensed professional counselor, Elizabeth must renew her license annually and complete a minimum of 20 hours of continuing education requirements. *See* 18 VAC 115-20-105.

12.      Elizabeth is also subject to oversight by the Virginia Board of Counseling, which establishes standards of practice applicable to all Virginia-licensed professional counselors. *See* 18 VAC 115-20-130. The Virginia Board of Counseling is empowered to discipline counselors who violate its standards of practice. *See* 18 VAC 115-20-140.

13.      From March 2010 through December 2017, Elizabeth provided counseling services from an office located in Alexandria, Virginia, under the business name Alexandria's Women Counseling.

14.      In 2018, Elizabeth closed her Alexandria office in order to pursue her doctoral degree at the University of the Cumberlands. As part of her doctorate training, Elizabeth provided intake assessment and individual counseling for college students at the University of

Mary Washington. In addition, starting in 2019, Elizabeth has served as a supervisor for individuals who have completed their Masters' degrees and are seeking licensure.

15.     In February 2020, Elizabeth signed a lease on an office in Burke, Virginia, where she intended to offer counseling in-person under the business name Nova Terra Therapy. Because of the COVID-19 pandemic, however, Elizabeth gave up the lease on the Burke office and instead opened Nova Terra Therapy as an online practice. Elizabeth currently provides counseling exclusively through the internet.

16.     The number of clients that Elizabeth serves varies week-to-week, but, in a typical week, Elizabeth currently provides teletherapy to between ten and twenty clients.

17.     Elizabeth advertises her teletherapy services online, including through websites that provide counseling referral services.

18.     Even when the pandemic is over, Elizabeth intends to continue providing online teletherapy for the indefinite future. Likewise, even when the pandemic is over, Elizabeth intends to continue advertising her teletherapy services over the internet, including through websites that provide counseling referral services.

19.     Elizabeth intends to continue providing teletherapy because she believes that it provides significant benefits for clients, as it allows clients to seek out help without having to make a trip to a counselor's office. Teletherapy can be beneficial for new mothers, as the demands of a newborn child can make it particularly difficult to schedule in-person counseling. Teletherapy also benefits clients who require counseling on an emergency basis, and who may not be able to wait for an in-person visit.

20.     Elizabeth advises her clients on a variety of topics, including anxiety, relationships, and mindfulness. Additionally, she has a particular specialty assisting women who are facing issues relating to infertility and postpartum depression.

21.     Clients seek out Elizabeth for a variety of reasons, including need for services from a counselor with Elizabeth's particular areas of specialization and referrals from existing clients who have been satisfied with Elizabeth's services.

22.     When Elizabeth provides counseling services, she does not prescribe medication or conduct any medical procedures.

23.     Elizabeth's counseling services consist entirely of conversations between her and her clients.

24.     Elizabeth speaks with her clients about a variety of topics, including, but not limited to, their emotions, their relationships, and their lives. Through these conversations, Elizabeth seeks to improve her clients' well-being.

25.     Elizabeth typically provides prospective clients with a free 15-minute counseling session to discuss the potential benefits of counseling.

26.     For clients who pay for her services, Elizabeth accepts both insurance and cash. She also charges on a sliding scale for those who cannot otherwise afford the full price of her services.

**D.C. Prevents Elizabeth from Offering Cross-Border Teletherapy**

27.     D.C. residents have contacted Elizabeth during the pandemic seeking to take advantage of her counseling services. However, because D.C.'s licensing laws prevent Elizabeth from providing teletherapy to D.C. residents at their homes in the District, Elizabeth has had to turn away those prospective clients.

5

28.     But for D.C.'s licensing laws, Elizabeth would provide teletherapy services to D.C. residents both today and in the future after the COVID-19 pandemic is over.

29.     Elizabeth believes that there is a market for her teletherapy services in D.C. and, but for D.C.'s licensing restriction, would advertise her availability to provide teletherapy to D.C. residents through her website, other media, and counselor referral networks.

30.     Currently, because Elizabeth cannot lawfully provide teletherapy to D.C. residents, she refrains from suggesting in her advertisements that she is available to provide teletherapy to D.C. residents.

31.     Under D.C.'s licensing laws, Elizabeth cannot provide teletherapy services to D.C. residents at their homes in D.C., although Elizabeth could provide the same services to those same people at a physical office in Virginia.

