## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELIZABETH BROKAMP, | ) ) ) | |
| | ) | |
| *Plaintiff,* | ) ) | |
| v. | ) | Civil Action No. 20-3574 (TJK) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) ) | |
| *Defendant.* | ) ) | |
| | ) ) | |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Elizabeth Brokamp respectfully moves this Court for entry of an Order granting summary judgment in her favor. A memorandum of points and authorities, statement of undisputed material facts, counter-statement of disputed material facts, and proposed order are attached. Because this motion is dispositive, Plaintiff has not sought Defendant's consent. *See* LCvR 7(m). Pursuant to LCvR 7(f), Plaintiff respectfully requests oral argument.

Dated: June 26, 2023

Respectfully submitted,

John G. Wrench (D.C. Bar No. 1722587)
Robert J. McNamara (D.D.C. Bar # VA065)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: jwrench@ij.org, rmcnamara@ij.org

/s/ Robert E. Johnson
Robert E. Johnson (D.C. Bar No. 1013390)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

*Attorneys for Plaintiff Elizabeth Brokamp*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| ELIZABETH BROKAMP, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-3574 (TJK) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| _____ | ) | |

---

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT
### AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Robert E. Johnson (D.C. Bar No. 1013390)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

John G. Wrench (D.C. Bar No. 1722587)
Robert J. McNamara (D.D.C. Bar # VA065)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: jwrench@ij.org, rmcnamara@ij.org

*Attorneys for Plaintiff Elizabeth Brokamp*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.  The Practice Of Professional Counseling. .................................................  2

    B.  The Regulation Of Professional Counselors............................................. 3

    C.  The District's Licensing Requirement. ...................................................... 7

    D.  The District's Enforcement Regime. .........................................................  8

    E.  The Burdens Of Licensure. ...................................................................... 11

    F.  Application Of The Licensing Requirement To Plaintiff Elizabeth Brokamp. .........  13

STANDARD OF REVIEW ..................................................................................... 15

ARGUMENT ......................................................................................................... 16

I.  Elizabeth Has Standing To Challenge The District's Licensing Requirement................ 16

II.  The District's Licensing Requirement Violates The First Amendment As Applied To Elizabeth's Speech. ........ 17

    A.  The District's Law Remains A Content-Based Regulation Of Speech. ..................... 18

        1.  Discovery Confirmed That The District Applies Its Licensing Law Based On The Content Of Speech. ...................... 19

        2.  The District's Attempt To Revive The Professional Speech Doctrine Remains Meritless........................ 21

        3.  A Law Need Not Dictate The Content Of Speech In Order To Be A Content-Based Regulation Of Speech. ........ 25

    B.  The District Fails To Justify Its Restriction Of Elizabeth's Speech Under Any Level of Scrutiny.................. 28

        1.  The District Asserts No Basis For Regulating Elizabeth's Speech. .................. 30

2.    The District Cannot Just Assume That Licensing Benefits The Public............ 32

3.    The District's Law Does Not Meaningfully Advance Its Asserted Hypothetical Interests. ........................................................................................................... 34

4.    The District Failed To Adequately Consider Less Restrictive Alternatives...... 38

III.   The District's Licensing Requirement Is Facially Overbroad Under The First Amendment ........................................................................................................... 40

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

*Page(s)*

<u>**Cases**</u>

*360 Virtual Drone Servs. LLC v. Ritter*,
　No. 5:21-cv-137-FL, 2023 WL 2759032 (E.D.N.C. Mar. 31, 2023).......................................23

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986)...............................................................................................................15

*Barr v. AAPC, Inc.*,
　140 S. Ct. 2335 (2020)......................................................................................................25, 27

*\*Billups v. City of Charleston*,
　961 F.3d 673 (4th Cir. 2020) ...............................................................................2, 33, 38, 39

*Brokamp v. James*,
　66 F.4th 374 (2d Cir. 2023) ..............................................................................................27, 28

*Boos v. Barry*,
　485 U.S. 312 (1988)...............................................................................................................23

*Capital Associated Industries, Inc. (CAI) v. Stein*,
　922 F.3d 198 (4th Cir. 2019) ...........................................................................................24, 29

*Century Commc'ns Corp. v. F.C.C.*,
　835 F.2d 292 (D.C. Cir. 1987)..............................................................................................32

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
　142 S. Ct. 1464 (2022)................................................................................................26, 27, 28

*City of Ladue v. Gilleo*,
　512 U.S. 43 (1994).................................................................................................................38

*Davis v. Fed. Election Comm'n*,
　554 U.S. 724 (2008)...............................................................................................................17

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
　26 F.4th 1214 (11th Cir. 2022) .............................................................................................23

*Edenfield v. Fane*,
　507 U.S. 761 (1993)..........................................................................................................32, 33

*\*Edwards v. District of Columbia*,
　755 F.3d 996 (D.C. Cir. 2014) ......................................................................................*passim*

*Green v. United States Dep't of Just.*,
   54 F.4th 738 (D.C. Cir. 2022)........................................................................... 26, 27

*Hines v. Quillivan*,
   No. 1:18-cv-155, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021) ............................. 26

*Hodge v. Talkin*,
   799 F.3d 1145 (D.C. Cir. 2015)............................................................................ 24

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)................................................................................. 19, 21, 25

*King v. Governor of New Jersey*,
   767 F.3d 216 (3d Cir. 2014)................................................................................. 22

*Lowe v. SEC*,
   472 U.S. 181 (1985)............................................................................................. 22

*Matter of Rosenberg*,
   491 Mass. 1027 (2023) ........................................................................................ 24

*McCullen v. Coakley*,
   573 U.S. 464 (2014)............................................................................................. 38

*NAAMJP v. Howell*,
   851 F.3d 12 (D.C. Cir. 2017)............................................................................... 24

*Nat'l Inst. of Family & Life Advocates (NIFLA) v. Becerra*,
   138 S. Ct. 2361 (2018)......................................................................................... 22

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978)............................................................................................. 22

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ............................................................... 22, 23, 34

*Otto v. City of Boca Raton*,
   41 F.4th 1271 (11th Cir. 2022) ............................................................................ 23

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ............................................................................. 29

*Paracha v. Biden*,
   No. 04-cv-2022, 2022 WL 2952493 (D.D.C. July 26, 2022) ................................ 18

v

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014) .................................................................................. 22

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ................................................................................ 25, 26, 29

*Serafine v. Branaman*,
   810 F.3d 354 (5th Cir. 2016) ............................................................. 33, 40, 43, 44, 45

*Trudel v. SunTrust Bank*,
   288 F. Supp.3d 239 (D.D.C. 2018) .......................................................................... 16

*United States v. Hansen*,
   No. 22-179, 2023 WL 4138994, at *5 (U.S. June 23, 2023) ................................. 45

*United States v. Stevens*,
   559 U.S. 460 (2010) ................................................................................ 42, 43, 45

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................ 41

*Upsolve, Inc. v. James*,
   604 F. Supp.3d 97 (S.D.N.Y. 2022) ..................................................... 24, 25, 33

*Vill. of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ................................................................................................ 17

## **Statutes**

12 Alaska Admin. Code § 62.900 .............................................................................. 40

Alaska Stat. § 08.01.075(a) ....................................................................................... 40

Alaska Stat. § 08.29.400 ............................................................................................ 40

Del. Code tit. 24, § 3011 ............................................................................................ 40

D.C. Code § 3-1201.02(15B) ................................................................. 7, 28, 41, 42

D.C. Code § 3-1201.02(15B)(A) ............................................................................... 42

D.C. Code § 3-1201.02(15B)(B) ............................................................................... 42

D.C. Code § 3-1201.03(d) ........................................................................................... 8

D.C. Code § 3-1201.03(d)(1) ................................................................ 8, 36

D.C. Code § 3-1201.03(d)(2) ................................................................ 8

D.C. Code § 3-1201.03(d)(5) ................................................................ 8, 36

D.C. Code § 3-1201.03(d)(7) ................................................................ 8

D.C. Code § 3-1202.13 ......................................................................... 8

D.C. Code § 3-1202.13(b) ..................................................................... 8, 9

D.C. Code § 3-1205.01 ......................................................................... 11

D.C. Code § 3-1205.01(a)(1) ................................................................. 7, 14, 17

D.C. Code § 3-1205.02(a)(4) ................................................................. 8

D.C. Code § 3-1205.04(1)(D) ................................................................ 11

D.C. Code § 3-1205.05(a)(1) ................................................................. 11

D.C. Code § 3-1205.05(a)(2) ................................................................. 11

D.C. Code § 3-1205.10(c)(3) ................................................................. 12

D.C. Code § 3-1207.10(a) ..................................................................... 11

D.C. Code § 3–1207.10(c) ..................................................................... 11

D.C. Code § 3-1210.03(t) ...................................................................... 14, 39

D.C. Code § 3-1210.07 ......................................................................... 7

## Constitutional Provisions

U.S. Const. amend. I ............................................................................ *passim*

## Rules

Fed. R. Civ. P. 56(a) ............................................................................ 15

## Regulations

17 DCMR § 6602.1(a) .......................................................................... 11

17 DCMR § 6603.1(b) .......................................................................................... 11

17 DCMR § 6605.1 ............................................................................................... 11

17 DCMR § 6610.4................................................................................................ 12

## Other Authorities

About the MBTI® Assessment, https://www.capt.org/mbti-assessment/mbti-overview.htm
   (last visited June 22, 2023) ......................................................................... 44

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*
   (5th ed. 2013)............................................................................................... 42

Strong Interest Inventory®: A career assessment that delivers insight and direction,
   https://www.themyersbriggs.com/en-US/Products-and-Services/Strong
   (last visited June 22, 2023) ......................................................................... 44

**INTRODUCTION**

Elizabeth Brokamp is a Virginia-licensed professional counselor who practices exclusively over the internet. She talks to people about their lives and their feelings and tries to help them improve their emotional well-being. She is free to do this when the person on the other end of her internet video call is based in Virginia. But when her clients go across state lines into D.C., her conversations become a crime—specifically, the unlicensed practice of professional counseling. And they are a crime specifically because of their content: Discovery in this case has made clear that one can only determine whether a conversation consists of unauthorized "counseling" by listening to what is being said. As this Court already recognized at the motion to dismiss stage, the District's restriction on unlicensed counseling is therefore a "content-based regulation of speech" subject to "strict scrutiny." MTD Minute Order (Mar. 7, 2022).

Discovery in this case has confirmed all of the allegations of the complaint—and then some. It remains clear that Elizabeth is forbidden from speaking to clients by D.C.'s counseling regulations. But it is now perfectly clear that Elizabeth is silenced for no good reason. The District's own witnesses agree that they have no reason to believe Elizabeth's conversations are dangerous—indeed, they would prefer a legal regime under which Virginia-licensed counselors like Elizabeth were allowed to practice. And the District has no evidence at all to suggest that its interests could not be served by a less-restrictive legal regime—say, one that restricted who could use the *title* "licensed professional counselor" without making it illegal to have particular conversations. Legislative history shows that the District's own officials suggested precisely that alternative, when licensing was proposed, and the D.C. Council adopted licensure without fully considering that suggestion. And, today, the District's own witnesses cannot identify any interest advanced by its current scheme that would not be equally well advanced by a titling restriction.

1

The best the District could muster in discovery was that conversations that count as "professional counseling" require a license because the D.C. Council has said so. There is no other evidence in support of the restriction.

But, undefended though it may be, the restriction remains, and that has real consequences for Elizabeth's First Amendment rights. The only way for Elizabeth to speak in the District is to obtain a District license, and the same is true for other jurisdictions with practice (as opposed to title) acts. That is no small thing. In the words of the former head of the District's licensing board, herself a professional counselor, "it is challenging and costly from our perspective to get licensed in every state we wish to work in." Pl's Ex. 2, Dr. Victoria Sardi-Brown Dep. Tr. (Sardi-Brown Dep.), 14:2–4. Under any standard of review, the District must support a "challenging and costly" burden on protected speech with real evidence. *See, e.g.*, *Edwards v. District of Columbia*, 755 F.3d 996, 1009 (D.C. Cir. 2014); *Billups v. City of Charleston*, 961 F.3d 673, 687–88 (4th Cir. 2020). Given the record here, the District cannot satisfy any level of scrutiny—much less the strict scrutiny that this Court has already held applies. Because the District does not seriously try to meet its First Amendment burden, summary judgment for Plaintiff is appropriate.

## BACKGROUND

### A.  The Practice Of Professional Counseling.

Dr. Heather Trepal, the District's expert witness and former president of the American Counseling Association (ACA), testified that counseling has roots in the "indigenous" practice of "talking about something—discussing something and feeling—having a feeling from it." Pl's Ex. 7, Dr. Heather Trepal Dep. Tr. (Trepal Dep.), 30:24–31:9. A professional counselor, in Dr. Trepal's view, bears important commonalities with an indigenous "spirit healer." *Id.* at 32:12–33:5.

2

As practiced today, professional counseling involves talking to clients about their feelings, in an effort to help them feel better. For instance, the former head of the District's licensing board testified that, "I guess the ultimate component of any counseling session is going to be the therapeutic relationship." Sardi-Brown Dep. 26:9–11. She testified that, "obviously, there's going to be dialogue, right? There's–there's going to be a back and forth sort of situation where there's going to be a lot of listening and a lot of dialoguing." *Id.* 27:16–20. And she testified that "the beauty about working with a professional is that we are trained to absorb what people are saying, and based on our years of experience from a theoretical standpoint, being guided by evidence-based practices, that we are skilled to be able to have meaningful conversation . . . ." *Id.* at 28:4–10. The current head of the licensing board agreed: "We might talk about: How can you deescalate yourself, you know, when you get upset like this . . . ." Pl's Ex. 3, Victoria Sherk Dep. Tr. (Sherk Dep.), 16:20–21. Even technical-sounding treatments like Cognitive Behavioral Therapy (CBT) involve talk-therapy in which the counselor encourages their client to identify and reflect on their thoughts. *Id.* at 12:17–13:24.

Plaintiff Elizabeth Brokamp's practice is no different. Elizabeth advises her clients on a variety of topics, including anxiety, relationships, and mindfulness. Pl's Statement of Undisputed Material Facts (SUMF), ¶ 4. Her counseling consists entirely of conversations between her and her clients. *Id*. at ¶ 5. Through these conversations, Elizabeth seeks to improve her clients' well-being. *Id.* at ¶ 6. Like other professional counselors, she does not prescribe medication or conduct any medical procedures as part of her counseling. *Id*. at ¶ 7.

## B.  The Regulation Of Professional Counselors.

From a regulatory perspective, professional counseling is "one of the newer professions." Trepal Dep. 29:14–23. Before the profession was regulated there were, of course, "people who did things that are similar to what professional counselors do now, even if those people weren't

licensed[.]" *Id.* at 29:14–17. As a legal matter, however, the first state to license professional counselors was Virginia in 1976. *Id.* at 33:10–13. In 2009, more than thirty years later, California became the last state to enact some form of licensing requirement. *Id.* at 33:14–17. Today, laws regulating professional counselors "vary from state to state," particularly because "[n]o two scopes of practice are the same." *Id.* at 135:8–23.

One form of licensing regime is a "practice act," which "limit[s] who can actually engage in the practice of professional counseling." Trepal Dep. 50:21–25. An alternative approach is a "title act," which merely "limits who can use the title of professional counselor" within a jurisdiction. *Id.* at 50:21–25. While many states have adopted practice acts, some states license professional counselors through title acts. SUMF at ¶ 93. In states with title acts but no practice acts, people can practice professional counseling without a license so long as they do not hold themselves out as "licensed professional counselors." Trepal Dep. 50:21–25.

In 1985, the District's Committee on Consumer and Regulatory Affairs (the "Committee") reported on a bill that proposed licensing requirements for several professions, including social workers and psychologists. SUMF at ¶ 95. Because the bill did not require licensure for therapists and counselors, the D.C. Association for Counseling and Development (DCACD)—a local chapter of what is now the ACA—requested that the Committee "include[ ] professional counselors in the legislation." *Id.* at ¶¶ 96–97. The Committee's report, however, rejected this gambit as a "bitter turf battle" driven by "striving for professional status" that was "of no moment in determining public policy." *Id.* at ¶ 98. The District's Law Revision Commission conducted a two-year study to "weigh[ ] the public protection of licensure against the possible restrictive impact on the availability of services," and, as a result of that study, the Commission concluded that there was "no evidence of public harm sufficient to justify licensure" of therapists and counselors. *Id.* at ¶ 99.

The D.C. Health Occupations Revision Act of 1985 (the "1985 Act") was ultimately enacted without a licensing requirement for professional counselors. *Id.* at ¶ 100.

In 1989, however, a member of the Committee proposed, "upon the request of the DCACD," an amendment to adopt a licensing requirement for professional counselors. *Id.* at ¶ 101. Under the proposed amendment, individuals could neither practice professional counseling nor describe themselves as licensed professional counselors—a practice and title act—without first obtaining a professional counseling license from the District. *Id.* at ¶ 102.

Two officials from the District's Department of Consumer and Regulatory Affairs testified in opposition to the amendment on the ground that no public need justified licensing professional counselors. *Id.* at ¶ 103. The Department's Acting Administrator testified that the executive "had received *no information* which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." *Id.* at ¶ 104 (emphasis added). Similarly, the Department's Acting Director opposed the amendment on the ground that there was no "demonstrated public need." *Id.* at ¶ 105; *see also* Pl's Ex. 1, Latrice Herndon 30(b)(6) Dep. Tr. (Herndon 30(b)(6) Dep.), 154:21–155:13.

As an alternative to licensing professional counselors, the Executive's representative recommended that the Committee instead "consider a registration program similar to the registration program for dance and recreation therapists." SUMF at ¶ 106. As far as the record reveals, the District never considered this less-restrictive alternative, Herndon 30(b)(6) Dep. 157:7–14, and the District does not have "any evidence that a registration requirement would have been less effective than a licensure requirement for professional counselors," *id.* at 158:3–15. Instead, the District adopted the proposed amendment and began enforcing a licensing requirement for professional counselors. SUMF at ¶ 110.

In response to the COVID-19 pandemic, D.C. adopted a temporary waiver of its licensing requirement. SUMF at ¶ 121. Under the waiver, D.C. lifted licensing requirements for out-of-state healthcare providers who were providing services in affiliation with a D.C.-licensed healthcare facility or who had "an existing relationship with a patient who has returned to the District . . . ." *Id.* at ¶ 122. The District's witness confirmed that "at least some people who were not licensed counselors in DC did engage in counseling activity" with District-based clients under the pandemic waiver. Herndon 30(b)(6) Dep. 170:16–23. The District does not have any evidence that anyone was harmed by these unlicensed counseling activities, *id.* at 171:9–13, and the District's own expert testified that such pandemic waivers were "helpful" and did not "dilute licensure," Trepal Dep. 70:5–20. The District's waiver, however, expired in August of 2022. SUMF at ¶ 124.

Beyond having no evidence that anyone has been harmed by unlicensed counseling, the District has no evidence that less-restrictive alternatives would not serve its interests just as well. The District's own expert witness directly conceded that they would: After listing all the purposes that are served by counselor licensing, Dr. Trepal was asked whether "title acts serve those purposes" and responded "[w]ell, yes." Trepal Dep. 143:6–9. So too with the District's 30(b)(6) witness, who identified two interests served by counselor licensing. The first was to "protect the integrity of the profession" by ensuring "that people who are claiming or stating that this is what they're engaged in are doing it to a standard that's acceptable to our residents." Herndon 30(b)(6) Dep. 143:13–17. That, of course, is precisely the purpose served by a title act. The second stated purpose, meanwhile, was to "protect people by ensuring that patients are receiving proper care, protecting vulnerable populations from being taken advantage of." *Id.* at 143:4–9. As to this second purpose, however, the District's 30(b)(6) witness could not identify any evidence to show that the licensing requirement ensures that people receive "proper care." *Id.* at 144:5–21. Instead of

presenting evidence, the District's position at deposition was that the only "evidence that licensure is necessary is that the city council passed the ordinance requiring licensure." *Id.* at 159:21–160:1.

### C. The District's Licensing Requirement.

District law prohibits the unlicensed practice of "professional counseling." D.C. Code § 3-1205.01(a)(1). The "[p]ractice of professional counseling" is, in turn, defined as "engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness." *Id.* § 3-1201.02(15B). Excluding language marked off by the use of "or" or "including," the statute defines "professional counseling" as "counseling . . . to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness." *Id.*

Having provided this definition, the statute goes on to provide that professional counseling "includes" at least two types of activities. First, professional counseling "includes" the "processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders or other appropriate classification schemes, and determining treatment goals and objectives." *Id.* Second, professional counseling also "includes" "[a]ssisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment." *Id.* The unlicensed practice of professional counseling is a misdemeanor offense that is punishable by imprisonment up to a year, by fines up to $10,000, or both. *Id.* § 3-1210.07.

District law exempts some categories of individuals from licensing requirements for all the various "health occupations" that it licenses, including the licensing requirement for professional counselors. *See* D.C. Code § 3-1201.03(d). These statutory exemptions include:

- A "minister, priest, rabbi, officer, or agent of any religious body or any practitioner of any religious belief" but only if "engaging in prayer or any other religious practice or nursing practiced solely in accordance with the religious tenets of any church . . . ." *Id.* §3-1201.03(d)(1).

- A "person engaged in the care of a friend or member of the family . . . whether employed regularly or because of an emergency or illness." *Id.* § 3-1201.03(d)(2).

- An individual "engaged in the practice of cosmetology or the operation of a health club." *Id.* § 3-1201.03(d)(5).

- "Marriage and family therapists, marriage counselors, art therapists, drama therapists, attorneys, or other professionals working within the standards and ethics of their respective professions." *Id.* § 3-1201.03(d)(7).

These exemptions apply so long as the person does not "hold themselves out, by title, description of services, or otherwise, to be practicing any of the health occupations regulated by this chapter." *Id.* § 3-1201.03(d).[1]

### D.  The District's Enforcement Regime.

The District's Board of Professional Counseling is responsible for enforcing the above licensing requirement. D.C. Code § 3-1202.13(b). Typically, the Board consists of five members appointed by the Mayor, including two licensed professional counselors, one counseling educator, one professional art therapist, and one consumer member. D.C. Code § 3–1202.13. Currently, the

---

[1] D.C. also exempts counselors who are licensed in another state adjoining the District, but only if the other state provides reciprocal privileges. *See* D.C. Code § 3-1205.02(a)(4). This means that if Virginia offered reciprocity for D.C.-licensed professional counselors, Elizabeth could counsel D.C. residents using teletherapy "without meeting any other requirements." Def. Mem. in Supp. MSJ, ECF 29 at n. 6 (Def. Mem.) (citing D.C. Code § 3-1205.02(a)(4)). However, Elizabeth cannot take advantage of this provision because Virginia does not provide reciprocal privileges to D.C.-licensed professional counselors. SUMF at ¶¶ 118–20.

Board's sole member and acting chair is Victoria Sherk. SUMF at ¶ 144. The Board is responsible for investigating and sanctioning individuals who are found to have engaged in the "practice of professional counseling" without a license. D.C. Code § 3-1202.13(b); Herndon 30(b)(6) Dep. 98:24–99:15.

The Board determines whether an individual is or has been engaged in unlicensed practice by looking to the definition of the "practice of professional counseling." Sherk Dep. 67:8–15; Herndon 30(b)(6) Dep. 41:15–24. Because counseling occurs between a counselor and her client, the "practice of professional counseling" is "defined as involving certain contents at the session." Sherk Dep. 67:8–15. Victoria Sherk, the sole current member of the licensing board, testified that the "content" of a counseling session is relevant to enforcement because it allows the Board to distinguish between, for example, "a casual conversation about . . . groceries" and a conversation about "treatment goals." Sherk Dep. 147:4–148:8.

The Board is assisted in its enforcement by investigators, who are overseen by Compliance Officer Gregory Scurlock. SUMF at ¶ 150. At the Board's request, an investigator may compile an "investigative report" based on information gathered through subpoenas, interviews, and researching the individual's social media pages. *Id.* at ¶ 152. Compliance Officer Scurlock, at his deposition, was asked whether, "consistent with the definition of professional counseling, [you could] reach a conclusion that someone was practicing without a license without knowing what they were discussing with their client?" Pl's Ex. 4, Gregory Scurlock Dep. Tr. (Scurlock Dep.), 144:8–12. He answered, "No, I could not." *Id.* at 144:16; *see also id.* at 123:21–25 ("Q. So you would need to know what . . . [t]hat person is discussing with their clients?" "A. Yes.").

The Board has repeatedly sanctioned applicants for professional counseling licenses based on their past unlicensed practice of professional counseling, as determined by evaluating the

content of the applicants' speech. For instance, the Board sanctioned a license applicant for engaging in the unlicensed practice of professional counseling during her previous career as a nutritionist, because the nutritionist had employed a family-based treatment for anorexia. SUMF at ¶ 155. Similarly, the Board sanctioned an applicant for having previously used personality tests to counsel people on their career choices, *id.* at ¶ 156, and sanctioned an applicant for having previously assisted people with their addiction and "support[ing] the recovery of over 300 people," *id.* at ¶ 157. These and other similar applicants were required to pay fines as sanctions for their prior unlicensed speech, but, after they paid a fine, they were ultimately granted a license. *See* Sherk Dep. 53:2–23. After all, as the Board's sole current member testified, "the [B]oard's goal is to help people become licensed." *Id.*

The District's Compliance Officer testified that, in addition to sanctioning applicants for prior unlicensed practice, the District affirmatively monitors for practice by unlicensed persons. Enforcement can be complaint driven: "[I]f a complaint comes in that an individual was practicing a health occupation without a license, then an investigation will ensue." Scurlock Dep. 14:18–21. But enforcement can also be proactive. *Id.* at 92:18–19 ("There's a possibility that we did some proactive [investigation] for licensed professional counselors."). Moreover, when the District investigates a particular individual for unlicensed practice, the District also has a practice of investigating any other individuals working in the same practice or facility to determine if those individuals are properly licensed. SUMF at ¶ 162. Investigators conduct interviews, review social media and online reviews, and even conduct covert operations. *Id.* at ¶ 163. Investigators also subpoena documents, including "notes that a professional keeps showing the conversations that they've had between them and their client." Scurlock Dep. 99:12–20.