32.     D.C.'s licensing law strictly limits the practice of "professional counseling" by out-of-state professional counselors. DC Code § 3-1205.01(a)(1). Only D.C.-licensed professional counselors may provide professional counseling, including professional counseling services via teletherapy, to people located in D.C.

33.     Elizabeth's teletherapy conversations with her clients constitute the practice of "professional counseling" as that term is defined by D.C. law. *See* DC Code § 3-1201.02(15B).

34.     Elizabeth's teletherapy conversations with her clients are just that: conversations, consisting of nothing other than speech.

35.     Elizabeth is not licensed as a professional counselor in D.C. and has no intention to apply to become licensed.

36.     There are two relevant exceptions to D.C.'s licensure requirements. First, professional counselors licensed out of state can offer services to D.C. residents for a limited

time after affiliating with a D.C.-licensed counselor. Second, professional counselors from neighboring states can offer services to D.C. residents if they have no office in the District, pay a local registration fee, and if their own state offers reciprocity to D.C. professionals under the same circumstances. DC Code § 3-1205.02.

37.     These exemptions do not apply to Elizabeth, as she is unaffiliated with a D.C.-licensed counselor and Virginia does not have reciprocity with any jurisdictions' professional counseling license.

38.     As a result of these provisions, Elizabeth cannot lawfully provide counseling services via teletherapy if the client at the other end of the call is a D.C. resident in his or her own home.

39.     In response to the pandemic, D.C. has temporarily waived licensing requirements for some out-of-state healthcare providers under some circumstances.[1] But the waiver applies only if a healthcare provider offers services in connection with a "licensed healthcare facility located in the District of Columbia" or if the provider "has an existing relationship with a patient who has returned to the District of Columbia."

40.     D.C.'s temporary waiver applies for the duration of D.C.'s public health emergency declaration. The emergency declaration has been extended to December 31, 2020,[2] and may be extended again, but (on information and belief) at some point the pandemic will end and the waiver will expire.

---

[1] D.C. Admin. Order No. 2020-02 (Mar. 13, 2020), https://dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/Order%20-%20Licensure%20Waivers.20.03.13.pdf.

[2] D.C. Admin. Order No. 2020-103 (Oct. 7, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-103.pdf.

41.     D.C.'s pandemic-related waiver of licensing requirements is inapplicable to Elizabeth because she is neither affiliated with a D.C.-licensed facility nor currently providing services to a client who moved from Virginia to D.C. during the pandemic.

42.     If Elizabeth were affiliated with a D.C.-licensed facility, she would be free to talk to clients located in D.C. during the pandemic. Similarly, if a client she worked with in Virginia moved to D.C. during the pandemic, she would be allowed to continue talking to that client (but only that client).

43.     D.C.'s pandemic-related waiver highlights the unnecessary and arbitrary nature of D.C.'s general restrictions on cross-border teletherapy. D.C. cannot articulate any reason why the speech permitted by the waiver would pose a danger to public health or should be prohibited. Yet, when the waiver expires, that speech will be prohibited once again.

44.     D.C.'s pandemic-related waiver is also incomplete, as it does not apply to services provided to *new* (as opposed to existing) clients.

45.     In October 2020, Elizabeth contacted the D.C. Board of Professional Counseling (the "Board") to determine whether she could offer counseling services to D.C. residents over the internet. Specifically, Elizabeth asked if she could provide such services if she informed D.C. residents that she is only licensed in Virginia and described her services as "counseling" instead of "licensed professional counseling." The Board responded that, even under those conditions, Elizabeth would be fined for practicing counseling without a license.

46.     The Board confirmed that Elizabeth would violate D.C.'s licensing requirements if she offered counseling services to a D.C. resident via teletherapy.

47.     The Board informed Elizabeth that she is prohibited from offering teletherapy services to D.C. residents unless she first obtains D.C.'s professional counseling license.

48.     D.C.'s licensing laws prohibit Elizabeth from speaking to D.C. residents over the phone or internet about their professional, educational, emotional, and spiritual development, because she has not been issued a government license allowing her to speak about those topics.

49.     But for these restrictions, Elizabeth would currently provide teletherapy services to D.C. residents and would provide teletherapy services to D.C. residents in the future, including after the pandemic is over.