### E.  The Burdens Of Licensure.

Before obtaining a license to practice professional counseling in the District, an individual must: (1) earn a Master's degree in an accredited program; (2) complete at least 60 post-graduate semester hours in counseling or related subjects; (3) complete at least 3,500 hours of post-graduate supervised professional counseling in not less than two or more than five years; (4) receive a passing score on a national counseling exam; and (5) pass a background check. D.C. Code § 3-1205.04(1)(D) & 3-1207.10(a); 17 DCMR §§ 6602.1(a), 6603.1(b), 6605.1. The applicant must assemble an application package to show they meet those requirements. D.C. Code § 3-1205.05(a)(1); Pl's Ex. 26, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Examination ("Examination Application Checklist"). Applicants must also pay a $230 fee. D.C. Code § 3-1205.05(a)(2); Examination Application Checklist, 3.

Individuals who are licensed in another jurisdiction and seek to be licensed in the District "by endorsement" must demonstrate that they meet all requirements listed in D.C. Code §§ 3-1205.01 *et seq.*, are currently licensed in another state, and have completed: (1) at least 60 hours of postgraduate education leading to a Master's degree in counseling or a related field from an accredited institution; (2) at least 4,000 hours of post-graduate supervised counseling over at least two years; (3) at least 2,500 hours of direct client contact within the 4,000 hours of post-graduate counseling; (4) at least 100 hours of clinical supervision as a post-graduate, with no more than 50 of those hours coming from group supervision; and (5) five years of post-licensure experience in clinical counseling at the independent level. D.C. Code § 3–1207.10(c). Applicants by endorsement are also required to submit an application package, including an application, an examination score report, a postgraduate supervised experience form, a supervision calculation form, an internship/practicum form, a coursework completion form, a "2x2" sized passport photo,

a copy of identification, fingerprints, proof of vaccination, and a $230 application fee. Pl's Ex. 27, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Endorsement ("Endorsement Application Checklist"), 1–3.

Once licensed, professional counselors are subject to further requirements. Licensed professional counselors must renew their licenses every two years, which requires the completion of 40 hours of approved continuing education, 17 DCMR § 6610.4, as well as payment of an annual fee, D.C. Code § 3-1205.10(c)(3).

The District's witnesses testified that these requirements impose meaningful burdens on individuals seeking to obtain a professional counseling license. First, there are "burdens inherent in post-degree pre-licensure supervision," including "[f]inancial burdens" and "[t]ime burdens." Trepal Dep. 90:16–91:6. The District's expert witness agreed that these burdens can be particularly burdensome for certain populations, including racial minorities, and that they are also "particularly burdensome to navigate for people who are providing care in [a] bilingual setting." Trepal Dep. 99:24–100:21. The former head of the District's licensing board further testified that even a relatively small $200 licensing fee can pose a "significant" burden for some individuals, as well as creating a larger "financial drain" on individuals seeking to become licensed in more than one state. Sardi-Brown Dep. 16:2–17:1.

The former head of the District's licensing board agreed that these burdens are magnified by online practice, which often can span multiple states, as "it is challenging and costly from our perspective to get licensed in every state we wish to work in." Sardi-Brown Dep. 13:12–14:10; *id.* at 13:21–22 ("it becomes challenging especially in our virtual world now"). Likewise, at the time that she served as President of the ACA, the District's expert witness stated during an interview that licensing can pose significant barriers "where people engage in telehealth, where they live in

one place and are working with clients who live in another place," and that she had "heard so many stories from ACA members . . . across the country about these concerns." Trepal Dep. 64:6–14. Asked at her deposition if those statements were accurate, Dr. Trepal agreed that they were. *Id.* at 65:18–19.

Dr. Trepal also testified about the burdens that licensing restrictions impose on clients of professional counselors. For example, licensing "might impact clients if they were seeing somebody in one state and they moved to another state and couldn't—a college student, let's say, who was seeing a counselor when they came home for the summer and then they went to college in another state and the counselor was not licensed in the other state." Trepal Dep. 76:12–18. Dr. Trepal continued: "You know, the college student, maybe they had a relationship or were working on very specific things . . . . it might have, you know, an impact on them . . . ." *Id.* at 76:19–23. Asked if that would be a "negative impact," Dr. Trepal answered: "Of course." *Id.* at 77:1–2.

### F. Application Of The Licensing Requirement To Plaintiff Elizabeth Brokamp.

Plaintiff Elizabeth Brokamp is a Virginia-based professional counselor. SUMF at ¶ 8. She has a Master's Degree in counseling from Columbia University, a PhD from the University of the Cumberlands, and over twenty years' experience in the counseling field. *Id.* at ¶¶ 1, 2. She provided counseling services from a brick-and-mortar office in northern Virginia, serving clients throughout the area, until 2018. *Id.* at ¶¶ 13–14. In all that time, Elizabeth never had any reason to challenge Virginia's licensing restriction. *Id.* at ¶ 56. Her office was in Virginia, *id.* at ¶¶ 13–14, and (so long as she truthfully disclosed that she was only a Virginia-licensed professional counselor) she could advertise and provide her services in-person in Virginia as she saw fit, *id.* at ¶¶ 19, 49.

That changed with the COVID-19 pandemic, which led Elizabeth to move her practice entirely online. *Id.* at ¶¶ 23, 42. Once Elizabeth began seeing patients online, she began to receive

inquiries from potential clients outside of Virginia, including residents of the District. *See id.* at ¶ 24; *see also* Pl's Ex. 25, Email Inquiries from D.C. Residents to Elizabeth Brokamp ("Email Inquiries"), 1–6. Elizabeth also had clients who she started seeing in Virginia, but who moved across state lines, and who wanted to continue to see her even after their move. SUMF at ¶ 25. In her brick-and-mortar practice, clients could drive to her, but the online practice meant that (perversely) the same conversations required licensure in whatever jurisdiction her client happened to be sitting in. *Id.* at ¶¶ 25–27. And for Elizabeth to become licensed in every state where she might practice would be a significant burden, and, in fact, is too significant a burden for her to shoulder. *Id.* at ¶¶ 29–41, 132.

So, on October 1, 2020, Elizabeth emailed the District's licensing board to ask if she could legally provide counseling services to D.C. residents so long as she truthfully disclosed that she is "licensed in Virginia but not in D.C." and "describe[d] [her] services . . . as 'counseling' rather than 'licensed professional counseling.'" Pl's Ex. 24, Elizabeth Brokamp Email to D.C. Board of Professional Counseling ("Brokamp Board Emails"), 2. Elizabeth's proposed course of action would comply with the District's title act, which prohibits an unlicensed person from calling herself a "licensed professional counselor" but specifically states that it does not "restrict the use of the generic terms 'counseling' or 'counselor.'" D.C. Code § 3-1210.03(t). But Elizabeth's proposed course of action would not comply with the District's separate practice act. *See id.* §§ 3-1205.01(a)(1). District officials thus responded to tell Elizabeth she is "not allowed to provide any counseling services to DC residents" without a D.C. license. Brokamp Board Emails, 1.

Although Elizabeth began providing services online during the pandemic, she now intends to continue her practice online. SUMF at ¶ 47. Elizabeth has found that teletherapy provides significant benefits for clients, as it allows clients to seek out help without having to make a trip

to a counselor's office. *Id.* at ¶ 43. That flexibility is particularly beneficial for new mothers, a group who Elizabeth serves in her practice, as the demands of a newborn child can make it particularly difficult to schedule in-person counseling. *Id.* at ¶ 44. Elizabeth also believes teletherapy is helpful for clients who want to be seen imminently rather than wait for an in-person appointment. *Id.* at ¶ 45. Dr. Heather Trepal, the District's expert witness, agreed that teletherapy is helpful because it "[i]ncreases access to services." Trepal Dep. 80:2–15.

If allowed, Elizabeth would use teletherapy to talk to D.C. residents in D.C., while she herself was located at her home in Virginia. SUMF at ¶ 52. Elizabeth is currently seeing and soliciting clients, and, if she could do so legally, would advertise her services to and accept referrals of D.C. residents. *Id.* at ¶¶ 64–74. Elizabeth, however, has no intention of applying to become licensed in the District, *id.* at ¶ 177, so unless the District's law is enjoined she will continue to turn District residents away. *Id.* at ¶ 178.

Elizabeth's teletherapy conversations with her clients are just that: conversations, consisting of nothing other than speech. *Id.* at ¶ 75; *see also* Brokamp Dep. 8:9–20. As a result, the only thing Elizabeth wants to do in the District is talk to clients over the internet. SUMF at ¶ 76.

### STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* A party cannot defeat summary judgment with "mere unsupported allegations or denials," but must

instead establish "specific facts" showing that there is a genuine issue for trial. *Trudel v. SunTrust Bank*, 288 F. Supp.3d 239, 246 (D.D.C. 2018).

ARGUMENT

Part I explains that Elizabeth has standing to challenge the District's licensing requirement because that requirement limits her ability to speak with District residents. Part II explains that the license requirement is unconstitutional as applied to Elizabeth, who seeks to provide services within the scope of the District's licensing law while truthfully disclosing that she is licensed only in Virginia. Part III explains that the District's licensing law is facially unconstitutional, as any interest the District purports to be advancing could be served by narrower means than prohibiting any conversation that fits within the broad definition of "professional counseling."

**I.    Elizabeth Has Standing To Challenge The District's Licensing Requirement.**

Elizabeth has standing to challenge the District's licensing requirement because she is currently being silenced by that requirement. She has been repeatedly contacted by District residents seeking her counseling services, SUMF at ¶ 24, but she had to turn those residents away because the District specifically informed her that she could not provide her services to District residents. SUMF at ¶¶ 176, 182. Elizabeth would provide counseling services in the District—and would advertise her services in the District—but for the licensing law. *Id.* at ¶¶ 64–74.[2]

The District's contrary argument misconstrues Elizabeth's claims. The District contends that Elizabeth has standing only to challenge "the requirements for individuals who are [licensed] in another jurisdiction" and not the requirements that apply to any other individuals. Def. Mem.

---

[2] Elizabeth currently solicits clients through an online portal called ModernHealth, and has changed her status on some other online referral services to indicate that she is no longer soliciting clients through those services. SUMF at ¶¶ 67, 69. In the future, as Elizabeth has room for new clients, she will resume soliciting clients through online referral services in addition to ModernHealth. *Id.* at ¶ 70.

11. However, there is only *one* licensing requirement in the District, and that statutory provision applies to the speech of *anyone* who is not licensed in the District—whether licensed in another state or not. *See* D.C. Code § 3-1205.01(a)(1); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (plaintiff injured by a statutory provision has standing to challenge that provision). While it is true that the steps applicants must complete to become licensed are somewhat different, depending on whether they are already licensed elsewhere, those qualification provisions are not the statutory provision that Elizabeth is challenging. Instead, Elizabeth is challenging the requirement to be licensed, *see* Compl. ¶¶ 83–107, which, after all, is the source of her harm.

Ultimately, the District appears to confuse the question of standing with the distinction between as-applied and facial relief. The line the District draws (between out-of-state counselors and other unlicensed persons) may be relevant to determine the scope of Elizabeth's *as-applied* challenge, which, after all, focuses on her "particular speech." *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). In the First Amendment context, however, it is axiomatic that plaintiffs who are subject to a law can bring a *facial* challenge on the ground that the law affects "the First Amendment rights of other parties not before the court." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980); *Edwards*, 755 F.3d at 1001. Elizabeth is subject to the District's licensing requirement and can challenge it both as applied and on its face.

## II. The District's Licensing Requirement Violates The First Amendment As Applied To Elizabeth's Speech.

This Court has already resolved most of the legal issues presented by this case. At the motion to dismiss stage, the Court held that the "licensing requirement regulates counseling, which is speech, not conduct." MTD Minute Order (Mar. 7, 2022). Further the "licensing requirement is also content-based, given that it only applies to Plaintiff's speech if she speaks about certain topics, such as her clients' mental, emotional, or behavioral issues." *Id.* "Because the District's licensing

17

requirement is content-based regulation of speech, strict scrutiny applies." *Id.* With respect to Elizabeth's as-applied challenge, the only remaining question is therefore whether the application of the District's licensing law to Elizabeth can satisfy strict scrutiny.

The District spends sparingly little time addressing the application of strict scrutiny, even though that is the ***only*** question remaining. *See* Def. Mem. 40–41. Instead, the District spends the bulk of its brief urging the Court to revisit its earlier legal conclusions. *See* Def. Mem. 13–24 (arguing that the law regulates conduct, not speech); *id.* at 25–40 (arguing that the law is content neutral and should be upheld under intermediate scrutiny). In doing so, however, the District does not address the Court's prior legal rulings, much less explain why the Court should revisit them. The Court should decline the invitation to re-travel a road that it has already travelled. *See Paracha v. Biden*, No. 04-cv-2022, 2022 WL 2952493, at *11 (D.D.C. July 26, 2022) ("It would be a waste of judicial resources—and it would contravene the law of the case doctrine—to permit relitigation of [resolved] legal conclusions.").

In any event, even if the Court were to entertain it, the District's attempt to relitigate the motion to dismiss cannot avoid the inevitable. Discovery here has only confirmed what was obvious from the face of the District's law: First, the licensing restriction is a content-based restriction on speech, meaning strict scrutiny must apply. But second, under any level of First Amendment scrutiny, the District would be required to carry a real evidentiary burden—which, on this record, it has entirely failed to do.

A.   The District's Law Remains A Content-Based Regulation Of Speech.

Discovery in this case confirms this Court's earlier conclusion that the prohibition on unlicensed counseling is a content-based restriction on speech. The cases cited in the District's summary judgment memorandum, meanwhile, do not lead to a different result.

### 1. Discovery Confirmed That The District Applies Its Licensing Law Based On The Content Of Speech.

This Court previously surveyed the text of the District's licensing law and determined that it is a content-based regulation of speech, as the law "only applies to Plaintiff's speech if she speaks about certain topics, such as her clients' mental, emotional, or behavioral issues." MTD Minute Order (Mar. 7, 2022); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (strict scrutiny applies where "the conduct triggering coverage under the statute consists of communicating a message"). Discovery confirmed that the Court need look no further than the statutory text, as the District's witnesses again and again confirmed that officials look to the statutory language to provide the definition of professional counseling. *See* Herndon 30(b)(6) Dep. 36:23–38:6; Sherk Dep. 67:8–15; Scurlock Dep. 24:10–19; Sardi-Brown Dep. 74:3–7.

In depositions, officials also confirmed that they in fact ***interpret and apply*** the District's law as a content-based regulation of speech. The current head of the District's licensing board— who is also currently the board's sole member—repeatedly testified that application of the licensing law turned on the "content" of the discussions between the counselor and her client. *See* Sherk Dep. 147:4–8; *see also id.* at 82:5 (referencing "the content of what is being said in the—in the session"); *id.* at 92:17–18 (asking "is there clinical content or is there not"); *id.* at 92:19–21 ("I've been saying all morning, it depends on what the content is"); *id.* at 93:5–8 (agreeing that "it's not possible to say whether all career counseling is professional counseling because it really would depend on the content"). On redirect, the District's lawyer sought to clarify what the board head meant by "content," and she confirmed that "by 'content' we mean, you know, is there a theoretical practice being used? . . . Or are they just having a casual conversation about, you know, groceries." *Id.* at 147:23–148:4. In other words, "content" means the content of speech.

Testimony from the District's compliance officer—who oversees the investigators who look into allegations of unlicensed practice—was in accord. Asked if he would be "able to, consistent with the definition of professional counseling, reach a conclusion that someone was practicing without a license without knowing what they were discussing with their clients," he answered, "No, I could not." Scurlock Dep. 144:8–16; *see also id.* at 123:21–25 (agreeing that he would "need to know what . . . [t]hat person is discussing with their clients"); *id.* at 129:16–20 (agreeing that whether a life coach was practicing unlicensed professional counseling "would depend on what the life coach is discussing with their clients"). Such testimony confirms what the license requirement makes clear on its face: discussions about particular topics trigger the license requirements, while other topics do not.[3]

Moreover, the head of the licensing board specifically confirmed that this is true not just for counselors in general but also for Plaintiff Elizabeth Brokamp. The board head was asked what guidance she would provide if "someone says, 'I am licensed in another state. I'm worried because I'm licensed in another state that I'm—that you're going to say that I'm practicing without a license, and I'm trying to figure out what I can talk to people in DC without needing to have a license.'" Sherk Dep. 115:21–116:3. To respond to such a question, the board head testified that, "we'd need content," which she agreed referred at least in part to "the content of the discussion between her and the clients." *Id.* at 116:21–117:17.

---

[3] This testimony refutes the District's suggestion—presented without citation—that the District's licensing law does not target speech and instead regulates who can enter certain types of relationships. Def. Mem. 20. To determine whether a life coach or a career counselor is engaged in the unlicensed practice of professional counseling, District officials do not ask if the coach or counselor has a "relationship" with a client. Rather, District officials look to the content of the discussions that occur within the context of that relationship.

The District briefly asserts, against all this, that the Board's email correspondence with Elizabeth demonstrates that the Board enforced its license requirement against Elizabeth based on "other factors" unrelated to the topic of her conversations with her clients. Def. Mem. 28. However, that is simply not the case. The Board did not say that ***any*** conversation between Elizabeth and her potential clients in the District would violate the licensing requirement; rather, the Board told Elizabeth she is "not allowed to provide any counseling services to DC residents." SUMF at ¶ 182. As the record makes clear, that means that Elizabeth is not allowed to talk to D.C. residents about their emotional development, but she is entirely free to engage in "a casual conversation about . . . groceries." Sherk Dep. 147:19–148:4. That is a content-based restriction on speech.

There is also no merit to the District's suggestion that its regulation is not content based because Elizabeth sometimes does things in addition to talking, like "scoring and interpreting assessments" or "developing a treatment plan." Def. Mem. 19. The relevant question is not whether ***Elizabeth*** sometimes does non-speech things; rather, the question is whether the ***District*** regulates Elizabeth because of her speech. *See Holder*, 561 U.S. at 28. The testimony of District officials confirms what is clear from the text of the licensing law. The District's regulation absolutely turns on the content of counselors' speech.

> 2.   *The District's Attempt To Revive The Professional Speech Doctrine Remains Meritless.*

As it did at the motion to dismiss stage, the District attempts to revive the moribund professional speech doctrine, contending that regulations of "professionals" are somehow exempt from ordinary First Amendment principles. Def. Mem. 13–24. In doing so, the District attempts a rhetorical maneuver: The District argues that regulations of professional speech are, in fact, regulations of "professional conduct," and that this "holds true even for professionals who use

speech to practice." *Id.* at 13. In other words, in the District's view, if a professional is talking then speech is somehow no longer speech—but rather conduct.

This Court, however, rightly rejected that argument as contrary to *National Institute of Family & Life Advocates (NIFLA) v. Becerra*, 138 S. Ct. 2361, 2375 (2018), which rejected a line of lower court decisions that exempted so-called "professional speech" from "ordinary First Amendment principles." In rejecting the professional speech doctrine, the Supreme Court in *NIFLA* criticized a handful of lower court decisions that had treated speech as "conduct" whenever it was uttered by "individuals who provide personalized services to clients and who are subject to a generally applicable licensing and regulatory regime." *Id.* at 2371 (citing *King v. Governor of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014), and *Pickup v. Brown*, 740 F.3d 1208, 1230 (9th Cir. 2014)). Incredibly, the District continues to rely on those same pre-*NIFLA* decisions to assert that Elizabeth's counseling is merely "professional conduct." Def. Mem. 21–22 (citing *Pickup*, 740 F.3d at 1229). The District's arguments are foreclosed by binding precedent.[4]

Indeed, as this Court recognized when it denied the District's motion to dismiss, the Eleventh Circuit has rejected the claim that therapy "consist[ing] entirely of speech" is somehow "conduct" subject to reduced constitutional protection. *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). Rather, as the Eleventh Circuit explained:

> If [therapy] is conduct, the same could be said of teaching or protesting—both are activities, after all. Debating? Also an activity. Book clubs? Same answer. But the law does not require us to flip back and forth between perspectives until our eyes hurt. Our precedent says the opposite: Speech is speech, and it must be analyzed as such for purposes of the First Amendment.

---

[4] In arguing otherwise, the District cites a variety of pre-*NIFLA* cases, including *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978), and Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985). However, the District also cited those decisions at the motion to dismiss stage, and they should be no more relevant or convincing now than they were in that earlier brief.

*Id.* at 865–66 (marks and citation omitted). The District argues that the decision in *Otto* is somehow undermined by a later statement concerning the denial of rehearing *en banc* that was joined by four Eleventh Circuit judges. *See* Def. Mem. 16–17. But that four-judge concurrence in fact underscores the point: "The professional setting of this speech does not transform it into conduct. Nor does characterizing it as a 'scientifically based healthcare treatment technique' governed by a standard of care." *Otto*, 41 F.4th 1271, 1274 (11th Cir. 2022) (Grant, J., concurring in denial of rehearing en banc). To be sure, the concurring judges highlighted that "[r]egulatory authority is alive and well," *id.* at 1277, but, as the opinion in *Otto* makes clear, that is true only insofar as such regulatory authority is consistent with the First Amendment. After all, "[i]f speaking to clients is not speech, the world is truly upside down." *Otto*, 981 F.3d at 866.[5]

　　The District cites a series of decisions that it claims "hold that professional licensing schemes are constitutional regulations on professional conduct." Def. Mem. 15. However, each is distinguishable. First, the District cites *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022), which involved a challenge to Florida's licensing requirement for nutritionists. That opinion, however, surveyed the practice of nutrition and found that the bulk of what nutritionists do is "not speech." *Id.* at 1226. Similarly, the District cites *360 Virtual Drone Servs. LLC v. Ritter*, No. 5:21-cv-137-FL, 2023 WL 2759032, at *11 (E.D.N.C. Mar. 31, 2023),

---

　　[5] For the same reason, the District is simply wrong to suggest that Elizabeth's speech is subject to regulation because she engages in "diagnosing" or "treatment." After all, none of this changes the fact that "the treatment provided by [Elizabeth] *is entirely* speech." *Otto*, 981 F.3d at 865; *see also id.* ("What the governments call a 'medical procedure' consists—entirely—of words.").

　　Nor is there any merit to the District's suggestion that Elizabeth is engaged in conduct because she is "quite literally—rewiring a person's brain and nervous system" and "changing a person's mental functions." Def. Mem. 23. The same can be true of much other speech, which can inspire strong emotions, beliefs, and even action. The courts, however, consistently hold that regulation cannot be justified based on "[t]he emotive impact of speech on its audience." *Boos v. Barry*, 485 U.S. 312, 321 (1988).

which likewise concluded that a license requirement for land surveyors "regulate[d] conduct with an incidental impact on speech." Whatever the merits of those decisions, they have nothing to say about a licensing law whose application (as here) turns on the content of speech.

Finally, the last two of the District's cited decisions upheld licensing requirements for lawyers against First Amendment challenge. *See Capital Associated Industries, Inc. (CAI) v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019) (rejecting challenge to bar on practice of law by corporations); *Matter of Rosenberg*, 491 Mass. 1027, 1029 (2023) (rejecting challenge to law licensing by disbarred attorney). Both opinions are little different from the D.C. Circuit's pre-*NIFLA* opinion in *NAAMJP v. Howell*, 851 F.3d 12, 19–20 (D.C. Cir. 2017), which this Court already considered and found inapposite. *See* MTD Minute Order (Mar. 7, 2022) (discussing *Howell*). The Fourth Circuit in *CAI* explained that "the practice of law has communicative and non-communicative aspects" and that law licensing is constitutional insofar as it does not "target the communicative aspects of practicing law." *CAI*, 922 F.3d at 208. And the Massachusetts Supreme Judicial Court, in *Rosenberg*, similarly reasoned that law licensing is constitutional insofar as it regulates who may appear in court, as it "is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." 491 Mass. at 1229 (citation omitted); *cf. Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. 2015) (holding that even the plaza outside of a courtroom is a nonpublic forum where restrictions on speech "must survive only a much more limited review"). These cases do not remotely stand for the proposition that restrictions on speech are somehow exempt from scrutiny, simply because they take the form of a professional licensing law.

In fact, a recent decision from the Southern District of New York demonstrates that even lawyer licensing is not exempt from First Amendment scrutiny. *See Upsolve, Inc. v. James*, 604 F.

Supp.3d 97 (S.D.N.Y. 2022). There, a nonprofit organization that sought to give legal advice to low-income citizens facing debt collection actions challenged the application of New York's unauthorized practice of law statutes to their program. *Id.* at 102–103. The court in *Upsolve* held that the application of the law-licensing rules to the organization was a content-based regulation of speech subject to strict scrutiny: "If Justice Advocates provide non-legal advice about a client's debt program … the UPL rules do not apply. But if they provide legal advice about how to respond … the UPL rules forbid their speech." *Id.* at 114. And, citing this Court's order denying the motion to dismiss in this case, the *Upsolve* court also rejected the argument that "professional licensing regimes … are outside of the First Amendment." *Id.* at 115. The decision in *Upsolve* confirms that where, as here, a licensing restriction applies to speech based on its content, ordinary First Amendment rules apply.