### D.C.'s Overbroad Definition of "Professional Counseling"

50.     D.C. law prohibits the unlicensed practice of "professional counseling," which is defined as "engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness." DC Code § 3-1201.02(15B).

51.     "Professional counseling" is further defined to include both the "processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups . . . and determining treatment goals and objectives" and "[a]ssisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment." *Id*.

52.     D.C.'s regulations provide a different definition of "professional counseling," which differs from the above in some minor respects, *see* D.C. Mun. Reg. Tit. 17 § 6699.1, but that definition defines the term only "[w]hen used in [the] regulations" and does not purport to alter the scope of D.C.'s prohibition on unauthorized practice.

53.     Individuals who violate these provisions are guilty of a misdemeanor offense and may be imprisoned up to a year, fined up to $10,000, or both. DC Code § 3-1210.07.

54.     On its face, D.C.'s professional counseling law sweeps up an extraordinarily broad swath of speech, including "interviews" designed to "assist[ ] individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational or career development and adjustment."

55.     D.C. cannot articulate any public health or safety rationale that would justify a licensing requirement for the broad universe of speech falling within the statutory definition of "professional counseling."

56.     In addition to the above restrictions on unlicensed practice, D.C. also has a separate titling law that prohibits an unlicensed person from calling herself a "licensed professional counselor." DC Code § 3-1210.03(t). The titling law also prohibits unlicensed individuals from using "any similar title or description of services with the intent to represent that the person practices professional counseling." At the same time, the titling law specifically states that it does not "restrict the use of the generic terms 'counseling' or 'counselor.'"

57.     By email, Elizabeth asked D.C.'s licensing board if she could provide her counseling services to D.C. residents if she disclosed that she is licensed in Virginia but not D.C. and "described the services to these individuals as 'counseling' rather than 'licensed professional counseling.'" If it were lawful to do so, Elizabeth would be willing to provide counseling services under those conditions. However, in response to Elizabeth's question, the licensing board informed Elizabeth that "[t]he only way you will be able to provide counseling services to DC residents is after you receive a license."

**D.C.'s Underinclusive Enforcement Practices**

58.     In practice, D.C. does not enforce its professional counseling licensing law against all the various individuals swept up by the overbroad definition.

59.     D.C. has not adopted any written official policy that articulates when the law will or will not be enforced, and individuals have no way to know for sure whether their speech will or will not be prohibited.

60.     At the same time, D.C.'s general practice is to enforce its professional counseling licensing law against individuals with significant training and expertise relevant to the provision of counseling.

61.     In practice, individuals who do not have significant training and expertise relevant to the provision of counseling can provide services falling within the definition of licensed professional counseling so long as they refrain from calling themselves "licensed professional counselors."

62.     For instance, unlicensed and untrained individuals frequently call themselves "life coaches" and offer services that fall within the definition of professional counseling under the label "life coaching."

63.     Similarly, although self-help gurus, mentors, spiritual leaders, and even friends and family members provide advice that falls within the scope of D.C.'s counseling regulations, D.C. does not require those individuals to obtain a professional counseling license.

64.     The Board, however, has confirmed that Elizabeth cannot provide her services in D.C. even if she refrains from calling herself a "licensed professional counselor." When Elizabeth asked the Board if she could provide her services so long as she discloses that she is licensed in Virginia and not in D.C. and describes her services as "counseling" rather than

11

"licensed professional counseling," the Board informed Elizabeth that any attempt to do so would be against the law.

65.     The Board's email made clear that, as applied to Elizabeth, D.C.'s licensing law is not just a titling restriction. According to the Board: "Until you have a license, you are not allowed to provide any counseling services to DC residents."

66.     In practice, therefore, Elizabeth is subject to greater burdens on her speech because she possesses greater qualifications to talk. Elizabeth is subject to D.C.'s professional counseling requirement because of her education and experience, but D.C. does not enforce that requirement against other individuals who speak about those same topics.

67.     Upon information and belief, D.C. possesses no evidence that counseling provided by individuals with *more* qualifications is somehow more dangerous than counseling provided by less qualified individuals.

**INJURY TO PLAINTIFF**

68.     Elizabeth is injured by D.C.'s licensing requirements for professional counselors because, without a license from D.C., she is significantly limited in her ability to share her advice and counseling expertise with D.C. residents.