> 3.   *A Law Need Not Dictate The Content Of Speech In Order To Be A Content-Based Regulation Of Speech.*

In addition to attempting to revive the professional speech doctrine, the District also attempts to redefine what it means for a law to be content based. *See* Def. Mem. 25–28. This Court previously determined that the licensing requirement is content based "given that it only applies to Plaintiff's speech if she speaks about certain topics." MTD Minute Order (Mar. 7, 2022). The District, however, now argues for a different definition of a content-based speech restriction, under which a law would only be content based if it "dictate[s] what can be said." Def. Mem. 25 (marks and citation omitted). This Court has already correctly rejected this argument.

The Court correctly determined, at the motion to dismiss stage, that the District's licensing law is content based because it is ***triggered*** by the content of speech. *See Holder*, 561 U.S. at 28; *Barr v. AAPC, Inc.*, 140 S. Ct. 2335, 2374 (2020); *Reed v. Town of Gilbert*, 576 U.S. 155, 169

(2015).[6] The District claims that conclusion is undermined by the Supreme Court's decision in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022), but, to the contrary, *City of Austin* reaffirmed *Reed*'s central holding that "[a] regulation of speech is *facially* content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" 142 S. Ct. at 1471 (emphasis added) (quoting *Reed*, 576 U.S. at 163). It is true that the Court in *City of Austin* upheld the distinction between on- and off-premises signs at issue in that case, even though it is necessary to ask what the sign is advertising to determine whether it is "on" the premises. *Id.* at 1474. But, in doing so, the Court reasoned that the on/off premises distinction ultimately regulated based on the "sign's relative location" and, as such, was akin to an "ordinary time, place, or manner restriction." *Id.* at 1473. That holding has no application here, as the District does not look to the content of counselors' speech to determine anything about their "time, place, or manner," but, rather, to determine whether it is the type of speech that is subject to regulation.

The D.C. Circuit's decision in *Green v. United States Dep't of Just.*, 54 F.4th 738 (D.C. Cir. 2022), also is in accord. The D.C. Circuit there recognized that a law is content based if it "applies to particular speech because of the topic discussed," the same standard applied by this Court at the motion to dismiss stage. *Id.* at 745. The D.C. Circuit then went on to uphold the provisions of the Digital Millennium Copyright Act ("DMCA") that make it unlawful to bypass copyright protections, as applied to a software designer who wanted to sell a device called a

---

[6] *See also Hines v. Quillivan*, No. 1:18-cv-155, 2021 WL 5833886, at *3 (S.D. Tex. Dec. 9, 2021) (holding that law regulating teletherapy by veterinarians was content based because "to determine whether Hines is engaging in veterinary practices . . . it is necessary to know the content of his communications").

"NeTVCR" that would contain computer code to bypass copyright. *Id.* at 742, 745. The D.C. Circuit assumed that the code within the NeTVCR device was speech, but it held that the DMCA was not a content-based regulation of that speech because it was not triggered by any "expressive message in the code" but rather based on the fact that the NeTVCR could be used to circumvent copyright. *Id.* at 746. Again, that holding has no application here. While an individual might use the NeTVCR to bypass copyright without ever reading the code inside, Elizabeth's clients cannot benefit from her services without listening to her speech, and the government targets that speech for regulation based on what she says.

The District reads *City of Austin* and *Green* far more broadly, for the proposition that a law is not content based so long as it regulates based on the "function" of speech. However, *City of Austin* itself says the opposite: "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." 142 S. Ct. at 1474. The District's contention is also contrary to *Barr*, 140 S. Ct. at 2347, cited in this Court's motion to dismiss order. The Supreme Court there rejected just such a function-based "proxy": The government argued that a law that regulated debt-collection robo-calls was content neutral because it depended on whether the caller was "engaged in a particular economic activity" (debt collection) and not on whether the caller was talking about a particular subject (debt collection), but the Supreme Court held that the law was content based because it "focuses on whether the caller is *speaking* about a particular topic." *Id.* Here, too, the government cannot avoid the application of strict scrutiny by recharacterizing speech about emotions as speech with the "function" of helping a person deal with emotions.

The Second Circuit's decision in *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023), is wrongly decided, and it is also distinct. It is wrongly decided because it approves of exactly the

kind of "'function or purpose' proxy" that the Supreme Court warned against in *City of Austin*.

But it is also distinct insofar as it considered the text of the specific New York counseling law and

held that it was triggered by the "purpose" of a conversation rather than the topics or subject

matters discussed:

> New York law does not condition its mental health licensing requirement on the topics or subject matters discussed. Indeed, for purposes of licensure, it matters not at all whether a counselor speaks to a client about *personal relationships, professional anxieties, medical challenges, world events, planned travel, hobbies, sports, favorite movies, or any other subject*. All that matters is that the conversations be for one of the statutorily identified therapeutic purposes, in addressing a mental disorder or problem, in the context of a private practice, group, or organized setting.

*Brokamp*, 66 F.4th at 397 (emphasis added). Far from helping the District, the Second Circuit's

reasoning highlights that the District's license requirement is a facially content-based restriction

on Elizabeth's speech. *See* D.C. Code § 3-1201.02(15B) (defining the "practice of professional

counseling" to include counseling about "mental, emotional, or behavioral conditions" and "long-

tern effective mental, emotional, physical, spiritual, social, education, or career development and

adjustment"). Both the text of the law and the record in this case make clear that the District's law

***does*** restrict Elizabeth's speech depending on "whether [she] speaks to a client about personal

relationships, professional anxieties, medical challenges, world events, planned travel, hobbies,

sports, favorite movies, or any other subject." *Brokamp*, 66 F.4th at 397. Thus, whatever may be

said of New York's law, the Second Circuit's reasoning has no application here.

B.   <u>The District Fails To Justify Its Restriction Of Elizabeth's Speech Under Any Level Of Scrutiny.</u>

The Court was correct to hold, at the motion to dismiss stage, that the District's licensing

law must satisfy strict scrutiny. But even if that were not the case, at the ***very most*** the District's

arguments would mean that the District's licensing law should be subject to intermediate (rather

than strict) scrutiny. *See*, *e.g.*, *Edwards*, 755 F.3d at 1001–02 (reserving question whether strict scrutiny applies to tour guide licensing law and, instead, striking down the law under intermediate scrutiny). After all, while the District's law is a content-based restriction on speech for all the reasons discussed above, at a minimum there is no denying that it at least has "incidental burdens on speech." Def. Mem. 14. And even incidental burdens on speech must satisfy intermediate scrutiny. *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) ("If legislation regulates conduct but incidentally burdens expression, we review that legislation under 'intermediate scrutiny'"); *CAI*, 922 F.3d at 209 ("[I]ntermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech.").

Whether analyzed under strict or intermediate scrutiny, the District must put forward *evidence* to justify its law. Under strict scrutiny, the law must serve a "compelling interest" and be "narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Under intermediate scrutiny, the government must prove that: (1) the challenged law "is within the constitutional power of the Government"; (2) the challenge law "furthers an important or substantial governmental interest"; (3) the governmental interest is "unrelated to the suppression of free expression"; (4) the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"; and (5) the "regulation leaves open ample alternative channels for communication." *Edwards*, 755 F.3d at 1002 (marks and citations omitted). Both standards require the District to show a close fit between its "stated objectives and the means chosen to achieve those goals." *Id.* at 1007.

The District cannot meet either standard. To begin with, the District effectively concedes that it has *no* real interest in restricting Elizabeth's particular speech, which, of course, is the focus of this as-applied challenge. The District gestures to the value of licensing more generally, but, in

29

doing so, does not put forward concrete actual **facts** to justify its law—instead relying on circular arguments and *ipse dixit*. In fact, the record shows that the District's hypothetical asserted interests are not meaningfully advanced by the licensing law, both because the licensing law itself contains voluminous exceptions, and because in practice the District typically does not enforce the law against the types of unqualified persons who would seem to most directly implicate its asserted interests. And, finally, the District also does not explain (and has never sufficiently investigated) why those hypothetical interests could not instead be satisfied by less restrictive alternatives.

        *1.    The District Asserts No Basis For Regulating Elizabeth's Speech.*

       Elizabeth's "particular speech activity" is the relevant focus of her as-applied challenge. *Edwards*, 755 F.3d at 1001. With that in mind, it bears emphasis that Elizabeth is an educated and experienced counselor, and that Elizabeth is already licensed in Virginia, the state where she is physically based. SUMF ¶¶ 1–2, 8, 23. The District has no evidence that Elizabeth's speech— talking to her clients about their feelings, their relationships, and their lives—has ever harmed any individual, including any D.C. resident. *See id.* ¶¶ 3–7, 208. Further, because Elizabeth practices over the internet, literally all she wants to do is talk to clients online. *Id.* at ¶ 76.

       In its brief, the District does not really argue that it has an interest in subjecting counselors like Elizabeth to any licensing burdens, when they are already licensed in another state. To the contrary, the District states that the *only* reason it does not allow counselors like Elizabeth to practice without a D.C. license is that Virginia has not enacted similar reciprocity for District-based counselors. Def. Mem. 37 n.6 ("In fact, if Virginia offered reciprocity for [licensed professional counselors], District law would recognize Dr. Brokamp's Virginia license, and Dr. Brokamp could treat clients in the District *without meeting any other requirements*." (emphasis added)). And the District also states that its pandemic-era waiver of its licensing requirements "did

not permit 'unlicensed practice' . . . because the providers needed to be licensed in their home jurisdiction and in good standing." Def. Mem. 39.

Throughout discovery, the District's witnesses agreed that it would be a positive change if counselors like Elizabeth could practice in the District without having to obtain a D.C. license. The District's expert witness has stated that "the issue of portability was of 'paramount' importance," and she testified at length about the harms caused by difficulties transporting licenses from one jurisdiction to another. Trepal Dep. 66:3–8, 67:3–7, 59:25–60:14. The former head of the District's board likewise testified that "portability is important" and that greater licensing reciprocity was "one of those wishlist items that we have been talking about, I think, for decades in the counseling profession." Sardi-Brown Dep. 13:13–14, 135:20–136:4. The current head of the District's board, meanwhile, testified that portability was "important . . . to help increase the number of providers in different jurisdictions" and that she overcame her initial concerns about increased portability when she learned that the District could still regulate out-of-state counselors even if they were not licensed in the District. Sherk Dep. 126:12–127:14.

Rather than attempt to justify its burdens on Elizabeth's speech, the District argues the burden is "minimal" because, if she chooses, "she can easily obtain a license." Def. Mem. 37. But, again, that is contrary to the evidence. In particular, the former head of the District's licensing board, who served on the board for 18 years (from 2003 to 2021), testified that it is "challenging especially in our virtual world now to be able to offer our services across state lines" because it is "challenging and costly from our perspective to get licensed in every state we wish to work in." Sardi-Brown Dep. 13:12–14:4. She testified that this is partly a financial burden, as, "obviously, you've got the licensure costs to pay for the state license," and it is "a financial drain to have to pay for license in every state." *Id.* at 15:7–9, 16:22–17:1. Navigating the laws of multiple states

can also be "complicated" for applicants. *Id.* at 17:3–15. That is certainly Elizabeth's experience: Elizabeth does not even know if she is eligible for licensure in the District, given how opaque the District's laws are, and, even if she were eligible, it would be a significant burden for her to apply for licensure, pay annual licensing dues, and complete annual continuing-education requirements that differ from the continuing-education requirements she is already subject to in Virginia. SUMF ¶ 46. These burdens are not "minimal" in any real sense, and they need to be justified.

### 2. The District Cannot Just Assume That Licensing Benefits The Public.

Unable to justify its burdens on Elizabeth's speech, the District focuses instead on the need for licensure more generally. In doing so, however, the District mostly relies on *ipse dixit*, arguing in circular fashion that the District's licensing law advances important interests because it ensures people are licensed, because the D.C. Council thought licensing was necessary, and because some other states also license counselors. None of this is sufficient to satisfy the First Amendment, as the District must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993); *see also Century Commc'ns Corp. v. F.C.C.*, 835 F.2d 292, 304 (D.C. Cir. 1987).

Simply put, the District has no evidence that there are any ***real***, as opposed to hypothetical, harms associated with unlicensed professional counseling. The District's expert witness testified that, prior to the enactment of the District's license requirement, there were "people who did things that are similar to what professional counselors do now, even if those people weren't licensed." Trepal Dep. 29:14–23. Yet, when the District first considered licensing professional counselors in 1985, a two-year study concluded that there was "no evidence of public harm sufficient to justify licensure" of counselors. SUMF at ¶ 99. Similarly, when the District enacted its license requirement in 1992, the Acting Director and Acting Administrator of the D.C. Department of Consumer and Regulatory Affairs testified in opposition to licensure on the ground that the

executive "had received no information which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." SUMF at ¶ 103–05. Nothing has changed since then. Indeed, the District's 30(b)(6) witness testified that the District has *never* "gathered any evidence that its counselor licensing requirement is necessary." Herndon 30(b)(6) Dep. 168:5–8. The District can point to nothing in the record to justify its imagined harms.

Rather than present specific evidence that professional counseling licensing addresses real harms, the District relies on the kind of *ipse dixit* reasoning that often characterizes rational basis review. For instance, the District asserts at length that licensing advances a compelling interest because it ensures that only people who meet the qualification requirements for licensure provide services to District residents. *See* Def. Mem. 29–30, 32–33. That is not even true as a factual matter. *See infra* pp. 34–38. And, in any event, that kind of circular logic is not sufficient to satisfy the First Amendment. *See Edwards*, 755 F.3d at 1003 ("That the District's asserted interests are substantial in the abstract, however, does not end our inquiry."). At times, the District seems to assert that ***all*** professional licensing laws necessarily satisfy the First Amendment, since the value of licensing is common sense. But that is not the law. *Id.*; *see also Billups*, 961 F.3d at 687; *Upsolve*, 604 F. Supp.3d at 114; *Serafine v. Branaman*, 810 F.3d 354, 369–70 (5th Cir. 2016). Licensing laws do not get a First Amendment free pass.

Nor can the District justify its licensing law just by observing that other states also license professional counselors. "[A]n indiscriminate survey of the laws of other jurisdictions without marshaling any evidence about *why* those laws were enacted and *how* the regulations are enforced is not sufficient." *Edwards*, 755 F.3d at 1004; *see also Edenfield*, 507 U.S. at 771. The District asserts that every state imposes a licensing requirement for professional counselors, but the District makes no effort whatsoever to establish how those laws operate or what burdens they impose. (As

noted *infra* pp. 38–41, some are in fact less burdensome.) The District's expert witness likewise testified that she engaged in no such inquiry. *See* Trepal Dep. 52:5–13. The District cannot satisfy either strict or intermediate scrutiny by waiving its hands at other states' laws.

Finally, the District cannot justify its law on the ground that it is supported by trade associations like the ACA. *See* Def. Mem. 35–36. The Eleventh Circuit has explained that "[s]trict scrutiny cannot be satisfied by professional societies' opposition to speech." *Otto*, 981 F.3d at 869. "Although we have no reason to doubt that these groups are composed of educated men and women acting in good faith, their institutional positions cannot define the boundaries of constitutional rights." *Id.* Similarly, the fact that trade associations (whose members can benefit from licensure by excluding competition) support licensure does not mean that licensure is necessarily justified. It is no surprise that the ACA supports licensure; the ACA was the group that pushed for licensure in the first place, even when the District's own regulatory officials said it was not needed. *See supra* pp. 4–5. But that support does not carry the District's burden under strict scrutiny.

> 3.    *The District's Law Does Not Meaningfully Advance Its Asserted Hypothetical Interests.*

When the District finally gets down to the brass tacks of identifying **specific** interests advanced by the licensing law, it identifies two. First, it asserts that licensing advances quality care by ensuring that counselors are appropriately trained to "use[ ] evidence-based methods of diagnosis and treatment."  Def. Mem. 31–32. Second, it asserts that licensing ensures that counselors are subject to "standards of conduct" and discipline. *Id.* at 32. However, the District does not actually establish that either interest is meaningfully advanced by its law.

To begin, the District does not cite any actual evidence that its law in fact addresses a problem with poor quality care or unethical conduct by unlicensed professional counselors. *See Edwards*, 755 F.3d at 1003 ("Despite the District's seemingly talismanic reliance on these asserted

problems, the record contains no evidence [they] are indeed a problem."). The District's 30(b)(6) witness in fact could not identify *any* such evidence:

> Q. What evidence, if any, does the District of Columbia have that would prove that its ensuring patients are receiving proper care by licensing professional counselors?
>
> … A. The best way to answer that question is by saying you don't wait until your house is on fire to install a smoke detector . . . . We're not going to sit back and wait for something to happen before we put protections in place.

 Herndon 30(b)(6) Dep. 144:5–19. Rather than prove that there is any problem with unqualified or unethical unlicensed professional counselors, the District assumes that the *absence* of evidence must itself prove that its licensing law is so remarkably effective that harms never occur. But that reasoning is undermined by the fact that the District survived—for years—without this restriction, and not only was its "house [not] on fire," the District's own regulators opposed the adoption of the licensing requirement because there was no evidence of any problem at that time either. *See* SUMF at ¶¶ 98–109. The historical evidence suggests that there is no evidence that licensing addresses a problem because there is no problem to address.

The District's assertion that licensing is necessary to ensure quality care is particularly dubious given that the District adamantly maintains that the licensing law *does not actually prohibit* lesser-quality care. *See* Def. Mem. 42–43; *see also Edwards*, 755 F.3d at 1007 (explaining that a law is "fatally underinclusive" where "there is an arbitrary exemption from or underinclusiveness of the scheme chosen by the government that may well suggest the asserted interests . . . are not pressing" (marks and citation omitted)). The District states that "a key indication of quality mental healthcare is the extent to which a provider uses evidence-based methods of diagnosis and treatment." Def. Mem. 30. Yet the District *also* asserts that "assessing and diagnosing mental disorders to then make 'evidence-based interventions' is 'crucial' to the District's definition of professional counseling," *id.* at 2, meaning that, in the District's stated view,

individuals whose speech does ***not*** make use of evidence-based techniques are ***not*** engaged in the practice of professional counseling (but are, instead, giving "generic life advice") and thus need ***not*** be licensed, *id.* at 42–43.[7] In other words, in the District's view, it is entirely legal to provide lesser-quality care without a license. It is hard to see how such a rule advances quality care.

If the District instead means to suggest that only properly trained or qualified people should be allowed to use these "evidence-based" techniques, then the law is equally unsupported. For one thing, there is absolutely no suggestion anywhere in the record that "evidence-based" counseling techniques are somehow dangerous if they fall into the wrong hands; evidence-based counseling techniques include things like administering and discussing the Myers-Briggs personality test, *see* SUMF at ¶ 156, and there is no evidence in the record that rogue personality-test administrators pose a public danger.[8] But even assuming that unauthorized "evidence-based" counseling techniques ***did*** pose such a danger, the law exempts a host of persons from the license requirement—including a "practitioner of any religious belief" and a person "engaged in the practice of cosmetology or the operation of a health club." D.C. Code § 3-1201.03(d)(1), (5).

---

[7] Consistent with the evidence that the District's law is a content-based restriction on speech, such "evidence-based interventions" consist of speech with certain content; as the former head of the District's licensing board testified, "evidence-based" counseling techniques are "meaningful conversations." Sardi-Brown Dep. 28:4–10; *see also id.* at 29:6–8 ("it's a dialogue using words, but it's a dialogue based on principles, theories and evidence-based practices"); Sherk Dep. 12:2–13:7 (describing evidence-based techniques such as "making connections between their past relationships and often family histories and their current depression," "encouraging people to regulate their nervous systems," and "exercises where I say: Over the next week, I'd like you to sort of pay attention to what your automatic thoughts are, write them down.").

[8] To the contrary, the record indicates that the Board allowed the rogue Myers-Briggs personality test administrator to become licensed after paying a $500 fine. *See* SUMF at ¶ 156. Similarly, the license applicant who used family-based treatment for anorexia was allowed to apply for licensure after paying a $100 fine. *See id.* at ¶ 155. In fact, the Board's acting chair testified that she could not recall a single instance in which the Board has withheld a professional counseling license from an individual sanctioned for unlicensed practice. Sherk Dep. 53:2–23.

Again, these statutory exemptions suggest that the government's asserted interests "are not pressing." *Edwards*, 755 F.3d at 1007.

The District's appeal to quality care is further undermined by its insistence that its licensing law "do[es] not dictate what can be said between counselors and clients during treatment." Def. Mem. 25 (marks and citation omitted). As the D.C. Circuit observed in *Edwards*, 755 F.3d at 1005, it is difficult to see how a law that does not impose an objective standard of quality actually advances quality services. So, for instance, while the District quotes Elizabeth's observation that in her experience other professional counselors frequently misdiagnose patients, the District does not point to any provision in its law that would *address* such misdiagnoses; indeed, Elizabeth's observation was that misdiagnoses occur despite licensure. Def. Mem. 31. The District's licensing law leaves licensed individuals entirely free to misdiagnose, to adopt wrongheaded theories of professional counseling, and to otherwise bungle the job. The District's invocation of ethical standards—in addition to being easily addressed through less-restrictive alternatives, *see infra* Part II.B.4—is also subject to this same flaw. Individuals within the statutory exemptions (including a "practitioner of any religious belief") are not subject to any ethical restrictions. And, under the District's interpretation of the licensing law, the same is true of unqualified life coaches—at least so long as their speech is not evidence-based and instead consists of "generic life advice." Def. Mem. 42–43. Under the District's interpretation, an opportunistic self-help guru can call himself a "life coach," can charge vulnerable clients for bogus assistance with mental and emotional problems that is not based on any evidence-based theory, and can engage in all manner of ethical transgressions—say, sleeping with his clients, breaking confidentiality, and maintaining conflicts of interest, *see* Def. Mem. 32—and, in the District's view, the licensing law has ***nothing at all*** to

say about it. This gaping hole in the licensing law "diminish[es] the credibility of the government's rationale for restricting speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

To the extent that the District addresses these issues at all, the District asserts that the statutory exemptions may "reflect[ ] reasonable legislative conclusions that the benefits of such persons' interactions sufficiently outweigh the risks to public health as to be excused from license requirements." Def. Mem. 38 (marks and citation omitted). But this is not a rational basis case, where deference to "reasonable legislative conclusions" is the rule. Rather, even if viewed under intermediate scrutiny, the government must provide a "persuasive" justification for the scope of its law. *Edwards*, 755 F.3d at 1008. The District here offers nothing of the sort.

> 4.    *The District Failed To Adequately Consider Less Restrictive Alternatives.*

Finally, to the extent that the government has identified any real interest that is actually served by its licensing law, the law still fails because the District has "less restrictive means to accomplish its interests." *Edwards*, 755 F.3d at 1009; *see also McCullen v. Coakley*, 573 U.S. 464, 496 (2014). Indeed, to "prove that a content-neutral restriction on protected speech is narrowly tailored to serve a significant governmental interest, the government must, *inter alia*, present evidence showing that—before enacting the speech-restricting law—it seriously undertook to address the problem with less intrusive tools readily available to it." *Billups*, 961 F.3d at 688 (internal quotation marks omitted). In other words, "the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate." *Id.* The District here can show no such thing.

Most obviously, the District does not explain why its interests could not be served by a title act, which would allow Elizabeth to engage in the practice of professional counseling in the District so long as she did not refer to herself as a "licensed professional counselor." In particular, while the District contends that licensure is necessary because it "confirms to members of the public that,

by seeking care from [a licensed professional counselor], they are receiving care from a person who meets relevant standards and is competent to practice counseling," Def. Mem. 33 (marks and citation omitted), precisely the same is true of a title act, which can "confirm[ ] to members of the public" that if a person uses the title "licensed professional counselor" they have certain qualifications, are subject to certain ethical standards, and can even be stripped of their title as discipline for ethical infractions.[9] For that reason, the District's expert witness, after laying out the purposes served by licensing, testified that title acts can also serve those purposes, Trepal Dep. 143:6–9, and was not able to "identify any purpose served by a practice act that would not also be served by a title act," *id.* at 149:21–150:2. The availability of this "less restrictive means to accomplish its interests" is "fatal to the District's regulatory scheme." *Edwards*, 755 F.3d at 1009.

The District also cannot show that it "actually tried" the less-restrictive alternative of a title act and found it to be inadequate. *Billups*, 961 F.3d at 688. Indeed, the District already has a title act limiting the use of the title "licensed professional counselor." D.C. Code § 3-1210.03(t). And, again, when the licensing law was adopted in 1992, the District's own regulators said that title restrictions would be enough, urging the D.C. Council to consider "a registration program similar to the registration program for dance and recreation therapists." SUMF ¶ 106. The District ignored this suggestion then and, to this day, has no evidence that a registration requirement would be any less effective than full licensure. Herndon 30(b)(6) Dep. 157:7–14; 158:3–15.

As a post-hoc rationale, the District now asserts that title acts "do not subject professionals to ethics codes and discipline." Def. Mem. 41. But this is just wrong. Under Alaska's title act,

---

[9] Similarly, while the District argues that some "insurers or payors" will only reimburse licensed professionals, and that "healthcare institutions may refuse to employ or contract with counselors" if they are not licensed, Def. Mem. 34–35, there is no evidence to suggest that these concerns could not be addressed by a title act, which would assure insurers, payors, and other institutions that practitioners bearing a certain title satisfy certain credentials.

licensed professional counselors are subject to a code of ethics and face disciplinary sanctions—including revocation of their title and up to $5,000 in fines—for violations. Alaska Stat. 08.29.400; 08.01.075(a); *see also* 12 AAC 62.900. So too under Delaware's title act for licensed professional counselors. Del. Code tit. 24, § 3011. The District could do the same.