69.     Under the currently-active pandemic waiver, Elizabeth is injured because she is unable to provide teletherapy to D.C. residents at their D.C. homes if she does not have an existing relationship with those clients.

70.     Under the pandemic waiver, Elizabeth has been injured because she has been unable to take on new clients who are D.C. residents.

71.     Elizabeth has been contacted by D.C. residents seeking to engage her services during the pandemic, and she has been forced to turn those individuals away. This has resulted in

a loss of revenue, and, just as important, it has meant that Elizabeth has not been able to help those individuals.

72.     After the pandemic ends and the current waiver expires, Elizabeth will be injured because she will not be able to provide teletherapy services to D.C. residents at their D.C. homes under any circumstances.

73.     Elizabeth intends to continue to advertise her teletherapy services online after the pandemic ends, and it is reasonable to expect that Elizabeth will continue to be contacted after the pandemic by D.C. residents who believe they will benefit from her counseling services.

74.     Furthermore, but for D.C.'s licensing restrictions, Elizabeth would use her website and other media to specifically market her teletherapy services to D.C. residents (for instance, by specifically mentioning her availability to meet with residents of D.C.). Elizabeth has refrained from engaging in advertising specifically directed to D.C. residents because of D.C.'s licensing restrictions.

75.     Elizabeth would provide D.C. residents with teletherapy services—that is, she would talk to them online, using video conferencing software—but for the fact that D.C.'s licensing regime makes it illegal to do so.

76.     D.C.'s licensing regime is triggered only if Elizabeth speaks to D.C. residents without a license about certain subjects.

77.     D.C.'s licensing requirement imposes special burdens on Elizabeth because of the content of her speech.

78.     In order to speak to D.C. residents about bettering their lives, Elizabeth would be forced to comply with burdensome licensing requirements.

79.     In order to obtain D.C.'s professional counseling license, Elizabeth would have to devote a significant amount of time to comply with the application process—time that could be spent providing counseling services to people that need help. Additionally, she would need to pay a $230 fee.

80.     These requirements are burdens placed on Elizabeth solely because of the content of her speech.

81.     These requirements restrict Elizabeth from offering teletherapy services to D.C. residents across the border without first obtaining a license.

82.     If Elizabeth offers counseling to paying clients in D.C. without a professional counseling license, she faces a threat of fines and even jail time.

## CONSTITUTIONAL VIOLATIONS

### Count I: As-Applied First Amendment Violation

83.     All preceding allegations are incorporated here as if set forth in full.

84.     D.C.'s licensing restriction for professional counselors violates the First Amendment as applied to Elizabeth's provision of teletherapy to D.C. residents.

85.     The only thing Elizabeth wants to do in D.C. is talk to clients over the internet. Elizabeth's teletherapy services consist of ideas, opinions, and guidance that she communicates based on her extensive education in counseling, as well as her professional experience.

86.     Elizabeth is prohibited from having these conversations no matter what disclosures she makes. D.C. officials have made clear that no amount of truthful factual disclosure about Elizabeth's training or licensure status would affect the prohibition on her offering "professional counseling."

87.     Elizabeth's individualized advice is a form of speech fully protected by the First Amendment; she does not prescribe medication or conduct medical procedures.

88.     By prohibiting Elizabeth from giving D.C. residents individualized advice through teletherapy, D.C. is preventing her from talking depending on what she says.

89.     Elizabeth could talk to clients about a range of topics, but if she talks about topics that fall within the definition of "professional counseling" she is required to have a license.

90.     Elizabeth can give clients fashion advice, but she cannot provide advice that advances their long-term human development.

91.     Elizabeth can give clients interior decorating advice, but she cannot provide advice about managing stress caused by infertility or a newborn child.

92.     Although Elizabeth is subject to the licensing requirement because of her qualifications, D.C. does not enforce the requirement against individuals with *fewer* qualifications. D.C. cannot articulate any interest that would justify that approach.

93.     D.C.'s temporary waiver, which allows unlicensed practice by some professional counselors in some circumstances, further demonstrates the arbitrary and unnecessary nature of D.C.'s licensing requirement.

94.     D.C. has no interest—compelling or otherwise—in preventing Elizabeth from speaking with clients over the internet.