The same is true for other less-restrictive alternatives to licensure. To the extent that the District is concerned that counselors may engage in fraud or abuse, there is no evidence that general criminal laws against this conduct are insufficient. *See Edwards*, 755 F.3d at 1009 (citing "regulations that punish fraud or restrict the manner in which tour guides may solicit business" as less restrictive alternatives); *see also McCullen*, 573 U.S. at 492 (treating "generic criminal statutes" as less restrictive alternatives). The District could also consider allowing providers licensed elsewhere to practice virtually within D.C.—an approach the District ***actually tried*** during the pandemic, with absolutely no ill effects. Herndon 30(b)(6) Dep. 171:7–13. Indeed, the record shows that the District's licensing board ***supports*** legislative changes that would allow greater reciprocity to out-of-state counselors. Sherk Dep. 126:12–127:14. Put simply, the District cannot show that less restrictive alternatives would be less effective because the District's own witnesses think they would be better. That means it cannot carry its burden under intermediate scrutiny.

### III.   The District's Licensing Requirement Is Facially Overbroad Under The First Amendment.

The Court should also grant summary judgment because the District's license requirement is facially overbroad, just as the Fifth Circuit held an analogous psychology-licensing law to be fatally overbroad. *See Serafine*, 810 F.3d at 369–70. Just as in *Serafine*, the speech-restrictive language in the statute "affects the speech of people beyond the purview of the state's interests or power." *Id.* at 364.

The "first step" in an overbreadth analysis is to construe the statute to "determine whether [it] reaches too far." *United States v. Williams*, 553 U.S. 285, 293 (2008). The relevant language here reads as follows:

> "Practice of professional counseling" means engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness. The practice of professional counseling includes:
>
> (A) The processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders or other appropriate classification schemes, and determining treatment goals and objectives; and
>
> (B) Assisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment.

D.C. Code § 3-1201.02(15B). The District does not defend this text, instead asking the Court to adopt a saving construction and hold that the prohibition is "narrowly limited to counseling as a professional, therapeutic, diagnostic practice, rather than extending to nebulous categories of generic life advice" like "life coaches." Def. Mem. 42–43. But this construction cannot be reconciled with the plain text of the ordinance or the District's own history of enforcement.

Begin with the text, which defines professional counseling as "engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation." D.C. Code § 3-1201.02(15B). Because of the use of the words "or" and "including," this language ultimately defines "professional counseling" as "engaging in counseling." And unlicensed "counseling" is prohibited if it has any of a number of broad purposes: One can violate the law by counseling "to facilitate human development" or "to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere

with mental health and wellness." *Id.* In other words, a speaker violates the law if she "counsel[s]" someone in an effort to "remediate" an "emotional . . . condition" that "interfere[s] with mental health and wellness." *Id.* By its own terms, the law prohibits talking to someone who is sad (an emotional condition if ever there was one) in an effort to help her cope with her sadness.

From there, the licensing law expands ever outwards, laying out a series of speech that definitely *is* counseling without identifying anything that is not. D.C. Code § 3-1201.02(15B)(A), (B). Of these additions, exactly one—"conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders"—fits within the District's saving construction of counseling as a "therapeutic, diagnostic practice." D.C. Code § 3-1201.02(15B)(A). Even that one section is far broader than the District's proposed construction would allow, reaching anyone who "conduct[s] interviews . . . for the purpose of diagnosing" clients with any of hundreds of disorders ranging from borderline personality disorder to caffeine withdrawal.[10] But that one section does not stand alone—the text goes on to sweep in anyone with a "professional relationship" who assists "individuals, families, and groups … to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment." D.C. Code § 3-1201.02(15B)(B). This second example covers the universe of almost any professional relationship, seemingly to give enforcement authorities virtually unlimited authority to identify and limit speech that they decide should qualify as professional counseling.

And that sweep answers the overbreadth question. If a "substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," then

---

[10] *See generally* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

it is overbroad. *Stevens*, 559 U.S. at 473 (quotation marks omitted). The most relevant authority here is *Serafine*, where the Fifth Circuit invalidated a substantially similar licensing law governing psychologists because the statute's language gave enforcement officials "unfettered discretion" to decide what speech counted as "psychology." 810 F.3d at 369. The same holds true here.

In *Serafine*, just like here, the government had argued that the statute's scope was sufficiently limited because it contained exemptions for clergy members and various licensed professionals, thereby limiting its application to "professional psychologists." *Id.* at 369. But the court rejected that argument, noting that, "under the canon of *expressio unius*, the presence of those exemptions suggests that anyone not granted an exemption . . . is affirmatively covered by the Act." *Id.* This meant that licensing burdens could fall on everything from "Weight-Watchers" to "life-coaches," and thus imposed a fatally overbroad restriction on "the ability of individuals to dispense personal advice about mental or emotional problems." *Id.* at 367, 369–70. The District's arguments here can be rejected for the same reasons.

And if the text were not enough (it is), the District's own testimony confirms that it does not follow the narrowing construction that its lawyers urge upon this Court. The District has applied its licensing law to an individual who allegedly offered "art therapy" without a license. SUMF at ¶ 154. So too with someone who offered nutritional services to clients struggling with anorexia, claiming those services constituted unlicensed "professional counseling" because they adopted a "family-based" approach. *Id.* at ¶ 155. So too with a person who administered common

personality tests like the Myers-Briggs Type Indicator[11] and the Strong Interest Inventory.[12] *Id.* at ¶ 156. Anyone can purchase these tests online, fill out the questions, and read the results—but the counseling restriction is triggered by *having a conversation* with someone about the results of their test. Sardi-Brown Dep. 101:8–102:14. Even life coaches are not safe—indeed, the former head of the licensing board testified that it would be difficult for a life coach to *avoid* slipping into prohibited counseling because "it's hard to talk about life issues without somehow getting wrapped up in the other day-to-day psychosocial issues" that are allowed only to licensees. Sardi-Brown Dep. 132:11–133:15. Every "life coach" in the District must speak carefully to avoid descending what Dr. Sardi-Brown called the "slippery slope" from coaching to counseling. *Id.*

Here, again, *Serafine* is instructive. One of the court's concerns there was that the government's own witnesses could not tell (without more information) whether the law applied to occupations ranging from "golf coaches" to "weight loss services." *Id.* at 368. The District is similarly unable to offer any assurances that people in non-counseling occupations can safely talk without running afoul of the counseling law. *See, e.g.*, Herndon 30(b)(6) Dep. 66:5–12 (opining that the Board would need more information to know if someone who runs "a writing workshop in which [they] help people work on their novels" was engaged in unlicensed counseling).

Against all this, the District contends that the sweep of its law is irrelevant unless Elizabeth can point to specific people whose speech has been "chilled." Def. Mem. 42. Not so. The District's

---

[11] The Myers-Briggs Type Indicator is a personality assessment created by Isabel Briggs Myers and Katharine Cook Briggs to "make the theory of psychological types . . . understandable and useful in people's lives." About the MBTI® Assessment, https://www.capt.org/mbti-assessment/mbti-overview.htm (last visited June 22, 2023). After answering a series of questions, the test suggests one of sixteen "personality types" and potential career options for each type. *Id.*

[12] The SII involves questions and scales that are meant to measure an individual's interests in topics like art, business, science, and teamwork. Strong Interest Inventory®: A career assessment that delivers insight and direction, https://www.themyersbriggs.com/en-US/Products-and-Services/Strong (last visited June 22, 2023).

law threatens people with criminal punishment for engaging in all sorts of ordinary speech; the point of the overbreadth doctrine is to allow "breathing room for free expression" by allowing a party to invoke the First Amendment rights of others who are, definitionally, not before the court. *United States v. Hansen*, No. 22-179, 2023 WL 4138994, at *5 (U.S. June 23, 2023); *accord United States v. Stevens*, 559 U.S. 460, 472–73 (2010). And, in any event, given the enforcement history above, there is no question that the District does in fact apply its law to limit speech far beyond the District's actual asserted interests. The chilling effect is undeniable.

And that is the end of the overbreadth analysis because the District rests entirely on its proposed (and untenable) limiting construction. *See* Def. Mem. 41–44. Nor could it have offered any justifications. Its law sweeps in the speech of everyone from life coaches to (amazingly) writing tutors. It prevents people from "provid[ing] guidance about the common problems of life— marriage, children, alcohol, health—[which] is a foundation of human interaction and society[.]" *Serafine*, 810 F.3d at 369. The District does not defend this breathtaking sweep because it is indefensible—and unconstitutional.

## CONCLUSION

Elizabeth's motion for summary judgment should be granted.

Dated: June 26, 2023                          Respectfully submitted,

John G. Wrench (D.C. Bar No. 1722587)         /s/ Robert E. Johnson
Robert J. McNamara (D.D.C. Bar # VA065)       Robert E. Johnson (D.C. Bar No. 1013390)
INSTITUTE FOR JUSTICE                         INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900               16781 Chagrin Blvd. #256
Arlington, Virginia 22203                     Shaker Heights, OH 44120
Tel: (703) 682-9320                           Tel: (703) 682-9320
Fax: (703) 682-9321                           Fax: (703) 682-9321
Email: jwrench@ij.org, rmcnamara@ij.org       Email: rjohnson@ij.org

*Attorneys for Plaintiff Elizabeth Brokamp*

45

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| ELIZABETH BROKAMP, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-3574 (TJK) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h)(1) and this Court's Standing Order [4], Plaintiff submits this statement of undisputed material facts.

| FACTS | RESPONSE |
|---|---|
| 1.      Elizabeth Brokamp has over twenty years' experience as a professional counselor. Declaration of Elizabeth Brokamp in Support of Plaintiff's Motion for Summary Judgment (Brokamp Decl.), ¶ 2. | |
| 2.      Elizabeth has a Master's Degree in counseling from Columbia University, and a PhD from the University of the Cumberlands. Brokamp Decl. ¶ 3. | |
| 3.      Professional counselors like Elizabeth talk to their clients about their feelings, their relationships, and their lives. Brokamp Decl. ¶ 4; Pl's Ex. 11, Elizabeth Brokamp Dep. Tr. (Brokamp Dep.), 161:19–162:9. | |

| | |
|---|---|
| 4.      Elizabeth advises her clients on a variety of topics, including anxiety, relationships, and mindfulness. Brokamp Decl. ¶ 4. | |
| 5.      Elizabeth's counseling consists entirely of conversations between her and her clients. Brokamp Decl. ¶ 5; Brokamp Dep. 142:4–7. | |
| 6.      Through her counseling conversations, Elizabeth seeks to improve her clients' well-being. Brokamp Decl. ¶ 5; Brokamp Dep. 8:9–20. | |
| 7.      Like other professional counselors, Elizabeth does not prescribe medication or conduct any medical procedures as part of her counseling. Brokamp Decl. ¶ 6; Brokamp Dep. 112:9–113:17. | |
| 8.      Elizabeth is licensed as a professional counselor in Virginia. Brokamp Decl. ¶ 7. | |
| 9.      Elizabeth first became licensed as a professional counselor in Virginia in 2004 after obtaining her Master's degree. Brokamp Decl. ¶ 7. | |
| 10.      Applicants for Virginia LPC licenses are required to: (1) earn a Master's degree in an accredited program; (2) complete at least 60 post-graduate semester hours in counseling or related subjects; (3) complete at least 3,400 hours of post-graduate supervised professional counseling; (4) receive a passing score on a national counseling exam; (5) include a report from the National Practitioner Databank; and (6) verify that she had no unresolved disciplinary action in Virginia or another jurisdiction. Elizabeth then had to complete an application, including documents verifying her completion of the education and supervision requirements. 18 VAC 115-20-49; 18 VAC 115-20-51(A); 18 VAC 115-20- | |

| | |
|---|---|
| 52(B)(1); 18 VAC 115-20-40(2); 18 VAC 115-20-40. | |
| 11.    As a Virginia-licensed counselor, Elizabeth must renew her license annually and complete a minimum of 20 hours of continuing education requirements. 18 VAC 115-20-105. | |
| 12.    As a Virginia-licensed counselor, Elizabeth is subject to oversight by the Virginia Board of Counseling, which establishes standards of practice applicable to all Virginia-licensed professional counselors. 18 VAC 115-20-130. The Virginia Board of Counseling is empowered to discipline counselors who violate its standards of practice. 18 VAC 115-20-140. | |
| 13.    From March 2010 through December 2017, Elizabeth provided counseling services from an office located in Alexandria, Virginia, under the business name Alexandria's Women Counseling. Brokamp Decl. ¶ 8. | |
| 14.    In 2018, Elizabeth closed her Alexandria office in order to pursue her doctoral degree at the University of the Cumberlands, though during that time she continued to provide counseling services as part of her doctoral studies. Brokamp Decl. ¶ 9. | |
| 15.    As part of her doctoral studies, Elizabeth provided intake assessment and individual counseling for college students at the University of Mary Washington. Brokamp Decl. ¶ 9. | |
| 16.    In addition, starting in 2019, Elizabeth has served as a supervisor for individuals who have completed their Master's degrees and are seeking licensure. Brokamp Decl. ¶ 9. | |

| | |
|---|---|
| 17.      In February 2020, Elizabeth signed a lease on an office in Burke, Virginia, where she intended to offer counseling in person under the business name Nova Terra Therapy. Brokamp Decl. ¶ 10. | |
| 18.      Although Virginia's law is a practice act and not a title act, from Elizabeth's perspective the Virginia law applies just as if it were a title act. Brokamp Decl. ¶ 35. | |
| 19.      Elizabeth is already licensed in Virginia, and, as such, she can truthfully state to consumers that she is a Virginia-licensed professional counselor. Brokamp Decl. ¶ 35. | |
| 20.      Elizabeth mentions her Virginia license on her website, but she would do the same thing if Virginia had a title act. Brokamp Decl. ¶ 35. | |
| 21.      Elizabeth believes that Virginia should change its law from a practice act to a title act, but that change would have no concrete impact on her as an individual. Brokamp Decl. ¶¶ 34, 35. | |
| 22.      Starting during the COVID-19 pandemic, Elizabeth has been impacted by practice acts of states outside of Virginia, including in the District. Brokamp Decl. ¶¶ 16–19. | |
| 23.      Because of the COVID-19 pandemic, Elizabeth gave up the lease on the Burke office and instead opened Nova Terra Therapy as an online practice. Brokamp Decl. ¶ 10. | |
| 24.      Once Elizabeth began seeing patients online, she began to receive inquiries from potential clients outside of Virginia, including residents of the District. Brokamp Decl. ¶¶ 16–19; *see also* Pl's Ex. 25, Brokamp Email Inquiries, 1–6. | |

| | |
|---|---|
| 25.     Elizabeth also had clients who she started seeing in Virginia, but who moved across state lines, and who wanted to continue to see her even after their moves. Brokamp Decl. ¶ 17. | |
| 26.     Because Elizabeth is not licensed in the District, she has had to turn away District residents who came to her seeking help. As a counselor, when Elizabeth sees a need for her services, she wants to provide assistance. It is difficult for her to turn away people in need because of a licensing law. Brokamp Decl. ¶ 18. | |
| 27.     Because of the burdens posed by licensing laws, Elizabeth has had to terminate relationships with existing clients who have moved away from Virginia. Brokamp Decl. ¶ 19. | |
| 28.     Terminating relationships with existing clients because they have moved away can be damaging for clients because it takes time to find a new counselor in a new state and to build up the same relationship of trust and comfort. Brokamp Decl. ¶ 19. | |
| 29.     For Elizabeth to become licensed in every state where she might practice would be a significant burden, and, in fact, is too significant a burden for her to shoulder. Brokamp Decl. ¶ 20. | |
| 30.     In large part, it would simply be too complicated and time-consuming for Elizabeth to become licensed in every state where she might practice. Brokamp Decl. ¶ 21. | |
| 31.     Every state has different requirements to become licensed, including different paperwork requirements, different coursework requirements, and different | |

| | |
|---|---|
| supervision requirements. Brokamp Decl. ¶ 21. | |
| 32.    To read the application instructions, complete the paperwork, and submit the application in even a single state is a time-consuming process. To do that in multiple states would be prohibitively difficult. Brokamp Decl. ¶ 21. | |
| 33.    For Elizabeth to become licensed in every state where she might practice would pose a significant financial burden. Brokamp Decl. ¶ 22. | |
| 34.    Most states impose hundreds of dollars in license fees, which must be paid every year. Brokamp Decl. ¶ 22; D.C. Code § 3-1205.05(a)(2). | |
| 35.    For Elizabeth to be licensed in every state where she might practice—including states where her current clients might move, might visit for work or vacation, and states where she might take on new clients—would cost thousands of dollars a year. Brokamp Decl. ¶ 22. | |
| 36.    During the pandemic, Elizabeth looked at the licensing requirements in the District and concluded that it would be too burdensome for her to become licensed in the District; when she looked at the requirements again more recently, that was still the case. Brokamp Decl. ¶ 23. | |
| 37.    Elizabeth is not even sure whether it would be possible for her to submit all of the required paperwork in the District. Brokamp Decl. ¶ 25. | |
| 38.    D.C. requires a "Coursework Completion Form" that requires detailed information on ten separate categories of required courses that must be completed in | |

| | |
|---|---|
| order to qualify for licensure. Brokamp Decl. ¶ 25. | |
| 39.    For each category of required courses on the "Coursework Completion Form," the form requires the "Course Title" and the "Course ID." Because Elizabeth completed her professional counseling Master's degree over twenty years ago, when counseling curriculum were less standardized, it is not a simple task for her to determine which of her courses matches up with each of the ten categories on the form. Elizabeth no longer has the information she would need to complete this form, and, when she contacted Columbia University, they also were not able to provide her with this information. Brokamp Decl. ¶ 25. | |
| 40.    Even if it were possible for Elizabeth to become licensed in the District, for her to go through the license process would be a significant investment of time and energy because Elizabeth would have to spend significant amounts of time to try to figure out how to complete the Coursework Completion Form and, even if she could eventually find some way to work with her school and the board to complete that form, Elizabeth would still have to submit all the other paperwork. Brokamp Decl. ¶ 26. | |
| 41.    It simply is not practical for Elizabeth to go through the process to become licensed in the District, and she has no intention of applying to become licensed in the District. Brokamp Decl. ¶ 27. | |
| 42.    Elizabeth currently provides counseling exclusively through the internet. Brokamp Decl. ¶ 11. | |
| 43.    While Elizabeth initially moved her counseling services online because of the pandemic, she has subsequently found that teletherapy provides significant benefits for | |

| | |
|---|---|
| clients, as it allows clients to seek out help without having to make a trip to a counselor's office. Brokamp Decl. ¶ 12. | |
| 44.      That flexibility is particularly beneficial for new mothers, a group who Elizabeth serves in her practice, as the demands of a newborn child can make it particularly difficult to schedule in-person counseling. Brokamp Decl. ¶ 12. | |
| 45.      Elizabeth also believes teletherapy is helpful for clients who want to be seen imminently rather than wait for an in-person appointment. Brokamp Decl. ¶ 12; *see also* Pl's Ex. 7, Dr. Heather Trepal Dep. Tr. (Trepal Dep.), 80:2–15 (testifying that teletherapy is helpful because it "[i]ncreases access to services."). | |
| 46.      Elizabeth does not even know if she is eligible for licensure in the District, given how opaque the District's laws are, and, even if she were eligible, it would be a significant burden for her to apply for licensure, pay annual licensing dues, and complete annual continuing-education requirements that differ from the continuing-education requirements she is already subject to in Virginia. Brokamp Decl. ¶¶ 20–27. | |
| 47.      Elizabeth intends to continue providing online teletherapy for the indefinite future. Brokamp Decl. ¶ 14. | |
| 48.      Elizabeth's teletherapy conversations are no different from her in-person counseling conversations. Brokamp Decl. ¶ 15. | |
| 49.      Elizabeth advertises her teletherapy services online, including through websites that provide counseling referral services. Brokamp Decl. ¶ 13. | |
| 50.      Clients seek out Elizabeth for a variety of reasons, including need for services from a | |

| | |
|---|---|
| counselor with Elizabeth's particular areas of specialization and referrals from existing clients who have been satisfied with Elizabeth's services. Brokamp Decl. ¶ 13. | |
| 51.     Since 2020, Elizabeth has been contacted by several D.C. residents seeking to engage her counseling services virtually. Brokamp Decl. ¶ 16; Pl's Ex. 25, Email Inquiries From D.C. Residents to Elizabeth Brokamp ("Brokamp Email Inquiries"), at 1–6. | |
| 52.     If it was legal for Elizabeth to practice in the District, she would use teletherapy to talk to D.C. residents in D.C., while she was located at her home in Virginia. Brokamp Decl. ¶ 28. | |
| 53.     If it was legal for Elizabeth to practice in the District, she would advertise her counseling services in the District through online counselor-referral services. Brokamp Decl. ¶ 29. | |
| 54.     Elizabeth filed this lawsuit challenging the District's licensing requirements because those requirements have prevented her from seeing clients in the District, and because she has had to turn away District residents who she could otherwise have helped. Brokamp Decl. ¶ 30. | |
| 55.     In addition to suing the District, Elizabeth filed a similar lawsuit in New York. Elizabeth sued New York because she has had clients who moved to New York and, because she is not licensed in New York, she had to stop talking to those clients. Brokamp Decl. ¶ 31. | |
| 56.     Elizabeth has not sued Virginia because she has never had any reason to challenge Virginia's licensing restriction. Brokamp Decl. ¶ 32. | |

| | |
|---|---|
| 57.     Elizabeth is licensed in Virginia, and, as a result, she has never had to turn away any clients because of Virginia's licensing requirements. Brokamp Decl. ¶ 32. | |
| 58.     To the extent that Virginia applies its licensing law to exclude out-of-state counselors, Elizabeth believes that is unconstitutional. Brokamp Decl. ¶ 33. | |
| 59.     Elizabeth thinks Virginia should allow out-of-state counselors to practice in the state without having to obtain a Virginia license, but, because she has a Virginia license, she cannot bring that claim in Virginia. Brokamp Decl. ¶ 33. | |
| 60.     In Elizabeth's opinion, states (including Virginia) should regulate the practice of professional counseling through what she understands are called "title acts," under which only licensed persons are allowed to use the title "licensed professional counselors," but a person who is not licensed can still practice so long as they do not falsely claim to be licensed. Brokamp Decl. ¶ 34. | |
| 61.     Consistent with her view on "title acts," Elizabeth lists her Virginia license on her website because it signifies that she has completed the requirements to use the title "licensed professional counselor" in the State of Virginia. Brokamp Decl. ¶ 35. | |
| 62.     Since Elizabeth is already licensed in Virginia, from her perspective Virginia's license law applies to her in the exact same way that it would apply if it were a title act. Brokamp Decl. ¶ 35. | |
| 63.     Elizabeth lists her Virginia license on her website because it lets people know where she is allowed to legally practice. Brokamp Decl. ¶ 36. | |

| | |
|---|---|
| 64.    Elizabeth is currently working as a professional counselor. Brokamp Decl. ¶ 37. | |
| 65.    The number of clients that Elizabeth serves varies week-to-week, but, in a typical week, Elizabeth currently provides teletherapy services to between ten and twenty clients. Brokamp Decl. ¶ 37. | |
| 66.    Elizabeth intends to continue working as a professional counselor for the foreseeable future and has no plans to stop working as a professional counselor. Brokamp Decl. ¶ 38. | |
| 67.    Currently, Elizabeth is soliciting clients through an online portal called ModernHealth, which she prefers at this time because Elizabeth finds that the clients who come to her through the portal are a good fit for her practice. Brokamp Decl. ¶ 39. | |
| 68.    If Elizabeth could legally practice in the District, she would inform ModernHealth that they can refer clients to her who are located in the District. Brokamp Decl. ¶ 40. | |
| 69.    Because Elizabeth is primarily focused on soliciting clients through ModernHealth, she has changed her status on some other online referral services to indicate that she is no longer soliciting clients through those services. Brokamp Decl. ¶ 41. | |
| 70.    In the future, as Elizabeth's current clients cycle out and she has room for new clients, she will resume soliciting clients through online referral services in addition to ModernHealth. Brokamp Decl. ¶ 41. | |
| 71.    If Elizabeth could legally practice in the District, she would inform online referral services other than ModernHealth that they can refer District residents to her as potential clients. Brokamp Decl. ¶ 42. | |

| | |
|---|---|
| 72.     In addition to soliciting clients through ModernHealth, Elizabeth also continues to receive inquiries from people who have been referred to her through more informal referral networks, including referrals from former clients. Brokamp Decl. ¶ 43. | |
| 73.     In the last month, Elizabeth has received three or four inquiries from such people, including people who are located outside of Virginia. Brokamp Decl. ¶ 43. | |
| 74.     If Elizabeth could legally practice in the District, she would accept informal referrals of clients located in the District. Brokamp Decl. ¶ 44. | |
| 75.     Elizabeth's teletherapy conversations with her clients are just that: conversations, consisting of nothing other than speech. Brokamp Decl. ¶ 15; Brokamp Dep. 8:9–20. | |
| 76.     The only thing Elizabeth wants to do in the District is talk to clients over the internet. Brokamp Decl. ¶ 6. | |
| 77.     From a regulatory perspective, professional counseling is "one of the newer professions." Trepal Dep. 29:14–23. | |
| 78.     Before the profession was regulated there were "people who did things that are similar to what professional counselors do now, even if those people weren't licensed[.]" Trepal Dep. 29:14–17. | |
| 79.     As a legal matter, the first state to license professional counselors was Virginia in 1976. Trepal Dep. 33:10–13. | |
| 80.     In 2009, more than thirty years later, California was the last state to enact some form of licensing requirement. Trepal Dep. 33:14–17. | |