95.     Elizabeth has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her First Amendment rights.

96.     Unless D.C. is enjoined from enforcing DC Code §§ 3-1201.02(15B) and 3-1205.01(a)(1) Elizabeth will suffer continuing and irreparable harm.

**Count II: Facial First Amendment Violation**

97.     The allegations of paragraphs 1 through 82 are incorporated here as if set forth in full.

98.     On its face, D.C.'s professional counseling licensing law is a content-based regulation of speech, as it applies only to speech that meets the definition of "professional counseling."

99.     D.C.'s professional counseling licensing law is substantially overbroad, as it sweeps in significant amounts of speech that D.C. has no conceivable interest in regulating.

100.    Under DC Code § 3-1201.02(15B), individuals who speak with other people in order to "facilitate" their "human development" fall within D.C.'s definition of "professional counseling."

101.    On its face, D.C.'s licensing requirement would apply to life coaches, self-help gurus, mentors, religious leaders, or even close friends, because each routinely offers advice that falls within the legal definition of "professional counseling" and none of them fall within the exemptions listed in DC Code § 3-1205.02.

102.    At the same time, as the law is enforced in practice, D.C.'s regulation of professional counseling is significantly underinclusive, as D.C. frequently fails to apply its licensing requirement to individuals who lack the training and qualifications associated with professional counselors.

103.    For instance, D.C. does not enforce the licensing requirement against life coaches, mentors, self-help gurus, religious leaders, or peoples' friends, each of whom routinely offer advice that falls within the legal definition of "professional counseling," even though none of these categories of individuals fall within the exemptions listed in DC Code § 3-1205.02.

104.    In practice, D.C. enforces its professional counseling licensing law against individuals with *more* qualifications but not against individuals with *fewer* qualifications. D.C. cannot articulate any interest that would justify that approach.

105.    By waiving these requirements in some circumstances and not others, D.C.'s temporary waiver further demonstrates the underinclusive and fundamentally arbitrary nature of D.C.'s licensing law.

106.    Elizabeth has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her First Amendment rights.

107.    Unless D.C. is enjoined from enforcing DC Code §§ 3-1201.02(15B) and 3-1205.01(a)(1) Elizabeth will suffer continuing and irreparable harm.

### Count III: First Amendment Vagueness

108.    The allegations of paragraphs 1 through 82 are incorporated here as if set forth in full.

109.    D.C.'s licensing requirement enacts an impermissibly vague and standardless restriction on speech.

110.    While D.C.'s licensing requirement sweeps up vast swaths of speech, in practice D.C. applies its licensing requirement far more narrowly. In practice, D.C. does not generally apply the licensing requirement to speech by life coaches, religious leaders, friends, or family members that falls within the statutory definition of professional counseling.

111.    D.C. has not articulated any standard that guides its decisions about when the restriction on professional counseling does or does not apply. Individuals are therefore left to guess whether their speech will be subjected to D.C.'s licensing requirement.

112.     D.C.'s failure to articulate any standard to guide its enforcement of this sweeping definition introduces impermissible discretion into the licensing process, as D.C. officials have broad and standardless discretion to decide whether speech should or should not be subject to the licensing requirement.

113.     Elizabeth has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her First Amendment rights.

114.     Unless D.C. is enjoined from enforcing DC Code §§ 3-1201.02(15B) and 3-1205.01(a)(1) Elizabeth will suffer continuing and irreparable harm.

**REQUEST FOR RELIEF**

In light of the foregoing, Plaintiff Elizabeth Brokamp respectfully requests the following relief:

A.     A declaratory judgment by the Court that, both as applied to Plaintiff and on its face, D.C.'s licensing law for professional counselors, DC Code §§ 3-1205.01(a)(1) and 3-1201.02(15B), violates the First Amendment to the United States Constitution;

B.     A permanent injunction prohibiting Defendant and its agents from applying D.C.'s licensing requirement for professional counselors to prevent Plaintiff from providing teletherapy services to D.C. residents;

C.     An award of Plaintiffs' costs and expenses of this action, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

D.     Any other legal or equitable relief to which Plaintiff may show herself to be justly entitled.

Dated: December 9, 2020        Respectfully submitted,

 /s/ Robert E. Johnson
Robert E. Johnson (D.C. Bar No. 1013390)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

Robert J. McNamara (Bar ID VA065)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rmcnamara@ij.org