| | |
|---|---|
| 81.     Counseling has roots in the "indigenous" practice of "talking about something—discussing something and feeling—having a feeling from it." Trepal Dep. 30:24–31:9. | |
| 82.     A professional counselor, in Dr. Trepal's view, bears important commonalities with an indigenous "spirit healer." Trepal Dep. 32:12–33:5. | |
| 83.     The former head of the District's licensing board testified that, "I guess the ultimate component of any counseling session is going to be the therapeutic relationship." Pl's Ex. 2, Dr. Victoria Sardi-Brown Dep. Tr. (Sardi-Brown Dep.), 26:9–11. | |
| 84.     The former head of the District's licensing board testified that, "obviously, there's going to be dialogue, right? There's – there's going to be a back and forth sort of situation where there's going to be a lot of listening and a lot of dialoguing." Sardi-Brown Dep. 27:16-20. | |
| 85.     The former head of the District's licensing board testified that, "the beauty about working with a professional is that we are trained to absorb what people are saying, and based on our years of experience from a theoretical standpoint, being guided by evidence-based practices, that we are skilled to be able to have meaningful conversation . . . ." Sardi-Brown Dep. at 28:4–10. | |
| 86.     The current head of the District's licensing board testified: "We might talk about: How can you deescalate yourself, you know, when you get upset like this . . . ." Pl's Ex. 3, Victoria Sherk Dep. Tr. (Sherk Dep.), 16:20–21. | |
| 87.     Even technical-sounding treatments like Cognitive Behavioral Therapy (CBT) involve talk-therapy in which the counselor | |

| | |
|---|---|
| encourages their client to identify and reflect on their thoughts. Sherk Dep. 12:17–13:24. | |
| 88.     "Evidence-based interventions" consist of speech with certain content; as the former head of the District's licensing board testified, "evidence-based" counseling techniques are "meaningful conversations." Sardi-Brown Dep. 28:4-10; *see also id.* at 29:7-8 ("it's a dialogue using words, but it's a dialogue based on principles, theories and evidence-based practices"); Sherk Dep. 12:2-13:17 (describing evidence-based techniques such as "making connections between their past relationships and often family histories and their current depression," "encouraging people to regulate their nervous systems," and "exercises where I say: Over the next week, I'd like you to sort of pay attention to what your automatic thoughts are, write them down."). | |
| 89.     Today, laws regulating professional counselors "vary from state to state," particularly because "[n]o two scopes of practice are the same." Trepal Dep. 135:8–23. | |
| 90.     The "profession of counseling" has "plenty of identity . . . apart from those who are licensed." Trepal Dep. 44:10–19. | |
| 91.     One form of licensing regime is a "practice act," which "limit[s] who can actually engage in the practice of professional counseling." Trepal Dep. 50:21–25. | |
| 92.     An alternative approach is a "title act," which merely "limits who can use the title of professional counselor" within a jurisdiction. Trepal Dep. 50:21–25. | |
| 93.     Some states currently license professional counselors through title acts. *See, e.g.*, Alaska Stat. §§ 08.29.010 *et seq.*; Del. Code tit. 24, § 3030 *et seq.* | |

| | |
|---|---|
| 94.      In states with title acts but no practice acts, people can practice professional counseling without a license so long as they do not hold themselves out as "licensed professional counselors." Trepal Dep. 50:21–25. | |
| 95.      In 1985, the D.C. Committee on Consumer and Regulatory Affairs (the "Committee") reported on a bill that proposed licensing requirements for several professions, including social workers and psychologists. Pl's Ex. 20, D.C. Council, Committee Report on Bill 6-317 D.C. Health Occupations Revision Act of 1985 (Nov. 26, 1985) ("Comm. Rep. on 1985 Revision Act"), 1. | |
| 96.      The D.C. Association for Counseling and Development (DCACD) was the D.C. chapter of the Association for Counseling and Development, which is now called the American Counseling Association (ACA). Pl's Ex. 22, D.C. Council, Committee Report on Bill 9-197 D.C. Health Occupations Revision Professional Counselors Amendment Act of 1992 (Feb. 11, 1992) ("Comm. Rep. on 1992 Amendment Act"), 3. | |
| 97.      Because the 1985 bill did not require licensure for therapists and counselors, the D.C. Association for Counseling and Development (DCACD)—a local chapter of what is now the ACA—requested that the Committee "include[ ] professional counselors in the legislation." Comm. Rep. on 1985 Revision Act, 26. | |
| 98.      The Committee's report on the 1985 bill concluded that:<br><br>Increasing specialization, perhaps inevitably, has spawned bitter turf battles. It's the old battle of the "in's" versus the "out's", and the | |

| | |
|---|---|
| fact that the combatants use words as their makes the battle no less ignoble.<br><br>[. . .]<br><br>The Committee has heard and thoughtfully considered the suggestions and arguments of health care practitioners in all fields. But for the Committee, and the Council, the overriding consideration is and must be the public interest. The turf battles, the third-party reimbursement question, the striving for professional status, are of no moment in determining public policy.<br><br>Comm. Rep. on 1985 Revision Act, 8. | |
| 99.     In connection with the Committee Report on the 1985 Revision Act, the D.C. Law Revision Commission conducted a two-year study to "weigh[ ] the public protection of licensure against the possible restrictive impact on the availability of services," and, as a result of that study, the Commission concluded that there was "no evidence of public harm sufficient to justify licensure" of therapists and counselors.  Comm. Rep. on 1985 Revision Act, 12. | |
| 100.    The D.C. Health Occupations Revision Act of 1985 (the "1985 Act") was ultimately enacted without a licensing requirement for professional counselors. Mar. 25, 1986, D.C. Law 6-99, § 103(d)(7), 33 DCR 729. | |
| 101.    In 1989, a member of the Committee proposed, "upon the request of the DCACD," an amendment to the 1985 Act that would adopt a licensing requirement for professional counselors. Pl's Ex. 21, D.C. Council, Introduction of Legislation, Professional Counselors Licensure Amendment Act of 1988 (Apr. 4, 1989) ("Introduction of Amendment Act"), 1. | |

| | |
|---|---|
| 102.    Under the proposed amendment, individuals could neither practice professional counseling nor describe themselves as licensed professional counselors—a practice and title act—without first obtaining a professional counseling license from the District. Comm. Rep. on 1992 Amendment Act, 6. | |
| 103.    Two officials from the District's Department of Consumer and Regulatory Affairs testified in opposition to the amendment on the ground that no public need justified licensing professional counselors. Comm. Rep. on 1992 Amendment Act, 4–5. | |
| 104.    The Department's Acting Administrator, Michael Taylor, testified that the executive "had received no information which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. | |
| 105.    The Department's Acting Director, Aubrey Edwards, opposed the amendment on the ground that there was no "demonstrated public need." Comm. Rep. on 1992 Amendment Act, 5; *see also* Pl's Ex. 1, Latrice Herndon 30(b)(6) Dep. Tr. (Herndon 30(b)(6) Dep.), 154:21–155:13. | |
| 106.    As an alternative to licensing professional counselors, the Executive's representative recommended that the Committee instead "consider a registration program similar to the registration program for dance and recreation therapists." Comm. Rep. on 1992 Amendment Act, 4. | |
| 107.    The District lacks "any evidence that a registration requirement would have been less effective than a licensure requirement for professional counselors." Herndon 30(b)(6) Dep. 158:3–15 | |

| | |
|---|---|
| 108.    The District lacks any evidence that the alternative of a registration requirement received any "further study." Herndon 30(b)(6) Dep. 157:7–14. | |
| 109.    When the District enacted the 1992 Amendment, the District was not "aware of any evidence that the public safety was being jeopardized or the consumers needed additional protection in the area of professional counseling." Herndon 30(b)(6) Dep. 154:21–155:13. | |
| 110.    In 1992, the District adopted the proposed amendment and began enforcing a licensing requirement for professional counselors. D.C. Health Occupations Revision Act of 1985 Professional Counselors Amendment Act of 1992, D.C. Law 9-126, § 2(g), 39 DCR 3824 (July 22, 1992). | |
| 111.    District law prohibits the unlicensed practice of "professional counseling." Pl's Ex. 32, D.C. Code § 3-1205.01(a)(1). | |
| 112.    Under D.C. Code § 3-1201.02(15B), the "practice of professional counseling" is defined as "engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness." Pl's Ex. 30, D.C. Code § 3-1201.02(15B). | |
| 113.    The "practice of professional counseling" includes the "processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders or other appropriate classification | |

| | |
|---|---|
| scheme, and determining treatment goals and objectives." Pl's Ex. 30, § 3-1201.02(15B). | |
| 114.    The "practice of professional counseling" includes "[a]ssisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment." Pl's Ex. 30, § 3-1201.02(15B). | |
| 115.    The unlicensed practice of professional counseling is a misdemeanor offense that is punishable by imprisonment up to a year, or by fines up to $10,000, or both. D.C. Code § 3-1210.07. | |
| 116.    D.C. law exempts some categories of individuals from licensing requirements for all the various "health occupations" that it licenses, including the licensing requirement for professional counselors. D.C. Code § 3-1201.03(d).   These   statutory   exemptions include:<br><br>•      A "minister, priest, rabbi, officer, or agent of any religious body or any practitioner of any religious belief" but only if "engaging in prayer or any other religious practice or nursing practiced solely in accordance with the religious tenets of any church . . . ."  Pl's Ex. 31, D.C. Code § 3- 1201.03(d)(1).<br><br><br><br>•      A "person engaged in the care of a friend or member of the family . . . whether employed   regularly   or   because   of   an emergency or illness." *Id.* § 3-1201.03(d)(2).<br><br><br><br>•      An individual "engaged in the practice of cosmetology or the operation of a health club." *Id.* § 3-1201.03(d)(5). | |

| | |
|---|---|
| • "Marriage and family therapists, marriage counselors, art therapists, drama therapists, attorneys, or other professionals working within the standards and ethics of their respective professions." *Id.* § 3-1201.03(d)(7). | |
| 117. Exemptions listed in D.C. Code § 3-1201.03(d) apply only if the person does not "hold themselves out, by title, description of services, or otherwise, to be practicing any of the health occupations regulated by this chapter." *Id.* § 3-1201.03(d). | |
| 118. D.C. exempts counselors from its license requirement if they are licensed in another state adjoining the District, but only if the other state provides reciprocal privileges. *See* D.C. Code § 3-1205.02(a)(4)(C). | |
| 119. Elizabeth is not exempt from the District's license requirement under D.C. Code § 3-1205.02(a)(4) because Virginia does not provide reciprocal privileges to D.C.-licensed professional counselors. Pl's Ex. 24, Brokamp Board Emails, 1. | |
| 120. If Virginia offered reciprocity for D.C.-licensed LPCs, Elizabeth could counsel D.C. residents using teletherapy "without meeting any other requirements." Def. Mem. n. 6 (citing D.C. Code § 3-1205.02(a)(4). | |
| 121. In response to the COVID-19 pandemic, D.C. adopted a limited and temporary waiver of its licensing requirement. Pl's Ex. 23, D.C. Health Regul. & Licensing Admin. Order No. 2020-02 (Mar. 13, 2020) ("D.C. Licensing Waiver"). | |
| 122. Under the COVID-19 waiver, D.C. waived licensing requirements for out-of-state healthcare providers who were providing services in affiliation with a D.C.-licensed | |

| | |
|---|---|
| healthcare facility or who had "an existing relationship with a patient who has returned to the District." D.C. Licensing Waiver, 2. | |
| 123.    Neither condition of the District's COVID-19 waiver applied to Elizabeth. Brokamp Board Emails, 3; D.C. Licensing Waiver, 2. | |
| 124.    The District's COVID-19 waiver expired in August of 2022. Herndon 30(b)(6) Dep. 171:14–15. | |
| 125.    "[A]t least some people who were not licensed counselors in DC did engage in counseling activity" with D.C.-based clients under the COVID-19 waiver. Herndon 30(b)(6) Dep. 170:16–20. | |
| 126.    The District does not have any evidence that anyone was harmed by counseling activities offered by unlicensed counselors to D.C.-based clients under the COVID-19 waiver. Herndon 30(b)(6) 171:9–13. | |
| 127.    The District's pandemic waiver was "helpful" and did not "dilute licensure." Trepal Dep. 70:5–20. | |
| 128.    Before obtaining a license to practice professional counseling in the District, an individual must: (1) earn a Master's degree in an accredited program; (2) complete at least 60 post-graduate semester hours in counseling or related subjects; (3) complete at least 3,500 hours of post-graduate supervised professional counseling in not less than two or more than five years; (4) receive a passing score on a national counseling exam; and (5) pass a background check. D.C. Code § 3-1207.10(a); 17 DCMR §§ 6602.1(a), 6603.1(b), 6605.1. | |
| 129.    The individual must then assemble an application package, including the following | |

| | |
|---|---|
| completed forms: a postgraduate supervised experience form; a supervision calculation form; official sealed transcripts; internship or practicum forms; a coursework completion form; an official score report from the national exam; responses to screening questions; and, the results of a self-query report from the National Practitioner Databank. D.C. Code § 3-1205.05(a)(1); Pl's Ex. 26, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Examination ("Examination Application Checklist"). | |
| 130.    Applicants must also pay a $230 application fee. D.C. Code § 3-1205.05(a)(2); Examination Application Checklist, 3. | |
| 131.    Individuals who are licensed in another jurisdiction and seek to be licensed in the District "by endorsement" must demonstrate that they meet all requirements listed in D.C. Code §§ 3-1205.01 *et seq.*, are currently licensed in another state, and have completed: (1) at least 60 hours of postgraduate education leading to a Master's degree in counseling or a related field from an accredited institution; (2) at least 4,000 hours of post-graduate supervised counseling over at least two years; (3) at least 2,500 hours of direct client contact within the 4,000 hours of post-graduate counseling; (4) at least 100 hours of clinical supervision as a post-graduate, with no more than 50 of those hours coming from group supervision; and (5) five years of post-licensure experience in clinical counseling at the independent level. D.C. Code § 3–1207.10(c). | |
| 132.    Applicants by endorsement are also required to submit an application package, including an application, an examination score report, a postgraduate supervised experience form, a supervision calculation form, an internship/practicum form, a coursework completion form, a "2x2" sized | |

| | |
|---|---|
| passport photo, a copy of identification, fingerprints, proof of vaccination, and a $230 application fee. Pl's Ex. 27, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Endorsement ("Endorsement Application Checklist"), 1–3. | |
| 133.   Professional counselors licensed in the District must renew their licenses every two years, which requires the completion of 40 hours of approved continuing education. 17 DCMR § 6610.4. | |
| 134.   LPCs applying for the renewal of their license must also pay an application fee. D.C. Code § 3-1205.10(c)(3). | |
| 135.   There are "burdens inherent" in the District's "post-degree, pre-licensure supervision requirement," including "[f]inancial burdens" and "[t]ime burdens." Trepal Dep. 90:16–91:6. | |
| 136.   Post-degree, pre-licensure supervision requirements can be particularly burdensome for certain populations, including racial minorities, and are also "particularly burdensome to navigate for people who are providing care in [a] bilingual setting." Trepal Dep. 99:24–100:21. | |
| 137.   Even a relatively small $200 licensing fee can pose a "significant" burden for some individuals, as well as creating a larger "financial drain" on individuals seeking to become licensed in more than one state. Sardi-Brown Dep. 16:22–17:1. | |
| 138.   Navigating the professional counseling laws of multiple states can be "complicated" for applicants. *Id.* at 17:3–15. | |
| 139.   These burdens are magnified by online practice, which often can span multiple states, as "it is challenging and costly from our | |

| | |
|---|---|
| perspective to get licensed in every state we wish to work in." Sardi-Brown Dep. at 13:12–14:4 (testifying that "it becomes challenging especially in our virtual world now"). | |
| 140.   Licensing can pose significant barriers "where people engage in telehealth, where they live in one place and are working with clients who live in another place," and there are many stories from ACA members . . . across the country about these concerns." Trepal Dep. at 64:6–14; 65:18–19. | |
| 141.   Licensing "might impact clients if they were seeing somebody in one state and they moved to another state and couldn't—a college student, let's say, who was seeing a counselor when they came home for the summer and then they went to college in another state and the counselor was not licensed in the other state . . . ." Trepal Dep. 76:12–18. Dr. Trepal continued: "You know, the college student, maybe they had a relationship or were working on very specific things . . . . … it might have, you know, an impact on them . . . ." *Id.* at 76:19–23. Asked if that would be a "negative impact," Dr. Trepal answered: "Of course." *Id.* at 77:1–2. | |
| 142.   The District's Board of Professional Counseling is responsible for enforcing the District's licensing requirement. D.C. Code § 3-1202.13(b). | |
| 143.   Typically, the Board consists of five members appointed by the Mayor, including two LPCs, one counseling educator, one professional art therapist, and one consumer member. D.C. Code § 3–1202.13. | |
| 144.   Currently, the Board's sole member and acting chair is Victoria Sherk. Sherk Dep. 21:24–22:18. | |
| 145.   The Board is responsible for investigating and sanctioning individuals who | |

| | |
|---|---|
| are found to have engaged in the "practice of professional counseling" without a license. D.C. Code § 3-1202.13(b); Herndon 30(b)(6) 98:24–99:15. | |
| 146.    The Board determines whether an individual is or has been engaged in unlicensed practice by looking to the definition of the "practice of professional counseling" provided in D.C. Code § 3-1201.02(15B). Herndon 30(b)(6) Dep. 36:23–38:6; Sherk Dep. 67:8–15; Pl's Ex. 4, Gregory Scurlock Dep. Tr. (Scurlock Dep.), 24:10–19; Sardi-Brown Dep. 74:3–7. | |
| 147.    The Board's sole member testified that application of the licensing law turned on the "content" of the discussions between the counselor and her client. *See* Sherk Dep. 67:8–15 (agreeing that the "practice of professional counseling" is "defined as involving certain contents at the session"; *id.* at 82:5-6 (referencing "the content of what is being said in the—in the session"); *id.* at 92:17–18 (asking "is there clinical content or is there not"); *id.* at 92:19–21 ("I've been saying all morning, it depends on what the content is"); *id.* at 93:5–8 (agreeing that "it's not possible to say whether all career counseling is professional counseling because it really would depend on the content"); *id.* at 147:23–148:4 ("[B]y 'content' we mean, you know, is there a theoretical practice being used? . . . Or are they just having a casual conversation about, you know, groceries."). | |
| 148.    The District's compliance officer—who oversees the investigators who look into allegations of unlicensed practice—testified that he "could not" "reach a conclusion that someone was practicing without a license without knowing what they were discussing with their clients." Scurlock Dep. 144:8–16; *see also id.* at 123:21-25 (agreeing that he would "need to know what . . . [t]hat person is discussing with their clients"); *id.* at 129:16- | |

| | |
|---|---|
| 20 (agreeing that whether a life coach was practicing unlicensed professional counseling "would depend on what the life coach is discussing with their clients"). | |
| 149.　The head of the licensing board was asked what guidance she would provide if "someone says, 'I am licensed in another state. I'm worried because I'm licensed in another state that I'm—that you're going to say that I'm practicing without a license, and I'm trying to figure out what I can talk to people in DC without needing to have a license.'" Sherk Dep. at 115:21–116:3. To respond to such a question, the board head testified that, "we'd need content," which she agreed referred at least in part to "the content of the discussion between her and the clients." *Id.* at 116:21–117:17. | |
| 150.　The Board is assisted in its enforcement by investigators, who are overseen by Compliance Officer Gregory Scurlock. Scurlock Dep. 13:19–14:6. | |
| 151.　Investigators are Department of Health employees assigned to assist all health licensing professional boards, including the Board of Professional Counseling. Herndon 30(b)(6) Dep. 20:17–20. | |
| 152.　At the Board's request, an investigator may compile an "investigative report" for the Board based on information gathered through subpoenas, interviews, and researching the individual's social media pages. Scurlock Dep. 25:21–26:6; 43:9–45:10; 99:3–11. | |
| 153.　Compliance Officer Scurlock, at his deposition, was asked whether, "consistent with the definition of professional counseling, [you could] reach a conclusion that someone was practicing without a license without knowing what they were discussing with their client?" *Id.* at 144:8–12. He answered, "No, I could not." *Id.* at 144:16; *see also id.* at | |

| | |
|---|---|
| 123:21–25 ("Q. So you would need to know what … [t]hat person is discussing with their clients?" "A. Yes."). | |
| 154.    The District has applied its licensing law to an individual who allegedly offered "art therapy" without a license. Pl's Ex. 12, D.C. Health Investigative Report (Mar. 12, 2019); Herndon 30(b)(6) Dep. 135:23–139:17. | |
| 155.    The Board sanctioned a license applicant for engaging in the unlicensed practice of professional counseling during her previous career as a nutritionist, because the nutritionist had employed a family-based treatment for anorexia. Pl's Ex. 13, 2018 Negotiated Settlement Agreement, D.C. Board of Professional Counseling (2018 NSA); Herndon 30(b)(6) Dep. 126:13–128:22. | |
| 156.    The Board sanctioned a license applicant for engaging in the unlicensed practice of professional counseling for having previously used personality tests to counsel people on their career choices. Pl's Ex. 14, 2019 Negotiated Settlement Agreement, D.C. Board of Professional Counseling (2019 NSA); Herndon 30(b)(6) Dep. 116:5–121:11. | |
| 157.    The Board sanctioned a license applicant for engaging in the unlicensed practice of professional counseling for having previously assisted people with their addiction and "support[ing] the recovery of over 300 people." Pl's Ex. 15, 2017 Negotiated Settlement Agreement, D.C. Board of Professional Counseling (2017 NSA), 1–2. | |
| 158.    These and other similar applicants were required to pay fines as sanctions for their prior unlicensed speech, but, having paid | |

| | |
|---|---|
| a fine, they were ultimately licensed. *See* Sherk Dep. 53:2–23 | |
| 159.    "[T]he [B]oard's goal is to help people become licensed." Sherk Dep. 53:2—23. | |
| 160.    The District affirmatively monitors for practice by unlicensed persons through complaint-driven enforcement. Scurlock Dep. 14:18–21. ("[I]f a complaint comes in that an individual was practicing a health occupation without a license, then an investigation will ensue."). | |
| 161.    The District also affirmatively monitors for practice by unlicensed persons through proactive enforcement. Scurlock Dep. 92:18–19 ("There's a possibility that we did some proactive [investigation] for licensed professional counselors."). | |
| 162.    When the District investigates a particular individual for unlicensed practice, the District also has a practice of investigating any other individuals working in the same practice or facility to determine if those individuals are properly licensed. Scurlock Dep. 94:20–95:10, 96:8–14. | |
| 163.    Investigators conduct interviews, review social media and online reviews, and even conduct covert operations. Scurlock Dep. 18:3–6, 22:10–16, 45:10–24, 46:14–18, 49:9–11. | |
| 164.    Investigators also subpoena documents, including "notes that a professional keeps showing the conversations that they've had between them and their client." Scurlock Dep. 99:12–20. | |
| 165.    During Board meetings, its members "have a discussion and look at all the materials" before determining whether the relevant individual was engaged in the | |

| | |
|---|---|
| practice of professional counseling without a license. Sherk Dep. 56:12–57:20. | |
| 166.    Each investigative report reaches a conclusion as to whether the relevant individual engaged in the unlicensed practice of professional counseling. Scurlock Dep. 48:15–50:2. | |
| 167.    If the Board members determine that an individual was engaged in the unlicensed practice of professional counseling, the Board will serve that individual with a "negotiated settlement agreement" (NSA). Sherk Dep. 50:5–16. | |
| 168.    NSAs describe the basis for the Board's determination that the individual was engaged in unlicensed practice. Herndon 30(b)(6) Dep. 116:20–118:20. | |
| 169.    An individual who agrees to an NSA is subject to sanctions, including fines or professional education courses. Sherk Dep. 53:2–23. | |
| 170.    The Board has the authority to "prohibit people from seeking a license based on their previous unlicensed practice." Herndon 30(b)(6) Dep. 107:5–107:24. | |
| 171.    The fact that an individual engaged in unlicensed practice does not preclude them from obtaining a professional counseling license from the Board. Sherk Dep. 53:2– 23. | |
| 172.    A murder conviction does not preclude an applicant from obtaining a professional counseling license in the District. Sherk Dep. 138:2–7. | |
| 173.    A bribery conviction does not preclude an applicant from obtaining a professional counseling license in the District. Sherk Dep. 135:6–10. | |

| | |
|---|---|
| 174.    The District has never withheld a professional counseling license from an individual after sanctioning that individual for practicing without a license. Sherk Dep. 53:2–23. | |
| 175.    On September 25, 2020, Elizabeth contacted the Board to ask whether she could legally "provide tele-mental health services from my office in Virginia to these D.C. residents at their homes in D.C." Pl's Ex. 24, Elizabeth Brokamp Email to D.C. Board of Professional Counseling ("Brokamp Board Emails"), at 4. | |
| 176.    On September 25, 2020, the Board confirmed that Elizabeth "will need to apply for the LPC" if she wants to "provide counseling services to residents who live in the District of Columbia[.]" Brokamp Board Emails, 3. | |
| 177.    Elizabeth has no intention of applying to become licensed in the District. Brokamp Decl. ¶ 27. | |
| 178.    Unless the District's law is enjoined, Elizabeth will continue to have to turn away District residents seeking her counseling services. Brokamp Decl. ¶ 45. | |
| 179.    District law prohibits an unlicensed individual from calling themselves a "licensed professional counselor," but does not "restrict the use of the generic terms 'counseling' or 'counselor.'" D.C. Code § 3-1210.03(t). | |
| 180.    On October 1, 2020, Elizabeth asked the Board if she could offer her counseling services so long as she discloses that she is "licensed in Virginia but not in D.C." and "describes [her] services . . . as 'counseling' rather than 'licensed professional counseling.'" Brokamp Board Emails, 2. | |

| | |
|---|---|
| 181.    The course of action that Elizabeth proposed in her October 1, 2020 to the Board would comply with the District's title act under D.C. Code § 3-1210.03(t), but would not comply with the District's practice act under D.C. Code § 3- 1205.01(a)(1). | |
| 182.    On October 2, 2020, the Board responded that the District "does not have a reciprocity process with any state. The only way you will be able to provide counseling services to DC residents is after you receive a license. Until you have a license, you are not allowed to provide any counseling services to DC residents. If you do anything in question 1 and/or question 2 without a license, you will be fined for practicing without a license." Brokamp Board Emails, 1. | |
| 183.    Elizabeth is subject to the District's license requirement and the burdens associated with it even if she discloses to D.C.-based clients that she is not licensed in D.C. Brokamp Board Emails, 1. | |
| 184.    The District's general practice is to enforce its professional counseling licensing law against individuals with significant training and expertise relevant to the provision of counseling. Sardi-Brown Dep. 110:21–115:2. | |
| 185.    Unlicensed individuals calling themselves "life coaches" offer "life coaching" services to D.C. residents. Scurlock Dep. 128:24–129:14. | |
| 186.    The "life coaching" services offered by unlicensed individuals calling themselves "life coaches" to D.C. residents can fall (depending on content) within the District's definition of the "practice of professional counseling." Scurlock Dep. 128:24–129:14. | |
| 187.    An unlicensed "life coach" who is "hav[ing] conversations with clients about | |

| | |
|---|---|
| their long-term mental and emotional development" could be engaged in the "practice of professional counseling." Herndon 30(b)(6) Dep. 59:3–10. | |
| 188.    An unlicensed "life coach" can inadvertently engage in the "practice of professional counseling" because "it's hard to talk about life issues without somehow getting wrapped up in the other day-to-day psychosocial issues that can one has . . . or other life experiences that come in." Sardi-Brown Dep. 132:11–133:15. | |
| 189.    If Elizabeth were less qualified, she could in practice offer her services as an unlicensed "life coach," but Elizabeth's training and expertise restrict her ability to talk to D.C. residents without a license. Sardi-Brown Dep. 110:21–115:2. | |
| 190.    Elizabeth is subject to greater burdens on her speech because she possesses greater qualifications to talk. Sardi-Brown Dep. 110:21–112. | |
| 191.    In states that license professional counselors through title acts, licensed counselors are subject to education standards. *see, e.g.*, Alaska Stat. § 08.29.010 *et seq.*; Del. Code § 3030 *et seq.*, including continuing education requirements, *see, e.g.*, 12 AAC 62.310(a)-(g); 24 Del. Admin. Code § 3000-12.2.1. | |
| 192.    In states that licenses professional counselors through title acts, licensed counselors are subject to codes of professional ethics. *See, e.g.*, Alaska Stat. 08.29.400, 08.01.075(a), 12 AAC 62.900; Del. Code tit. 24, § 3011. | |
| 193.    In states that licenses professional counselors through title acts, licensed counselors are subject to each respective states' disciplinary authority. *See, e.g.*, Alaska | |

| | |
|---|---|
| Stat. 08.29.400, 08.01.075(a), 12 AAC 62.900; Del. Code tit. 24, § 3011. | |
| 194.    The District's expert witness testified that licensure of professional counselors serves three purposes: (1) ensuring that individuals who use "the title 'professional counselor'" have "a certain level of qualification"; (2) providing an avenue to report complaints about professional counselors; and (3) ensuring that self-identified professional counselors are "bound by certain ethical rules." Trepal Dep. 141:11–142:19. | |
| 195.    Title acts serve the same purposes as practice acts. Trepal Dep. 143:6–9. | |
| 196.    The District's 30(b)(6) witness identified two interests served by licensing professional counselors. The first was to "protect the integrity of the profession" by ensuring "that people who are claiming or stating that this is what they're engaged in are doing it to a standard that's acceptable to our residents." Herndon 30(b)(6) Dep. 143:13–17. | |
| 197.    The second stated purpose was to "protect people by ensuring that patients are receiving proper care, protecting vulnerable populations from being taken advantage of." Herndon 30(b)(6) Dep. 143:4–9. | |
| 198.    As to this second purpose, the District's 30(b)(6) witness could not identify any evidence to show that the licensing requirement ensures that people receive "proper care." Herndon 30(b)(6) Dep. 144:5–21. | |
| 199.    The District's 30(b)(6) witness agreed that the only "evidence that licensure is necessary is that the city council passed the ordinance requiring licensure." Herndon 30(b)(6) Dep. 159:21–160:1. | |

| | |
|---|---|
| 200. The District's position at deposition was that the only "evidence that licensure is necessary is that the city council passed the ordinance requiring licensure." Herndon 30(b)(6) Dep. 159:21–160:1. | |
| 201. The District has no evidence that its license requirement "achieve[s] any greater public benefits than are achieved in any other American jurisdiction. Herndon 30(b)(6) Dep. 169:2–7. | |
| 202. The District has never "gathered any evidence that its counselor licensing requirement is necessary." Herndon 30(b)(6) Dep. 168:5–8. | |
| 203. License portability is of "paramount" importance. Trepal Dep. 66:3–8, 67:3–7, 59:25–60:14; *see also* Sardi-Brown Dep. 13:13–14, 135:20–136:2 (describing licensing reciprocity as "one of those wishlist items that we have been talking about, I think, for decades in the counseling profession."); Sherk Dep. 126:12–127:14 (testifying that portability is "important . . . to help increase the number of providers in different jurisdictions"). | |
| 204. The District lacks any evidence that would prove that it is ensuring patients are receiving proper care by licensing professional counselors. Herndon 30(b)(6) Dep. 144:5-21. | |
| 205. The Myers-Briggs Type Indicator is a personality assessment created by Isabel Briggs Myers and Katharine Cook Briggs to "make the theory of psychological types . . . understandable and useful in people's lives." About the MBTI® Assessment, https://www.capt.org/mbti-assessment/mbti-overview.htm (last visited June 22, 2023). After answering a series of questions, the test suggests one of sixteen "personality types" and potential career options for each type. *Id.* | |

| | |
|---|---|
| 206. The Strong Interest Inventory (SII) involves questions and scales that are meant to measure an individual's interests in topics like art, business, science, and teamwork. Strong Interest Inventory®: A career assessment that delivers insight and direction, https://www.themyersbriggs.com/en-US/Products-and-Services/Strong (last visited June 22, 2023). | |
| 207. According to the American Counseling Association, some states license professional counselors solely under "title acts." Pl's Ex. 8, American Counseling Association, Practice Act/Title Act Chart, 1–4. | |
| 208. The District has no evidence that Elizabeth's counseling services have ever harmed anyone. | |
| 209. The District has no evidence that a standalone title act would be less effective at achieving the District's asserted interests than its license requirement. | |
| 210. The District has no evidence that direct prohibitions on misconduct would be less effective at achieving the District's asserted interests than its license requirement. | |
| 211. The District has no evidence that a licensing requirement that allowed counselors licensed in the jurisdiction where they are physically located to provide teletherapy to District residents would be less effective at achieving the District's asserted interests than its license requirement. | |
| 212. The District has no evidence of harm caused by the unlicensed practice of professional counseling in the District. | |

| | |
|---|---|
| 213.   The District has no evidence of harm caused by the unlicensed practice of professional counseling in any jurisdiction. | |

Dated: June 26, 2023

                    Respectfully submitted,

                    /s/ Robert E. Johnson
                    Robert E. Johnson (D.C. Bar No. 1013390)
                    INSTITUTE FOR JUSTICE
                    16781 Chagrin Blvd. #256
                    Shaker Heights, OH 44120
                    Tel: (703) 682-9320
                    Fax: (703) 682-9321
                    Email: rjohnson@ij.org

                    John G. Wrench (D.C. Bar No. 1722587)
                    Robert J. McNamara (D.D.C. Bar # VA065)
                    INSTITUTE FOR JUSTICE
                    901 North Glebe Road, Suite 900
                    Arlington, Virginia 22203
                    Tel: (703) 682-9320
                    Fax: (703) 682-9321
                    Email: jwrench@ij.org, rmcnamara@ij.org

                    *Attorneys for Plaintiff Elizabeth Brokamp*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| ELIZABETH BROKAMP, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-3574 (TJK) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| _____ | ) | |

---

**PLAINTIFF'S COUNTER-STATEMENT OF DISPUTED FACTS**

---

Pursuant to Local Civil Rule 7(h)(1) and this Court's Standing Order [4], Plaintiff

submits this counter-statement of disputed material facts in response to Defendant District of

Columbia's (the District) Statement of Undisputed Material Facts (Docket No. 29-1).

| DEFENDANT'S FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 1. So residents receive safe, competent healthcare, the District requires that individuals engaged in health occupations obtain a license.  D.C. Code § 3-1205.01(a)(1). | **Admitted** that the District requires individuals obtain a license before engaging in the occupations listed in D.C. Code § 3-1205.01(a)(1).<br><br>**Denied** that the District's purpose for requiring a license for each occupation listed in D.C. Code § 3-1205.01(a)(1) is so that "residents receive safe, competent healthcare." In 1985, the D.C. Law Revision Commission concluded that there was "no evidence of public harm sufficient to justify licensure" of therapists and counselors. Pl's Ex. 20, D.C. Council, Committee Report on Bill 6-317 D.C. Health Occupations Revision Act of 1985 (Nov. 26, |

1

<table>
<tr>
<td></td>
<td>1985) ("Comm. Rep. on 1985 Revision Act"), 12.

In 1992, the District "had received no information which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." Pl's Ex. 22, D.C. Council, Committee Report on Bill 9-197 D.C. Health Occupations Revision Professional Counselors Amendment Act of 1992 (Feb. 11, 1992) ("Comm. Rep. on 1992 Amendment Act"), 4.

When the District enacted the licensing requirement for professional counselors in 1992, the District was not "aware of any evidence that the public safety was being jeopardized or the consumers needed additional protection in the area of professional counseling." Pl's Ex. 1, Latrice Herndon 30(b)(6) Dep. Tr. (Herndon 30(b)(6) Dep.), 154:21–155:13. The District has never "gathered any evidence that its counselor licensing requirement is necessary." Herndon 30(b)(6) Dep. 168:5–8.</td>
</tr>
<tr>
<td>2. This occupational licensing requirement includes individuals engaged in the "[p]ractice of professional counseling," defined as:

engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness. The practice of professional counseling includes:</td>
<td>**Admitted** that D.C. Code § 3-1201.02(15B) defines the "practice of professional counseling."</td>
</tr>
</table>

| | |
|---|---|
| (A) The processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders or other appropriate classification schemes, and determining treatment goals and objectives; and<br><br>(B) Assisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment.<br><br>*Id.* § 3-1201.02(15B). | |
| 3. As the statute makes clear, assessing and diagnosing mental disorders to then make "evidence-based interventions" is "crucial" to the District's definition of professional counseling. Def.'s Ex. B, Victoria Sardi-Brown Dep. Tr. (Sardi-Brown Dep.) 63. | **Denied** that "assessing and diagnosing mental disorders to then make 'evidence-based interventions' is 'crucial' to the District's definition of professional counseling" under D.C. Code § 3-1201.02(15B). When asked in her deposition whether "all conversations that constitute counseling activity require the purpose of diagnosis," the District's 30(b)(6) witness answered, "No." Herndon 30(b)(6) Dep. 39:7–10.<br><br>Rather, the "practice of professional counseling is defined as involving certain contents at the session." Pl's Ex. 3, Victoria Sherk Dep. Tr. (Sherk Dep.), 67:8–15. Moreover, in the context of professional counseling, diagnosis consists of speech about particular topics. Sherk Dep. 20:7–21:1 (testifying that diagnostic assessment involves "conversation [with the client] about what kinds of symptoms they may be experiencing" as well as "collecting history" from the client, which are then summarized in written form). And the same is true of |

| | |
|---|---|
| | evidence-based interventions. *See* Sardi-Brown Dep. 28:4–10 (testifying that "evidence-based care" consists of "meaningful conversations"). |
| 4. Although licensed professional counselors (LPCs) often convey and gather information for diagnosis and treatment orally, "[t]he purpose of counseling is not to have a conversation; it is, most often, to seek treatment."  Def.'s Ex. G, Expert Rep. of Dr. Heather Trepal (Trepal Rep.) 4; *see also, e.g.*, Sardi-Brown Dep. 20, 27–28, 79–82. | **Admitted** that LPCs like Elizabeth convey and gather information orally.<br><br>**Denied** that "the purpose of counseling . . . is not to have a conversation." LPCs' like Elizabeth's "treatment" consists of talk therapy. Pl's Ex. 11, Elizabeth Brokamp Dep. Tr. (Brokamp Dep.), 142:4–7. Clients seek out professional counselors "to have meaningful conversations." Pl's Ex. 2, Dr. Victoria Sardi-Brown Dep. Tr. (Sardi-Brown Dep.), 28:4–14. LPCs' conversations with their clients consists of "a back and forth sort of situation where there's going to be a lot of listening and a lot of dialoguing." Sardi-Brown Dep. 27:12–20. "Diagnostic assessments" include "conversation[s]" about a client's "family history," "living situation," "physical health," and "legal history." Sherk Dep. 20:7–18.<br><br>**Denied** that LPCs "often" convey and gather information for "diagnosis." When asked in her deposition whether "all conversations that constitute counseling activity require the purpose of diagnosis," the District's 30(b)(6) witness answered, "No." Herndon 30(b)(6) Dep. 39:7–10. "[D]iagnosing somebody is not what they come for . . . it's not the focus and it's, certainly, not why people come." Brokamp Dep. 162:18–163:17. |
| 5. Client sessions—just one component of LPCs' practice—are structured around "principles, theories and evidence-based practices," Sardi-Brown Dep. 29, and "words are a tool . . . specifically that are guided by evidence-based theories, practices, assessments, interventions, [and] diagnoses," *id.* at 112. | **Admitted** that LPCs provide counseling services in "client sessions." **Admitted** that counseling consists of "words."<br><br>**Denied** that the District's definition of the "practice of professional counseling" only includes "words . . . specifically guided by evidence-based theories, practices, assessments, interventions, [and] diagnoses." *See* § 3-1201.02(15B). |

|  | **Denied** that client sessions are "just one component of LPCs' practice." Elizabeth's counseling consists entirely of conversations between her and her clients. Declaration of Elizabeth Brokamp in Support of Plaintiff's Motion for Summary Judgment (Brokamp Decl.), ¶ 5; Brokamp Dep. 142:4–7. Counseling consists of "a back and forth sort of situation where there's going to be a lot of listening and a lot of dialoguing." Sardi-Brown Dep. 27:12–20; *id.* at 26:9-15; *id.* at 28:4–11; Sherk Dep. 16:20–21; *id.* at 12:17–13:24. |
|---|---|
| 6. Professional counseling consists of a relationship in which an LPC provides professionalized, therapeutic treatment to a client. Trepal Rep. 5; Sardi-Brown Dep. 81–82; *see also* Def.'s Ex. A, Elizabeth Brokamp Dep. Tr. (Brokamp Dep.) 8–9 (testifying that her counseling "really is a relationship" with a "professional part"). | **Denied.** Under D.C. Code § 3-1201.02(15B), the "practice of professional counseling is defined as involving certain contents at the session." Sherk Dep. 67:8–15. The District cannot, "consistent with the definition of professional counseling, reach a conclusion that someone was practicing without a license without knowing what they were discussing with their clients." Pl's Ex. 4, Gregory Scurlock Dep. Tr. (Scurlock Dep.), 144:8–16. For example, it is "not possible" for the District to "say whether all career counseling is professional counseling because it really would depend on the content." Sherk Dep. 93:5–8. Accordingly, a "life coach" who is "hav[ing] conversations with clients about their long-term mental and emotional development" might be engaged in the practice of professional counseling. Herndon 30(b)(6) Dep. 59:3–10.

**Denied** that Elizabeth testified that "her counseling 'really is a relationship' with a 'professional part.'" When asked how she would explain what she does to someone "in the elevator," Elizabeth answered that "part of it is the counseling, which really is a relationship . . . built on talking to one another" and another part is the "professional part, which to me means you're doing it as part of a job[.]" Brokamp Dep. 8:9–9:3. |

| | |
|---|---|
| | Elizabeth was not answering a question about the District's definition of the "practice of professional counseling" or how other LPCs would describe counseling in their own words. Professional counseling consists of a "a back and forth sort of situation where there's going to be a lot of listening and a lot of dialoguing." Sardi-Brown Dep. 27:12–20, *id.* at 26:9-15, *id.* at 28:4-11; Sherk Dep. 16:20-21, *id.* at 12:17–13:24. |
| 7. The relationship between LPC and client is highly structured with clear roles and responsibilities.  *See* Sardi-Brown Dep. 108–11 (explaining how LPCs' relationships with clients include informed consent and confidentiality elements unique to a professional setting); Brokamp Dep. 84–86 (explaining that all her client relationships begin with informed consent and confidentiality agreements). | **Admitted** that Elizabeth sends her new clients "paperwork so that they have informed consent." Brokamp Dep. 81:14–82:2. **Admitted** that Elizabeth "explain[s] confidentiality" to her new clients." Brokamp Dep. 84:21–86:5.

**Denied** that the relationship between LPC and their client is "highly structured" with "clear roles and responsibilities." Neither the District's witness nor Elizabeth testified to that effect. *See* Sardi-Brown Dep. 108–11; Brokamp Dep. 84–86.

**Denied** that Elizabeth testified that "all her client relationships begin with . . . confidentiality agreements." Brokamp Dep. 84:21–86:5. |
| 8. A person may not "practice, attempt to practice, or offer to practice" professional counseling without a license.  D.C. Code § 3-1210.01. | **Admitted** that a person may not "practice, attempt to practice, or offer to practice" professional counseling in the District without a license. D.C. Code § 3-1210.01. |
| 9. A totality of circumstances indicates whether an individual is practicing professional counseling and therefore needs a license.  *E.g.,* Sardi-Brown Dep. 83–85; Def.'s Ex. C, LaTrice Herndon Dep. Tr. (Herndon Dep.) 50; Def.'s Ex. D, Gregory Scurlock Dep. Tr. (Scurlock Dep.) 131–32; Def.'s Ex. E, Victoria Sherk Dep. Tr. (Sherk Dep.) 81–82, 108. | **Denied.** Under D.C. Code § 3-1201.02(15B), the "practice of professional counseling is defined as involving certain contents at the session." Sherk Dep. 67:8–15. The District cannot, "consistent with the definition of professional counseling, reach a conclusion that someone was practicing without a license without knowing what they were discussing with their clients." Scurlock Dep. 144:8–16. For example, it is "not possible" for the District to "say whether all career counseling is professional counseling because it really would depend on the content." Sherk Dep. |

| | 93:5–8.  Accordingly, a "life coach" who is "hav[ing] conversations with clients about their long-term mental and emotional development" might be engaged in the practice of professional counseling. Herndon 30(b)(6) Dep. 59:3–10. |
|---|---|
| 10. Relevant factors for determining whether an individual is practicing professional counseling include what the nature of an individual's relationship with a client is, particularly whether that relationship is professional and therapeutic. *E.g.*, Sardi-Brown Dep. 83, 118; D.C. Code § 3-1201.02(15B) (defining professional counseling to include "counseling or psychotherapy activities . . . to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness"); *id.* § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15, *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>The "nature of an individual's relationship with a client" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19.<br><br>In particular, the therapeutic relationship between a professional counselor and her clients is defined by the content of speech. As the former head of the District's licensing board testified, the "therapeutic relationship" is "*not* just let's sit down and banter" but rather involves "dialogue about the real issues." Sardi-Brown Dep. 26:11–22.<br><br>**Denied** that a "professional" or "therapeutic" relationship is sufficient to constitute the "practice of professional counseling" under § 3-1201.02(15B). For example, whether a professional "life coach" is engaged in the "practice of professional counseling" depends not on the existence of a "professional" or "therapeutic" relationship, but on "what they were discussing with their clients." Scurlock Dep., 144:8–16; Sherk Dep. 67:8–15; *id.* at 93:5–8; Herndon 30(b)(6) Dep. 59:3–10. |

| | |
|---|---|
| 11. Relevant factors for determining whether an individual is practicing professional counseling include whether an individual uses evidence-based assessments. *E.g.*, Sardi-Brown Dep. 84; D.C. Code § 3-1201.02(15B)(A) (defining professional counseling to include "[t]he processes of conducting interviews, tests, and other forms of assessment"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual uses "evidence-based assessments" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19.<br><br>"Evidence-based assessments" consist of speech about particular topics. *See* Sardi-Brown Dep. 28:4–10 (testifying that "evidence-based care" consists of "meaningful conversations"); *id.* at 29:6–8 (describing "evidence-based care" as "a dialogue using words, but it's a dialogue based on principles, theories and evidence-based practices"); Sherk Dep. 12:2–13:7 (describing evidence-based techniques such as "making connections between their past relationships and often family histories and their current depression," "encouraging people to regulate their nervous systems," and "exercises where I say: Over the next week, I'd like you to sort of pay attention to what your automatic thoughts are, write them down."). |
| 12. Relevant factors for determining whether an individual is practicing professional counseling include whether an individual is qualified to interpret assessments. *E.g.*, Sardi-Brown Dep. 84; D.C. Code § 3-1201.02(15B)(A) (defining counseling to include "[t]he processes of conducting interviews, tests, and other forms of assessment"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual is "qualified to interpret assessments" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the |

| | |
|---|---|
| | Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19.<br><br>"Assessments" consist of speech about particular topics. *See* Brokamp Dep. 29:6–12 ("Things that I might use would be like – I tend to use more informal things like so on a scale of one to 10 how are you feeling today, and we sort of self-measure that way.").<br><br>"Assessments" also include the use of personality tests to counsel people on their career choice. Pl's Ex. 14, 2019 Negotiated Settlement Agreement, D.C. Board of Professional Counseling (2019 NSA); Herndon 30(b)(6) Dep. 116:5–121:11. The use of such assessments involves speech: "[Y]ou and your career counselor would then be talking about—or you and your career counselor would be talking about the results and getting the client's reaction to them. Was anything surprising? Does this sound like you? … [I]t gives you something to talk about." Sardi-Brown Dep. 101:20–102:14. |
| 13. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual diagnoses mental disorders or conditions. *E.g.*, Sardi-Brown Dep. 84; Herndon Dep. 51–52; D.C. Code § 3-1201.02(15B)(A) (defining professional counseling to include "diagnosing individuals, families, and groups"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "diagnoses mental disorders or conditions" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not |

| | |
|---|---|
| | always have direct access to that content. Sherk Dep. 65:14–66:19.<br><br>In particular, in the context of professional counseling, "diagnosis" consists of speech about particular topics. Sherk Dep. 20:7–21:1 (testifying that diagnostic assessment involves "conversation [with the client] about what kinds of symptoms they may be experiencing" as well as "collecting history" from the client, which are then summarized in written form). |
| 14. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual consults the Diagnostic and Statistical Manual of Mental Disorders (DSM).  *E.g.*, Sardi-Brown Dep. 84; D.C. Code § 3-1201.02(15B)(A) (defining professional counseling to include "diagnosing . . . as outlined in the Diagnostic and Statistical Manual of Disorders"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "consults the Diagnostic and Statistical Manual of Mental Disorders (DSM)" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 15. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual treats or purports to treat mental disorders or conditions.  Sardi-Brown Dep. 75–76, 118, 120; D.C. Code § 3-1201.02(15B) (defining professional counseling to include "counseling or psychotherapy activities . . . to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "treats or purports to treat mental disorders or conditions" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not |

| | |
|---|---|
| | always have direct access to that content. Sherk Dep. 65:14–66:19.<br><br>In particular, in the context of professional counseling, treatment involves speech about certain topics. Sardi-Brown Dep. 30:18–31:7 (testifying that "being empathetic, listening, having positive regard for your clients" make up "a good 80 percent of what goes on in professional counseling" and are "tantamount for a successful counseling relationship and successful outcomes for clients"). |
| 16. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual develops treatment plans. *E.g.*, Sardi-Brown Dep. 84; D.C. Code § 3-1201.02(15B)(A) (defining professional counseling to include "determining treatment goals and objectives"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "develops treatment plans" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. The development of "treatment goals" consists of speech about particular topics.<br><br>"Treatment goals" are determined by clients and consist of the client's "objectives." Sherk Dep. 37:21–38:4. A "treatment plan" consists of the counselor's suggested approach to meeting their client's objectives. *Id.* And, in the context of professional counseling, treatment involves speech. Sardi-Brown Dep. 30:18–31:7. |
| 17. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual uses evidence-based interventions, psychotherapy, cognitive behavior therapy | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10. |

| | |
|---|---|
| (CBT), or other treatment modalities to treat a client's mental conditions or disorders.  Sardi-Brown Dep. 21, 75–76; D.C. Code § 3-1201.02(15B) (defining professional counseling to include "counseling or psychotherapy activities, including cognitive behavioral therapy or other modality"). | Whether an individual "uses evidence-based interventions, psychotherapy, cognitive behavior therapy (CBT), or other treatment modalities to treat a client's mental conditions or disorders" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. <br><br> CBT, like other "treatment modalities," consists of speech about particular topics. *See* Sherk Dep. 12:17–13:24 (testifying that CBT involves talk-therapy in which the counselor encouraged their client to identify and reflect on their thoughts). The same is true of other evidence-based treatment techniques. *See* Sardi-Brown Dep. 28:4–10 (testifying that "evidence-based" care consists of "meaningful conversations"); *id.* at 29:6–8; Sherk Dep. 12:2–13:7. |
| 18. Relevant factors for determining whether an individual is practicing professional counseling include how the individual measures treatment progress.  *E.g.*, Sardi-Brown Dep. 84; D.C. Code § 3-1201.02(15B)(A) (defining professional counseling to include "determining treatment goals and objectives"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10. <br><br> "[H]ow [an] individual measures treatment progress" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. <br><br> "[M]easuring treatment goals" consists of keeping "notes," Sardi-Brown Dep. 11–18, |

|  | about conversations that help clients meet their "objectives," Sherk Dep. 37:21–38:4 |
|---|---|
| 19. Relevant factors for determining whether an individual is practicing professional counseling include what an individual's practice setting is. *E.g.*, Sardi-Brown Dep. 119; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>An "individual's practice setting" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 20. Relevant factors for determining whether an individual is practicing professional counseling include how the individual holds herself out to the public or potential clients. *E.g.*, Herndon Dep. 50; Sardi-Brown Dep. 84; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>"[H]ow [an] individual holds herself out to the public or potential clients" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 21. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual purports to use her qualifications in rendering services. *E.g.*, Sardi-Brown Dep. 84, 118–19; Herndon Dep. 50; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "purports to use her qualifications in rendering services" is only |

| | |
|---|---|
| include "[a]ssisting individuals, families, and groups through a professional relationship"). | relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 22. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual takes pay. *E.g.*, Sardi-Brown Dep. 119; Herndon Dep. 50; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "takes pay" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 23. Relevant factors for determining whether an individual is practicing professional counseling include whether the individual takes insurance. *E.g.*, Sardi-Brown Dep. 119; Herndon Dep. 50; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | **Denied.** The "practice of professional counseling" is defined as involving certain contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "takes insurance" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 24. Relevant factors for determining whether an individual is practicing professional | **Denied.** The "practice of professional counseling" is defined as involving certain |

14

| | |
|---|---|
| counseling include whether the individual consults with other professionals. *E.g.*, Sardi-Brown Dep. 84–85, 119; *see* D.C. Code § 3-1201.02(15B)(B) (defining counseling to include "[a]ssisting individuals, families, and groups through a professional relationship"). | contents at the session." Sherk Dep. 67:8–15; *id.* at 93:5–8; Scurlock Dep. 144:8–16; Herndon 30(b)(6) Dep. 59:3–10.<br><br>Whether an individual "consults with other professionals" is only relevant under D.C. Code § 3-1201.02(15B) to the extent that it is "indirect evidence" that allows the Board to "make an inference as to what the content of the session is." Sherk Dep. 65:14–66:2. The Board relies on such indirect evidence to draw inferences about the "content of the session" because it does not always have direct access to that content. Sherk Dep. 65:14–66:19. |
| 25. An unlicensed person may not "use the phrase 'licensed professional counselor' or 'licensed graduate professional counselor' or any similar title or description of services with the intent to represent that the person practices professional counseling," though she may use "the generic terms 'counseling' or 'counselor.'" D.C. Code § 3-1210.03(t). | **Admitted.** |
| 26. Certain individuals will not be considered to practice professional counseling or any health occupation "if the individuals do not hold themselves out, by title, description of services, or otherwise, to be practicing any of the health occupations regulated by [the District]." D.C. Code § 3-1201.03(d). | **Admitted.** |
| 27. Those individuals include, among others, religious officials, family caregivers, marriage and family therapists, and art therapists. D.C. Code § 3-1201.03(d)(1), (2), (7). | **Admitted** that the District exempts, among others, marriage and family therapists, and art therapists, if those individuals "do not hold themselves out, by title, description of services, or otherwise, to be practicing any of the health occupations regulated by [the District]." D.C. Code § 3-1201.03(d).<br><br>**Denied** that one category of individuals exempt from the District's license requirement are "religious officials." §3-1201.03(d)(1) exempts any "minister, priest, rabbi, officer, or agent of any religious body or any practitioner of any religious belief" but only if "engaging in prayer or any other religious practice or nursing practiced solely |

| | |
|---|---|
| | in accordance with the religious tenets of any church." |
| | **Denied** that one category of individuals exempt from the District's license requirement are "family caregivers." § 3-1201.03(d)(2) exempts "person engaged in the care of a friend or member of the family . . . whether employed regularly or because of an emergency or illness." |
| 28. To become an LPC in the District, an individual must (1) earn a master's degree in an accredited program, (2) complete at least 60 post-graduate semester hours in counseling or related subjects, (3) complete 3,500 hours of post-graduate supervised professional counseling, (4) receive a passing score on a national exam, (5) pass a background check, (6) complete a few forms, and (7) pay a fee. D.C. Code § 3-1207.10(a); 17 DCMR §§ 6602, 6603, 6605. | **Admitted** that, to become an LPC in the District, an individual must: earn a master's degree in an accredited program; complete at least 60 post-graduate semester hours in counseling or related subjects; complete 3,500 hours of post-graduate supervised professional counseling; receive a passing score on a national exam; pass a background check; and pay a $230 application fee.<br><br>**Denied** that applicants must also complete a "few forms." The individual must assemble an application package, including the following completed forms: a postgraduate supervised experience form; a supervision calculation form; official sealed transcripts; internship or practicum forms; a coursework completion form; an official score report from the national exam; responses to screening questions; and the results of a self-query report from the National Practitioner Databank. D.C. Code § 3-1205.05(a)(1); Pl's Ex. 26, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Examination ("Examination Application Checklist"). |
| 29. In addition, the individual must be over 18 years old and cannot have "been convicted of an offense that is related to the occupation for which the license . . . is sought." D.C. Code § 3-1205.03(a)(1)–(2). | **Admitted.** |
| 30. Licenses may also be denied if the individual had a license in another state that | **Admitted.** |

| | |
|---|---|
| was revoked or suspended, or if the individual is the subject of a pending disciplinary proceeding.  D.C. Code § 3-1205.03(c). | |
| 31. Evidence-based practices, like scored assessments and CBT, are the subject of LPC's required coursework and examinations.  *E.g.*, 17 DCMR § 6602.2(c)(6); Def.'s Ex. R, Nat'l Bd. for Certified Counselors, *Content Outline: The National Counselor Examination* 2 (2023) ("NCE Outline"); Sardi-Brown Dep. 21, 90. | **Admitted.** |
| 32. LPCs' education covers skills and topics pertaining to client safety like ethics, client confidentiality, assessing for high-risk behaviors (*e.g.*, suicide, self-harm, violence), assessing client competency to provide informed consent, and screening clients for appropriate treatments.  *E.g.*, NCE Outline 3–5; DCMR § 6602.2(c)(5), (6), (10). | **Admitted.** |
| 33. Aspiring LPCs must apply evidence-based practices they learned to actual clients while under clinical supervision.  17 DCMR § 6603.1(b); Trepal Rep. 7. | **Admitted.** |
| 34. A long clinical supervision period "serves the important dual functions of protecting client welfare and ensuring competent and ethical practice of the aspiring-to-be independently licensed LPC."  Trepal Rep. 8. | **Denied** that clinical supervision has any relationship to "protecting client welfare and ensuring competent and ethical practice of the aspiring-to-be independently licensed LPC." Before and after the District enacted its license requirement (and thus its supervision requirements) individuals offered and continue to offer services to District residents that constitute the "practice of professional counseling."  Pl's Ex. 7, Dr. Heather Trepal Dep. Tr. (Trepal Dep.), 29:14–23; Herndon 30(b)(6) Dep. 59:3–10. The District lacks evidence that, prior to its license requirement, "the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. Today, the District has no evidence that its license requirement, including the supervision requirement, have any relationship to public safety. Herndon 30(b)(6) Dep. 159:21–160:1 (testifying that the District's only "evidence that licensure is necessary is that the city council passed the |

| | ordinance requiring licensure."); *id.* at 168:5–8 (testifying that the District has never "gathered any evidence that its counselor licensing requirement is necessary."). |
|---|---|
| 35. These educational and experiential requirements ensure that LPCs do not independently practice until they "are adequately prepared to navigate the risks [counseling] involves" and avoid "harm to clients or the public."  Trepal Rep. 9; *see* Sardi-Brown Dep. 26 (explaining that it "takes a certain skill to create that safe space" necessary for a therapeutic relationship); *id.* at 91–92 (explaining that misinterpreting assessments can cause harm). | **Denied** that educational and experiential requirements have any relationship to "navigating the risks" of counseling or avoiding "harm to clients or the public." Before and after the District enacted its license requirement (and thus its educational and experiential requirements) individuals offered and continue to offer services to District residents that constitute the "practice of professional counseling." Trepal Dep. 29:14–24; Herndon 30(b)(6) Dep. 59:3–10. The District lacks evidence that, prior to its license requirement, "the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. Today, the District has no evidence that its license requirement, including the educational and experiential requirements, have any relationship to public safety. Herndon 30(b)(6) Dep. 159:21–160:1 (testifying that the District's only "evidence that licensure is necessary is that the city council passed the ordinance requiring licensure."); *id.* at 168:5–8 (testifying that the District has never "gathered any evidence that its counselor licensing requirement is necessary."). |
| 36. Separate from this initial licensure process, the District provides streamlined licensure "by endorsement" for LPCs from other jurisdictions.  D.C. Code § 3-1207.10(c). | **Admitted** that D.C. Code § 3-1207.10(c) provides for licensure "by endorsement." <br><br> **Denied** that licensure under D.C. Code § 3-1207.10(c) is "streamlined." Applicants who seek to be licensed in the District "by endorsement" must demonstrate that they meet all requirements listed in D.C. Code §§ 3-1205.01 *et seq.*, are currently licensed in another state, and have completed: (1) at least 60 hours of postgraduate education leading to a Master's degree in counseling or a related field from an accredited institution; (2) at least 4,000 hours of post-graduate supervised counseling over at least two years; (3) at least |

| | 2,500 hours of direct client contact within the 4,000 hours of post-graduate counseling; (4) at least 100 hours of clinical supervision as a post-graduate, with no more than 50 of those hours coming from group supervision; and (5) five years of post-licensure experience in clinical counseling at the independent level. D.C. Code § 3–1207.10(c).<br><br>Applicants must then submit an application package, including an application, an examination score report, a postgraduate supervised experience form, a supervision calculation form, an internship/practicum form, a coursework completion form, a "2x2" sized passport photo, a copy of identification, fingerprints, proof of vaccination, and a $230 application fee. Pl's Ex. 27, D.C. Health Regulation & Licensing Administration, New License Application Checklist – By Endorsement ("Endorsement Application Checklist"), 1–3.<br><br>Those requirements impose significant burdens of time and energy, including application fees and accessing information that may not be readily accessible, if at all. Brokamp Decl. ¶¶ 20–27. |
|---|---|
| 37. Individuals may receive a license by endorsement if they (1) are already licensed in another jurisdiction, (2) possess a master's degree in counseling or related field, and (3) have practiced professional counseling for 5 years.  Def.'s Ex. N, Bd. of Pro. Counseling, *Policy No. 20-003* (Oct. 9, 2020); *see also* Def.'s Ex. O, Bd. of Pro. Counseling, *Licensure by Endorsement Checklist*. | **Admitted** that an individual cannot obtain a license by endorsement unless they are (1) are already licensed in another jurisdiction, (2) possess a master's degree in counseling or related field, and (3) have practiced professional counseling for 5 years.<br><br>**Denied** that those are the only requirements for obtaining a license by endorsement. Applicants who seek to be licensed in the District "by endorsement" must demonstrate that they meet all requirements listed in D.C. Code §§ 3-1205.01 *et seq.*, are currently licensed in another state, and have completed: (1) at least 60 hours of postgraduate education leading to a Master's degree in counseling or a related field from an accredited institution; |

| | |
|---|---|
| | (2) at least 4,000 hours of post-graduate supervised counseling over at least two years; (3) at least 2,500 hours of direct client contact within the 4,000 hours of post-graduate counseling; (4) at least 100 hours of clinical supervision as a post-graduate, with no more than 50 of those hours coming from group supervision; and (5) five years of post-licensure experience in clinical counseling at the independent level. D.C. Code § 3–1207.10(c). Applicants must then submit an application package, including an application, an examination score report, a postgraduate supervised experience form, a supervision calculation form, an internship/practicum form, a coursework completion form, a "2x2" sized passport photo, a copy of identification, fingerprints, proof of vaccination, and a $230 application fee. Endorsement Application Checklist, 1–3. |
| 38. The District also will allow professional counselors licensed in Maryland and Virginia to practice in the District without a District-issued license if that state has reciprocity with the District.  D.C. Code § 3-1205.02(a)(4). | **Admitted.** |
| 39. Virginia, however, does not allow LPCs licensed in the District to practice in Virginia without a Virginia license.  Va. Bd. of Counseling, *LPC Licensure Process Handbook* 12 (Mar. 2023), https://tinyurl.com/3j77ndzu. | **Admitted.** |
| 40. The Board of Professional Counseling (Board) administers the licensing system and "regulate[s] the practices of professional counseling."  D.C. Code § 3-1202.13(b). | **Admitted.** |
| 41. To renew a license as required every two years, an LPC must meet continuing education requirements.  17 DCMR §§ 6601, 6610. | **Admitted.** |
| 42. Continuing education requirements ensure LPCs to stay "up to date with the most evidence-based practices in the field," which is "crucial" to "safeguard the public." Sardi-Brown Dep. 20 | **Denied.** The District has no evidence that continuing education requirements have any relationship to "safeguard[ing] the public." Before and after the District enacted its license requirement (and thus its continuing |

20

| | |
|---|---|
| | education requirements), individuals offered and continue to offer services to District residents that constitute the "practice of professional counseling."  Trepal Dep. 29:14–24; Herndon Dep. 59:3–10. The District lacks evidence that, prior to its license requirement, "the public safety was being jeopardized or that consumers needed additional protection in this area." Herndon 30(b)(6) Dep. 154:21–155:13; Comm. Rep. on 1992 Amendment Act, 4. Today, the District has no evidence that its license requirement, including the specific continuing education requirements, have any relationship to public safety. Herndon 30(b)(6) Dep. 159:21–160:1 (testifying that the District's only "evidence that licensure is necessary is that the city council passed the ordinance requiring licensure."); *id.* at 168:5–8 (testifying that the District has never "gathered any evidence that its counselor licensing requirement is necessary."). |
| 43. LPCs must adhere to standards of conduct.  17 DCMR § 6609. | **Admitted** that DC-licensed LPCs are subject to the standards of conduct provided in 17 DCMR § 6609. |
| 44. Accordingly, the District's licensing system imposes "ethical and legal obligation[s]" that those who are not subject to a licensing system are not bound by.  Sardi-Brown Dep. 129–30. | **Admitted** that the District's licensing system imposes "ethical and legal obligations." <br><br> **Denied** that individuals not licensed in the District are "not subject to a licensing system are not bound by" ethical and legal obligations. Individuals licensed in other jurisdictions are subject to that jurisdiction's ethical and legal obligations. *See* 18 VAC 115-20-130. As are individuals licensed under title acts. *See, e.g.*, *See, e.g.*, Alaska Stat. 08.29.400, 08.01.075(a), 12 AAC 62.900; Del. Code tit. 24, § 3011. |
| 45. If an LPC violates professional standards, the Board may discipline her.  D.C. Code § 3-1205.14. | **Admitted.** |
| 46. In addition, the District's Department of Health (DC Health) investigates and disciplines individuals who purport to practice professional counseling without a license.  Scurlock Dep. 50. | **Admitted** that DC Health investigators investigate and discipline individuals who they determine to be practicing professional counseling without a license. |

| | |
|---|---|
| | **Denied** that the DC Health Investigators discipline individuals who merely "purport" to practice professional counseling without a license. That discipline is based on investigators' determination that the individual did, in fact, practice professional counseling as defined in D.C. Code § 3-1201.02(15B). Herndon 30(b)(6) Dep. 135:23–139:17 (testifying that investigator disciplined individual based on determination that unlicensed individual's "art therapy" constituted the "practice of professional counseling"). |
| 47. For violations of professional standards or unlicensed practice, an individual usually pays an assessment.  *See* D.C. Code §§ 3-1210.09, 3-1205.14(c)(5); Scurlock Dep. 14–15, 137–38; Herndon Dep. 71. | **Admitted** that individuals found to have engaged in unlicensed practice are usually charged an "assessment" in the form of a monetary fine, of up to $2,000. Scurlock Dep. 14:17–15:3. <br><br> **Denied** that individuals "usually" pay a monetary fine for "violations of professional standards." The District's witness testified about "unlicensed practice"—not violations of "professional standards." Scurlock Dep. 14:17–15:3; 136:22–138:14. The cited testimony from the District's 30(b)(6) witness does not involve any discussion of assessments or fines. *See* Herndon 30(b)(6) Dep. 71. |
| 48. Criminal penalties of imprisonment not to exceed a year or a fine not to exceed $10,000 are also available.  D.C. Code § 3-1210.07. | **Admitted.** |
| 49. If an individual is the subject of an enforcement action, she may appeal to the Office of Administrative Hearings and then to the D.C. Court of Appeals.  D.C. Code §§ 3-1205.19(i), 3-1205.20; Scurlock Dep. 137. | **Admitted.** |
| 50. Every District witness (Board members, DC Health enforcement officers, and the District's Rule 30(b)(6) witness) testified that they either had never even considered enforcement against a life coach or did not believe life coaches (as vaguely described by Dr. Brokamp) would fall under the definition of professional counseling.  Scurlock Dep. 90; | **Denied.** The District's 30(b)(6) witness agreed that a self-styled life coach who is "hav[ing] conversations with clients about their long-term mental and emotional development" might be engaged in the practice of professional counseling. Herndon 30(b)(6) Dep. 59:3–10. |

| | |
|---|---|
| Sardi-Brown Dep. 112–115; Sherk Dep. 86–87; Herndon Dep. 50–53; Def.'s Ex. F, Whitney Moore Dep. Tr. 33. | Compliance Officer Gregory Scurlock testified that services advertised on a D.C.-based life coach's website could constitute the "practice of professional counseling." Scurlock Dep. 128:24–129:14; *see also id.* at 129:16–20 (agreeing that "whether they are practicing without a license would depend on what the life coach is discussing with their clients").<br><br>The former head of the licensing board testified that a life coach "could be engaged in the practice of professional counseling . . . depending on how that person is providing coaching." Sardi-Brown Dep. 108:2–18; *see also* Sardi-Brown Dep. 132:11–133:15 (testifying that it could be a "slippery slope" for life coaches, because "it's hard to talk about life issues without somehow getting wrapped up in the other day-to-day psychosocial issues."). |
| 51. The District's licensure law is intended to further interests in public health and safety as well as professional standards.  Def.'s Ex. Q, Council of the Dist. of Columbia, *Bill 9-197, the District of Columbia Health Occupations Revision Professional Counselors Amendment Act of 1992* 1 (Feb. 11, 1992) ("Comm. Rep."). | **Denied.** The licensure law was initially rejected in 1985 after the District's two-year weighing "the public protection of licensure against the possible restrictive impact on the availability of services" concluded that there was "no evidence of public harm sufficient to justify licensure" of therapists and counselors." Comm. Rep. on 1985 Revision Act, 13.<br><br>The licensure law was proposed "upon the request of the DCACD," not because of any finding that licensure was necessary to protect public safety. Pl's Ex. 21, D.C. Council, Introduction of Legislation, Professional Counselors Licensure Amendment Act of 1988 (Apr. 4, 1989) ("Introduction of Amendment Act"), 1.<br><br>In 1992, the Acting Administrator of the Department of Consumer and Regulatory Affairs testified in opposition to the addition of a licensure requirement on the ground that the executive "had received no information |

| | |
|---|---|
| | which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. Similarly, the Department's Acting Director opposed the amendment on the ground that there was no "demonstrated public need." Comm. Rep. on 1992 Amendment Act, 5.<br><br>When the District enacted the licensure law, the District was not "aware of any evidence that the public safety was being jeopardized or the consumers needed additional protection in the area of professional counseling." Herndon 30(b)(6) Dep. 154:21–155:13.<br><br>The District has never "gathered any evidence that its counselor licensing requirement is necessary." Herndon 30(b)(6) Dep. 168:5–8. |
| 52. In passing the District's licensure law, the Council reasoned that "regulating professional counselors" "protect[s] the public by licensing only qualified practitioners and enforcing professional standards of practice." Comm. Rep. 2. | **Denied.** The Committee made no findings that "regulating professional counselors" "protect[s] the public by licensing only qualified practitioners and enforcing professional standards of practice." Herndon 30(b)(6) Dep. 154:21–155:13.<br><br>The Committee merely stated that the general "objective in regulating professional counselors" is to "protect the public by licensing only qualified practitioners and enforcing professional standards of practice." Comm. Rep. on 1992 Amendment Act, 2. |
| 53. A key indication of quality mental healthcare is the extent to which a provider uses evidence-based methods of diagnosis and treatment. Inst. of Med., *Improving the Quality of Health Care for Mental and Substance-Use Conditions* 35 (2006), https://tinyurl.com/2p9ajnj8. | **Denied.** The District has no evidence that "evidence-based care," which consists of "meaningful conversations," has any relationship to the quality of counseling. Sardi-Brown Dep. 28:4–10; *see also id.* at 29:6–8 (describing "evidence-based care" as "a dialogue using words, but it's a dialogue based on principles, theories and evidence-based practices"); Sherk Dep. 12:2–13:7 (describing evidence-based techniques such as "making connections between their past relationships and often family histories and their current depression," "encouraging people to regulate their nervous systems," and |

| | |
|---|---|
| | "exercises where I say: Over the next week, I'd like you to sort of pay attention to what your automatic thoughts are, write them down."). |
| 54. Another indication of quality mental healthcare is whether the care is safe.  Inst. of Med., *supra*, at 35. | **Denied.** The District has no evidence that its law addresses an actual problem with poor quality care. Herndon 30(b)(6) Dep. 144:5–21. |
| 55. Mental health services are an area of healthcare with serious risks. Trepal Rep. 9; Sardi-Brown Dep. 91–96; Brokamp Dep. 40, 63, 74. | **Denied** that "the practice of professional counseling" is an "area of healthcare with serious risks." Before and after the District enacted its license requirement individuals offered and continue to offer services to District residents that constitute the "practice of professional counseling."  Trepal Dep. 29:14–24; Herndon Dep. 59:3–10. The District lacks evidence that, prior to its license requirement, "the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. Today, the District has no evidence that its license requirement has any relationship to public safety. Herndon 30(b)(6) Dep. 144:5–21. |
| 56. For example, if a provider fails to correctly assess suicide risk and intervene, the client could die by preventable suicide.  Inst. of Med., *supra*, at 167. | **Denied.** The District has no evidence that anyone, including a D.C. resident, has died by preventable suicide because a counselor failed to correctly diagnose the client as a suicide risk. Herndon Dep. 144:5–21. |
| 57. Every state has a licensing requirement for LPCs and has thus concluded that licensing professional counseling protects and promotes public health.  Trepal Rep. 7; *see also, e.g.*, 225 Ill. Comp. Stat. Ann. § 107/5 (listing findings). | **Admitted** that every jurisdiction licenses professional counselors under a practice act, title act, or both.<br><br>**Denied** that "[e]very state . . . has concluded that licensing professional counseling protects and promotes public health." The District licensed professional counselors even though it "had received no information which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area." Comm. Rep. on 1992 Amendment Act, 4. |

| | |
|---|---|
| 58. Many states have licensed professional counselors for decades. *See* Trepal Rep. 6 (tracing history of licensure). | **Denied** that "many" states have licensed professional counselors "for decades." The first state to license professional counselors was Virginia in 1976. Trepal Dep. 33:10–13. In 2009, more than thirty years later, California became the last state to enact some form of licensing requirement. Trepal Dep. 33:14–17. |
| 59. In a survey considered by one state, 27% of complaints handled by state licensing boards nationwide involved unlicensed practice or other inaccurate representations. Bill Jacket for 2002 N.Y. Laws ch. 676, at 36. | **Denied.** The cited "survey" was "conducted by JCMHS," Bill Jacket for 2002 N.Y. Laws ch. 676, at 36, an "advocacy coalition representing the members" of three professional associations in New York, *id.* at 38. The survey was presented to the New York legislature by a public affairs organization that represented JCMHS's goals of enacting licensing requirements for various professionals in New York. *Id.* As part of its advocacy, the public affairs organization did not cite any information supporting its characterization of the "survey." Bill Jacket for 2002 N.Y. Laws ch. 676, at 36. |
| 60. Another state had a backlog of 250 complaints of "unscrupulous and unethical practices among those claiming to be mental health specialists." Bill Jacket for 2002 N.Y. Laws ch. 676, at 36. | **Denied.** The cited information was allegedly gathered in a survey "conducted by JCMHS," Bill Jacket for 2002 N.Y. Laws ch. 676, at 36, an "advocacy coalition representing the members" of three professional associations in New York, *id.* at 38. The survey was presented to the New York legislature by a public affairs organization that represented JCMHS's goals of enacting licensing requirements for various professionals in New York. *Id.* As part of its advocacy, the public affairs organization did not cite any information supporting its characterization of the "survey." Bill Jacket for 2002 N.Y. Laws ch. 676, at 36. |
| 61. Many insurers or payors—including government programs—only cover counseling services if provided by an LPC. Trepal Rep. 10; *see also, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 4121, 136 Stat. 4459, 5901–03 (2022) (Medicare). | **Denied.** In her expert report, the District's expert witness asserted that licensing is "often" used by clients, that clients in states without licensure "would likely" no longer use their insurance to cover counseling, that some clients "may" forgo counseling services, and that providers "generally" refer clients to licensed counselors. Trepal Rep. 10. The expert report cites no evidence that supports |

| | |
|---|---|
| | the District's conclusion that "many" insurers "only cover counseling services if provided by an LPC." |
| 62. Many healthcare providers "where counselors might work require all individuals providing services through the institution to be licensed."  Trepal Rep. 10; *see also, e.g.,* 38 U.S.C. § 7402(b)(11)(B) (Veterans Health Administration). | **Denied.** The District's expert witness makes this assertion in her report without any evidence to support it. The report's only citation is to a single counseling educator's anecdotal, unsupported characterization in a letter to the New York Governor advocating for the licensure of mental health counselors. Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. The assertions in the letter are not supported by any data or evidence. Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. |
| 63. In a "prominent example, after 9/11 in New York, 'many qualified mental health counselors were not able to assist those in mental anguish, because the Red Cross [would] allow only state licensed or nationally certified mental health workers to assist them,' and New York at the time did not license counselors."  Trepal Rep. 10 (quoting Bill Jacket for 2002 N.Y. Laws ch. 676, at 21). | **Denied.** The cited source is a single counseling educator's anecdotal, unsupported characterization in a letter to the New York Governor advocating for the licensure of mental health counselors.  Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. The assertions in the letter are not supported by any data or evidence. Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. |
| 64. If a state could no longer license professional counselors, healthcare institutions may refuse to employ or contract with counselors from that state, as was the case in New York pre-licensure.  Trepal Rep. 10. | **Admitted** to the extent that a state "may" also agree to employ or contract with counselors from that state if the state could no longer license professional counselors.<br><br>**Denied** as an unsupported description of the "case in New York pre-licensure." The cited source is a single counseling educator's anecdotal, unsupported characterization in a letter to the New York Governor advocating for the licensure of mental health counselors. Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. The assertions in the letter are not supported by any data or evidence. Bill Jacket for 2002 N.Y. Laws ch. 676, at 21. |
| 65. If a state could no longer license professional counselors, insurers may refuse to cover counseling services provided by counselors in that state.  Trepal Rep. 10; *see* Brokamp Dep. 167–68 (stating that she was unsure if she could diagnose District clients, | **Denied.** In her expert report, the District's expert witness asserted that licensing is "often" used by clients, that clients in states without licensure "would likely" no longer use their insurance to cover counseling, that some clients "may" forgo counseling services, |

27

| | |
|---|---|
| as required for insurance coverage, if she was not licensed in the District). | and that providers "generally" refer clients to licensed counselors. Trepal Rep. 10. The expert report cites no evidence that supports the District's assertion that "insurers may refuse to cover counseling services provided by counselors in that state." |
| 66. The ACA, formerly known as the American Association of Counseling and Development (AACD), supported the District's licensure law and testified in its favor.  Comm. Rep. 3. | **Admitted** that the ACA supported the District's licensure law. |
| 67. The District's law mirrored the AACD's 1990 model legislation, which had concluded that licensure protected the public "by demanding high standards of professional conduct, by promoting responsible professional practice, and by requiring strong and uniform preparation standards of education and experience."  Def.'s Ex. S, John Bloom, *et al.*, *Model Legislation for Licensed Professional Counselors*, 68 J. Couns. & Dev. 511, 511 (1990). | **Admitted** that the District's proposed law "mirrored the AACD's 1990 model legislation." <br><br> **Denied** that the AACD's model legislation "concluded that licensure protected the public." The "Philosophy Behind Model Licensure Bill" section of the 1990 model legislation states that the "AACD Licensure Committee . . . seeks to advance the counseling and human development profession," and that "[t]his will be done, in part, by demanding high standards of professional conduct[.]" Def.'s Ex. S, John Bloom, *et al.*, *Model Legislation for Licensed Professional Counselors*, 68 J. Couns. & Dev. 511, 511 (1990). It goes on to state that the "model bill . . . represents an ideal, although not necessarily the most pragmatic or the only model, for achieving licensure." *Id.* |
| 68. The AACD reached that conclusion after "a thorough review of some 33 state laws" and "extensive dialogue."  Bloom, *supra*, at 511. | **Denied.** The AACD's 1990 model bill does not reach a conclusion about whether the legislation would protect the public. Def.'s Ex. S, John Bloom, *et al.*, *Model Legislation for Licensed Professional Counselors*, 68 J. Couns. & Dev. 511, 511 (1990). The "thorough review of some 33 state laws" resulted in the AACD's proposed "definition of counseling," and was drawn from "the richness of practical information gained through their efforts to pass legislation[.]" Def.'s Ex. S, John Bloom, *et al.*, *Model Legislation for Licensed Professional Counselors*, 68 J. Couns. & Dev. 511, 511 (1990). |

| | |
|---|---|
| 69. Today, the ACA continues to support the need for licensure "to protect public safety." ACA, *State Licensing of Professional Counselors*, https://perma.cc/XME5-PNZ7. | **Denied** as a misstatement of the ACA's position. According to the ACA, "states establish licensure or certification standards for health and human services professionals" "[i]n order to protect public safety." ACA, *State Licensing of Professional Counselors*, https://perma.cc/XME5-PNZ7. |
| 70. According to the ACA, "practice acts," which prohibit a person from practicing professional counseling without a license (like the law challenged here), "are considered to be more strongly protective of consumers than are title acts."  ACA, *supra*; *see also* Bloom, *supra*, at 517. | **Admitted** that, according to the ACA, "practice acts" are "considered to be more strongly protective of consumers than are title acts." **Admitted** that the law challenged here is a "practice act." |
| | **Denied** that "practice acts" are, in fact, "more strongly protective of consumers than are title acts." When asked whether title acts serve the same purposes as practice acts, the District's expert witness answered "Well, yes." Trepal Dep. 143:6–143:9. The District's 30(b)(6) witness could not identify any evidence suggesting that its license requirement "achieve[s] any greater public benefits than are achieved in any other American jurisdiction. Herndon 30(b)(6) Dep. 169:2–7. |
| 71. Dr. Brokamp is a professional counselor licensed and based in Virginia.  Brokamp Dep. 7. | **Admitted.** |
| 72. Dr. Brokamp has a master's degree and a PhD in counselor education and supervision. Def.'s Ex. H, About Elizabeth Webpage 5. | **Admitted.** |
| 73. Dr. Brokamp operates a "therapy clinic" which "offers a variety of comprehensive mental health services" to Virginia clients. Def.'s Ex. I, Depression Counseling Webpage (Depression Webpage) 6. | **Admitted.** |
| 74. Dr. Brokamp advertises her qualifications and license.  Brokamp Dep. 124–25. | **Admitted.** |
| 75. Dr. Brokamp charges all clients for her counseling services, and her sessions cost from $150 to $180.  Brokamp Dep. 121; About Elizabeth Webpage 3. | **Admitted.** |
| 76. Dr. Brokamp is an in-network provider with Blue Cross Blue Shield, which required her license information before agreeing to make her practice in-network.  Brokamp Dep. 77, 117–18. | **Admitted.** |

| | |
|---|---|
| 77. Dr. Brokamp's practice specializes in, among other things, "anxiety treatment," "depression treatment," and post-traumatic stress disorder (PTSD) "treatment." Depression Webpage 6. | **Admitted.** |
| 78. In providing treatment, Dr. Brokamp first assesses and diagnoses a client.  Brokamp Dep. 13. | **Denied.** A diagnosis is not required unless a client wants to use their insurance. Brokamp Dep. 42:10–41:4. Diagnosis is "not the focus" of counseling and "it's, certainly, not why people come." Brokamp Dep. 163:6–17. |
| 79. All clients who use insurance must receive a diagnosis from Dr. Brokamp on their first visit.  Brokamp Dep. 13–14. | **Admitted** that a client who wants to use their insurance must receive a diagnosis in their first visit. |
| 80. As part of Dr. Brokamp's training to become an LPC, she studied the major mental disorders and learned how to use specialized tools to diagnose such disorders, like the DSM—a reference guide that categorizes mental health disorders and offers diagnostic criteria.  Brokamp Dep. 34–36. | **Admitted.** |
| 81. In formulating a diagnosis, Dr. Brokamp uses "every bit of information at [her] disposal," including observing body language and facial expressions.  Brokamp Dep. 44. | **Denied**. Elizabeth testified that she relies on her observations of a client in providing *counseling*, not diagnosis. Brokamp Dep. 43:7–44:14. |
| 82. Sometimes, Dr. Brokamp uses psychological assessments, which are "survey type instruments" tested by scientists for validity and which mental health professionals are trained to use and interpret. Brokamp Dep. 25–29. | **Admitted** that some counselors are trained to use and interpret assessments, a "survey type instrument."<br><br>**Denied** that assessments are "tested by scientists." Brokamp Dep. 28:2–14 (clarifying that "when you say scientific" it means "social science").<br><br>**Denied** that Elizabeth uses assessments "sometimes"—she testified that she uses them "[v]ery seldom." Brokamp Dep. 29:6–12 ("Things that I might use would be like – I tend to use more informal things like so on a scale of one to 10 how are you feeling today, and we sort of self-measure that way."). |
| 83. Dr. Brokamp then relies on her observations, assessments, the DSM, and her training to make a diagnosis.  Brokamp Dep. 36, 44. | **Admitted** that Elizabeth has relied on the DSM to diagnose a client.<br><br>**Denied**. Elizabeth testified that she relies on her observations of a client in providing |

| | |
|---|---|
| | *counseling*, not diagnosis. Brokamp Dep. 43:7–44:14. |
| 84. Dr. Brokamp has diagnosed, among other disorders, depression, PTSD, and suicidal risk.  Brokamp Dep. 92, 113, 110. | **Admitted** that Elizabeth has diagnosed depression.<br><br>**Denied** that Elizabeth has diagnosed a client with PTSD. Brokamp Dep. 92:18–93:4. (testifying whether she has diagnosed someone with PTSD is "hypothetical" because she "can't remember" diagnosing someone with PTSD). Elizabeth did not testify that she "diagnosed" someone as suicidal. *Id.* at 113:18–114:19 (testifying that she has offered counseling services to someone who was suicidal). |
| 85. Dr. Brokamp takes the diagnostic process seriously because of the potential for harm from wrong diagnoses.  Brokamp Dep. 40, 74. | **Denied** that Elizabeth takes the diagnostic process seriously "because of the potential for harm." Brokamp Dep. 40:9–41:4 (testifying that the "issue of diagnosis" is concerning because "it can stigmatize people unnecessarily" and because the diagnosis "happens so rapidly"); *id.* at 73:21–74:18 (testifying that it is generally "important for me to be accurate in the things that I do"). |
| 86. In tandem with diagnosing, Dr. Brokamp identifies a client's treatment goals and creates a treatment plan.  Brokamp Dep. 13–15. | **Denied** that "diagnosing" is part of identifying a client's treatment goals and creating a treatment plan. *See* Brokamp Dep. 13:11–15:11 (distinguishing between diagnosing and identifying a client's treatment goals). |
| 87. A treatment goal may be to "reduce anxiety," and the treatment plan could be "three to five new techniques" or "relaxation exercise[s]," which Dr. Brokamp teaches to clients.  Brokamp Dep. 17. | **Admitted.** |
| 88. Creating a treatment plan is a specific skill learned by LPCs in their education and training.  Trepal Rep. 7–8. | **Admitted** that LPCs learn about how to create a treatment plan as part of their education. |
| 89. Treatment plans, according to Dr. Brokamp, should be "observable and measurable."  Brokamp Dep. 17. | **Admitted.** |
| 90. A form of treatment that Dr. Brokamp regularly provides is Cognitive Behavioral Therapy (CBT), which she advertises as "one of the most well-researched and clinically | **Admitted** that Elizabeth's offers counseling services based on CBT. |

| | |
|---|---|
| effective forms of mental health treatment." Def.'s Ex. J, CBT Webpage 3. | **Denied** that CBT is purely "[a] form of treatment." For example, individuals can use CBT "self-help workbooks." Brokamp Dep. 90:8–14. Applying CBT "to counseling" is merely "one mode of CBT." *Id.* In the context of counseling, CBT consists of talk therapy in which the counselor encourages their client to identify and reflect on their thoughts. Sherk Dep. 12:17–13:24. |
| 91. She received specialized training and certification in CBT.  Brokamp Dep. 122–24. | **Admitted** that Elizabeth received training and certification in CBT. |
| 92. CBT aims to help clients understand their thought patterns and reorient their thinking. CBT Webpage 3–4. | **Denied** that CBT "aims" to do anything; CBT is a form of talk therapy in which the counselor encourages their client to identify and reflect on their thoughts. Sherk Dep. 12:17–13:24. |
| 93. CBT differs from "other forms of counseling" due to "the structured nature of the sessions" and the need for clients to "practice skills between sessions."  CBT Webpage 4–5. | **Denied** that CBT "differs" from "other forms of counseling" as CBT is a form of talk therapy in which the counselor encourages their client to identify and reflect on their thoughts. Sherk Dep. 12:17–13:24; *see also* Brokamp Dep. 98:1–99:3. |
| 94. Dr. Brokamp also uses a treatment modality called Eye Movement Desensitization and Reprocessing (EMDR), for which she has received specialized training.  Brokamp Dep. 94–99, 124. | **Admitted** that Elizabeth is trained on EMDR. |
| 95. Simplified, EMDR involves "a very specific protocol" in which Dr. Brokamp coaches a client to concentrate on her moving fingers or a moving object on a screen. Brokamp Dep. 94. | **Admitted** that EMDR includes Elizabeth "coach[ing] a client to concentrate on her moving fingers or a moving object on a screen." <br><br> **Denied** that this is a "[s]implified" description of EMDR. In essence, EDMR is "retelling" and "talking about" memories. Brokamp Dep. 97:11–22. |
| 96. While the client is concentrating, Dr. Brokamp helps the client access memories associated with trauma.  Brokamp Dep. 94. | **Admitted** that EDMR consists of Elizabeth helping people access their memories and talk about them. Brokamp Dep. 97:11–22. |
| 97. Scientific studies have shown that following this protocol can affect the physical ways the brain stores memories.  Brokamp Dep. 94–96; *see generally* Cleveland Clinic, *EMDR Therapy* (Mar. 29, 2022), https://tinyurl.com/2z2s6d88. | **Denied.** Elizabeth did not testify that EMDR "affect[s] the physical ways" the brain stores memories. Brokamp Dep. 94:6–22 (testifying that "you're helping them access old memories"). EMDR is a form of counseling that helps people "identify themes and specific memories" to emphasize "positive |

| | beliefs that you would like to believe about yourself going forward." S*ee generally* Cleveland Clinic, *EMDR Therapy* (Mar. 29, 2022), https://tinyurl.com/2z2s6d88. |
|---|---|
| 98. Dr. Brokamp will coordinate her treatments with a client's psychiatrist or physician, especially when treating depression.  Depression Webpage 5; Brokamp Dep. 109–10. | **Denied** that Elizabeth "will" coordinate with a client's psychiatrist or physician. Elizabeth is willing to coordinate with her client's doctor or psychiatrist if the client "would like to pursue" that option. Brokamp Dep. 109:5–22. |
| 99. To prescribe medication, psychiatrists or physicians may require that their patients concurrently seek professional counseling. Brokamp Dep. 109–10, 115. | **Denied** that psychiatrists or physicians may "require" their patients to seek professional counseling before prescribing medication. Elizabeth testified that she is willing to speak to a client's doctor or psychiatrist "if they want me to," or if the doctor or psychiatrist "wants to know that they're working with a counselor while getting medicated." Brokamp Dep. 109:5–22. |
| 100. Dr. Brokamp's counseling, she advertises, "can provide helpful and much-needed support" while a psychiatrist or physician develops a medication plan. Depression Webpage 5. | **Admitted**. |
| 101. In Dr. Brokamp's view, the "trick" to treating depression is determining what combination of CBT, medication, and exercise is effective for each patient. Depression Webpage 5. | **Denied** that Elizabeth's website states that the "trick" to treating depression is determining what "combination" of CBT, exercise, and medication is effective. The website states that the "trick" is finding out "which method *or* combination is right for you." Def.'s Ex. I, Depression Counseling Webpage (Depression Webpage), 5. |
| 102. Dr. Brokamp advertises that depression "can affect your physical health," Depression Webpage 3, and depression treatment (*i.e.,* a combination of CBT and medication) "will help you feel better," *id.* at 5 (capitalization altered); *see also* Brokamp Dep. 105–09 (testifying that her clients had experienced physical improvements after receiving treatment from her). | **Admitted** that Elizabeth's website states that studies show that depression "can affect your physical health," and that "depression treatment will help you feel better."<br><br>**Denied** that Elizabeth advertises that she offers medication for depression. *See* Brokamp Decl., ¶ 6.<br><br>**Denied** that her clients have "experience physical improvements after receiving treatment from her." Elizabeth testified that some of her clients "expressed to me that they |

| | have less pain" after her counseling. Brokamp Dep. 105:1–14. |
|---|---|
| 103. Dr. Brokamp previously practiced out of a physical office in Virginia.  Compl. ¶ 13; Def.'s Ex. M, Sept. 2020 Email Correspondence Between Brokamp & Bd. (Emails) 4. | **Admitted** that, between 2010 through December 2017, Elizabeth provided counseling services from an office located in Alexandria, Virginia, under the business name Alexandria's Women Counseling. |
| 104. Due to the COVID-19 pandemic, Dr. Brokamp began treating clients through video or telephone calls.  Compl. ¶ 13; Emails 4. | **Admitted** that Elizabeth began offering teletherapy services to her clients through video and telephone calls due to the COVID-19 pandemic. |
| 105. Dr. Brokamp's "teletherapy" involves the "same level of clinical skill" as in-person sessions, and "the therapeutic process is the same."  Def.'s Ex. K, Online Therapy Webpage 5. | **Admitted**. |
| 106. Dr. Brokamp contacted the Board to ask whether she could provide such services to District residents in late 2020.  Emails 4. | **Admitted** that Elizabeth contacted the Board on September 25, 2020.<br><br>**Denied** that Elizabeth asked whether could "provide such services" to D.C. residents. Elizabeth asked the Board "whether it would be legal under D.C. law for [her] to provide tele-mental health services from [her] office in Virginia to these D.C. residents at their homes in D.C. Pl's Ex. 24, Elizabeth Brokamp Email to D.C. Board of Professional Counseling ("Brokamp Board Emails"), at 4. |
| 107. Dr. Brokamp explained to the Board that (1) she wanted to provide "tele-mental health services," (2) she was an LPC in Virginia, (3) she had a Virginia office and therapy practice, (4) District residents had contacted her "in need of professional counseling services," (5) she thought in her "professional estimation" that these District residents needed professional help and were in "pain," and (6) she felt "an ethical obligation to help these individuals" by taking them on as clients.  Emails 4. | **Admitted** that Elizabeth informed the Board that she was an LPC in Virginia. **Admitted** that Elizabeth informed the Board that she had an office in Virginia. **Admitted** that Elizabeth informed the Board that District residents had contacted her in need of professional counseling services.<br><br>**Denied** that Elizabeth "explained to the Board" that "she wanted to provide "tele-health mental health services." Elizabeth asked "whether it would be legal under D.C. law for [her] to provide tele-mental health services from [her] office in Virginia to these D.C. residents at their homes in D.C. Brokamp Board Emails, at 4. |

| | |
|---|---|
| | **Denied** that Elizabeth informed the Board that she had a "therapy practice" in Virginia. Elizabeth's email states: "I am a Licensed Professional Counselor in the State of Virginia, registered with the Virginia Department of Health, and I am also board certified in tele-mental health. My offices are located in Burke, Virginia, within the larger D.C. metropolitan area." Brokamp Board Emails, at 4.<br><br>**Denied** that Elizabeth stated that "she thought in her 'professional estimation' that these District residents . . . were in pain." Elizabeth stated, "Both individuals indicated a desire to work with me after speaking on the phone, and I feel an ethical obligation to help these individuals if the law permits. It is difficult to hear pain and not respond with help." Brokamp Board Emails, at 4.<br><br>**Denied** that Elizabeth felt "an ethical obligation to help these individuals" by taking them on as clients. This is an incomplete version of Elizabeth's actual statement: "Both individuals indicated a desire to work with me after speaking on the phone, and I feel an ethical obligation to help these individuals if the law permits." Brokamp Board Emails, at 4. |
| 108. Dr. Brokamp asked the Board whether she needed a license or whether she qualified for the District's pandemic waiver.  Emails 4. | **Denied.** Elizabeth asked the Board "whether it would be legal under D.C. law for [her] to provide tele-mental health services from [her] office in Virginia to these D.C. residents at their homes in D.C." Brokamp Board Emails, at 4.<br><br>Elizabeth further stated: "I understand that the District has currently waived licensing requirements in some circumstances in recognition of the COVID pandemic. However, I am concerned that waiver may not apply to my situation, as I do not have a relationship with a District-licensed healthcare facility and would be taking these |

| | individuals on as new patients (rather than continuing an existing relationship). Any guidance you can provide concerning the application of the law in my circumstance would be greatly appreciated." Brokamp Board Emails, at 4. |
|---|---|
| 109. The pandemic waiver had allowed healthcare professionals licensed in other jurisdictions to provide tele-care to District residents if the provider had an existing relationship with the resident who had returned to the District (*e.g.*, a college student), or the individual was at a licensed healthcare facility in the District.  Def.'s Ex. P, DC Health, *Admin. Order 2020-02* (Mar. 13, 2020). | **Admitted** that the pandemic waiver applied if the provider had an existing relationship with the resident who had returned to the District (*e.g.*, a college student), or if the individual was providing services at a D.C.-licensed healthcare facility.<br><br>**Denied** that the pandemic waiver allowed healthcare professionals licensed in other jurisdictions "to provide tele-care to District residents." The pandemic waiver waived all "[l]icensure, registration, or certification requirements, permits and fees" for individuals offering services in the two circumstances outlined in the waiver. Pl's Ex. 23, D.C. Health Regul. & Licensing Admin. Order No. 2020-02 (Mar. 13, 2020) ("D.C. Licensing Waiver"). |
| 110. A representative from the Board responded that Dr. Brokamp did not appear to qualify for the pandemic waiver and would need a license, but she could apply for licensure-by-endorsement.  Emails 3. | **Denied** that the Board responded that Elizabeth "did not appear" to qualify for the pandemic waiver. The Board stated that "[t]he waiver is only applicable in the following two pathways: 1. The individual is working at a licensed healthcare facility in the District of Columbia; or 2. Working with existing clinical relationships where the client has returned to the District of Columbia . . . From what you shared, you are unable to use this waiver. In order for you to provide counseling services to residents who live in the District of Columbia, you will need to apply for the LPC by Endorsement." Brokamp Board Emails, at 3. |

| | |
|---|---|
| 111. Dr. Brokamp then asked whether she could "provide my services to these individuals in D.C. if I were to disclose that I am licensed in Virginia but not in D.C. and if I described the services to these individuals as 'counseling' rather than 'licensed professional counseling.'"  Emails 2. | **Denied** as an incomplete statement of Elizabeth's email. Elizabeth asked three questions: "1. Would it be lawful for me to provide my services to these individuals in D.C. if I were to disclose that I am licensed in Virginia but not in D.C. and if I described the services to these individuals as "counseling" rather than "licensed professional counseling"?; 2. Does D.C. have any kind of reciprocity arrangement with Virginia that I could take advantage of to practice in D.C. under my Virginia license? 3. Would it be legal for me to provide my services to D.C. residents if they paid for their services with cash, rather than through insurance?" Brokamp Board Emails, at 2. |
| 112. The representative responded that such conduct would still require a license.  Emails 1. | **Denied** that the representative informed Elizabeth that "such conduct would still require a license." The Board responded that the District "does not have a reciprocity process with any state. The only way you will be able to provide counseling services to DC residents is after you receive a license. Until you have a license, you are not allowed to provide any counseling services to DC residents. If you do anything in question 1 and/or question 2 without a license, you will be fined for practicing without a license." Brokamp Board Emails, at 1. |
| 113. Pandemic restrictions have since subsided, but Dr. Brokamp prefers to keep working from home and still only sees clients virtually.  Brokamp Dep. 165. | **Admitted** that, currently, Elizabeth only sees clients virtually.

**Denied** that Elizabeth testified that "pandemic restrictions have since subsided" or that she "prefers to keep working from home." Brokamp Dep. 165. |
| 114. Dr. Brokamp has not received any inquiries from potential District clients in the past year.  Brokamp Dep. 164. | **Admitted.** However, further state that Elizabeth would take additional steps to advertise her services to District residents (including through online counselor referral programs) if it was lawful for her to provide her services in the District. Brokamp Decl. ¶¶ 29, 40, 42, 44. |
| 115. According to Dr. Brokamp's profile on Zencare, a website she has used to schedule | **Denied** that Elizabeth is "currently not taking any new clients." Brokamp Decl., ¶¶ 37–41. |

| | |
|---|---|
| appointments, she is currently not taking any new clients.  Def.'s Ex. L, Brokamp Zencare Webpage 1. | |
| 116. Dr. Brokamp has never tried to apply for a District license and has no intention of applying; nor has she ever received any indication that she would be denied a license. Brokamp Dep. 152, 165, 168. | **Admitted.** However, further state that Elizabeth has not applied for a District license because of the burdens entailed in the application process. Brokamp Decl. ¶¶ 22–27. |

Dated: June 26, 2023

Respectfully submitted,

/s/ Robert E. Johnson
Robert E. Johnson (D.C. Bar No. 1013390)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

John G. Wrench (D.C. Bar No. 1722587)
Robert J. McNamara (D.D.C. Bar # VA065)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: jwrench@ij.org, rmcnamara@ij.org

*Attorneys for Plaintiff Elizabeth Brokamp*