**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ELIZABETH BROKAMP, | |
| *Plaintiff*, | |
| v. | Civil Action No. 20-3574 (TJK) |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

## MEMORANDUM OPINION

Elizabeth Brokamp is a psychologist licensed and located in Virginia who wants to offer teletherapy services to clients in the District of Columbia. But she cannot speak with those clients unless she is licensed as a professional counselor here. So she sued, arguing that the District's licensure requirement for professional counselors violates the First Amendment both as applied to her and as facially overbroad. The parties cross move for summary judgment. For the reasons explained below, the Court finds that the licensure requirement violates the First Amendment as applied to Brokamp. So it will grant her motion in part, deny the District's, enter judgment for Brokamp, and award her declaratory and injunctive relief.

## I.    Background

### A.    Legal Background

The District of Columbia licenses professional counselors, defined as those individuals:

> engaging in counseling or psychotherapy activities, including cognitive behavioral therapy or other modality, with or without compensation, to facilitate human development and to identify and remediate mental, emotional, or behavioral conditions and associated difficulties that interfere with mental health and wellness. The practice of professional counseling includes:

> (A) The processes of conducting interviews, tests, and other forms of assessment for the purpose of diagnosing individuals, families, and groups, as outlined in the Diagnostic and Statistical Manual of Disorders or other appropriate classification schemes, and determining treatment goals and objectives; and
>
> (B) Assisting individuals, families, and groups through a professional relationship to achieve long-term effective mental, emotional, physical, spiritual, social, educational, or career development and adjustment[.]

D.C. Code § 3-1201.02(15B). The District exempts those who "do not hold themselves out . . . to be practicing any of the health occupations regulated by [the District]." *Id.* § 3-1201.03(d). That exemption covers, among others, religious officials, family caregivers, and household aides. *Id.* § 3-1201.03(d)(1)–(2).

The licensure law has two components (only the first of which is at issue here): First, no one may "practice, attempt to practice, or offer to practice" professional counseling in the District without a license. D.C. Code §§ 3-1210.01, 1205.01(a)(1). The parties call this a "practice act." Second, no one without a license may "use the phrase 'licensed professional counselor' or 'licensed graduate professional counselor,' or any similar title or description of services with the intent to represent that the person practices professional counseling," though use of "generic terms" such as "counseling" or "counselor" are permitted. *Id.* § 3-1210.03(t). The parties call this a "title act." These provisions apply both to practitioners physically located in the District and those outside the District but who provide services to clients here by video or telephone. *Id.* § 3-1201.05(a). Unlicensed practice is a misdemeanor punishable by imprisonment up to a year, a fine up to $10,000, or both. *Id.* § 3-1210.07.

The District imposes a series of requirements to become licensed as a professional counselor. An applicant must, among other things, earn a master's degree in an accredited program, complete at least 60 post-graduate semester hours in counseling or related subjects, complete two

years of supervised professional counseling, and receive a passing score on a national exam. D.C. Code § 3-1207.10(a). Applicants must also be at least 18 years old, not have "been convicted of an offense that is related to the occupation for which the license . . . is sought," and not have had a license in another state revoked or suspended or be subject to a pending disciplinary proceeding. *Id.* § 3-1205.03(a)(1)–(2), (6)–(7). If an applicant meets all the requirements, she may receive her license after submitting an application "to the board regulating the health occupation on the form required by the board" and "pay[ing] the applicable fees." *Id.* § 3-1205.05(a).

Those licensed in another jurisdiction have a few other options if they wish to practice in the District. The path most relevant here is that they can become licensed "by endorsement" instead. D.C. Code § 3-1207.10(c). Along with a license in good standing from another state, licensure by endorsement requires, among other things, that the applicant have "[e]ngaged in independent professional counseling practice providing clinical counseling for at least 5 years," which is reduced to three years if the applicant has a "National Certified Counseling credential" issued by a particular Board. *Id.* The applicant must also comply with "any requirements the Mayor may establish by rule." *Id.*[1] That means "furnish[ing] proof" that she has (1) completed 3,500 hours of professional counseling, 200 of which must be under the supervision of a qualified supervisor; (2) passing a national exam; and (3) submitting transcripts from their graduate program, among other requirements. 17 DCMR §§ 6602, 6603, 6605.

The District also allows for professional counselors licensed in the neighboring jurisdictions of Maryland and Virginia to practice here without a District-issued license if their home state

---

[1] An individual seeking licensure by endorsement is an "applicant" just like an individual seeking an initial license is. *See* D.C. Code 3-1205.07(a)(1). They are thus subject to the DCMR regulations applicable to "applicants for licensure." *E.g.*, 17 DCMR § 6602.1.

does the same for those licensed in the District.  *See* D.C. Code § 3-1205.02(a)(4).  Virginia, though, does not have such reciprocity with the District.  ECF No. 34 at 110 ¶ 39.  In addition, a third, limited option existed during the COVID-19 pandemic.  *See* ECF No. 38-1 at 24 ¶ 124.  Previously, the District offered a waiver allowing those licensed in other jurisdictions to provide telecare to District residents if the provider had a preexisting relationship with that individual or if the patient was at a healthcare facility in the District.  ECF No. 29-18.  But that waiver program ended in 2022.

### B.      Factual Background

Brokamp is licensed as a professional counselor in Virginia.  ECF No. 34 at 119 ¶ 71.  There, Brokamp operates a "therapy clinic" specializing in treatment of anxiety, depression, and PTSD as well as relationship and "women's issues" counseling.  ECF No. 29-11 at 7; ECF No. 34 at 119 ¶ 73.  She offers cognitive behavioral therapy, eye movement desensitization and repro-cessing, and other types of treatment.  ECF No. 29-12 at 4; ECF No. 29-3 at 62–67, 90; ECF No. 34 at 121–22 ¶¶ 90, 94.  She has training in those modalities along with a master's degree and Ph.D. in counselor education and supervision.  ECF No. 34 119–22 ¶¶ 72, 80, 91.  She does not prescribe medication.  ECF No. 38-1 at 2 ¶ 7.

Brokamp used to see clients in a physical office in Virginia but, after the COVID-19 pan-demic began, she started meeting with clients exclusively by video or telephone.  ECF No. 34 at 124, 127 ¶¶ 103–04, 113; ECF No. 29-3 at 99–100.  Apparently, she was contacted by District residents "in need of professional counseling services," but because she is not licensed in the Dis-trict, she has had to turn them away.  ECF No. 29-15 at 5; ECF No. 38-1 at 5 ¶¶ 24, 26.

In 2020, Brokamp contacted the District's Board of Professional Counseling to ask whether she could provide "tele-mental health services" to those here.  ECF No. 29-15 at 5; ECF No. 34 at

124 ¶ 106.  The Board told her that she was "unable to use" the pandemic waiver and that she would need a license to serve District residents even if she were to "disclose that [she] [is] licensed in Virginia but not in D.C. and if [she] described the services to these individuals as 'counseling' rather than 'licensed professional counseling.'"  ECF No. 29-15 at 2–3; ECF No. 34 at 126–27 ¶¶ 110, 111.  Although she was given the option to apply for a District license by endorsement, Brokamp has not done so.  ECF No. 34 at 126–28 ¶¶ 110, 116.

### C.    Procedural History

Brokamp sued the District in late 2020, arguing that the practice act portion of its licensure requirements, as embodied in D.C. Code §§ 3-1201.02(15B) and 3-1205.01(a)(1), violates the First Amendment and is unconstitutionally vague.  ECF No. 1.  She seeks a declaratory judgment and an injunction barring the District from using its licensing requirement to prevent her from providing teletherapy services to District residents.  *Id.* at 18.

In March 2022, the Court dismissed Brokamp's unconstitutional vagueness claim but permitted her two First Amendment claims to continue.  Minute Orders of March 7, 2022.  The parties conducted discovery and then cross-moved for summary judgment on the First Amendment claims.  ECF Nos. 29, 34.  The American Counseling Association (ACA), a national professional organization for counselors, submitted an amicus brief in support of the District.  ECF No. 33.  The parties also submitted notices of supplemental authority and related responses.  ECF Nos. 41–50.

In July 2024, before the Court could resolve the parties' cross-motions, the District of Columbia amended several portions of the disputed licensure law.  The Court, upon discovering the amendment—for some reason, the parties did not inform it on their own—ordered the parties to prepare supplemental briefs addressing the impact of the change.  Minute Order of March 4, 2025.  In her response, Brokamp argued that "nothing ha[d] meaningfully changed" and that the "board's

approach to licensure" was, for now, largely the same.  ECF No. 51 at 2.  The District, meanwhile, represented that it had "recently entered the Counseling Compact," which it said was an "interstate compact in which [professional counselors] licensed in one member state may practice in another member state without obtaining a license from that state."  ECF No. 52 at 4.  Because the Compact included Virginia and was slated to become operational after the formation of a "necessary database" in the coming "summer or early fall," the District moved to stay the case, arguing that Brokamp's claims would soon be moot.  *Id.* at 4–5.  This Court agreed to do so, issuing a stay set to expire on the day it set for a hearing on the parties' cross-motions.  *See* ECF No. 58 at 2.

Since then, the parties have again submitted several notices of supplemental authority, regulatory updates, and related responses.  *See* ECF Nos. 59–64, 66–67.  Most notably, the District has told the Court that the Counseling Compact has not yet been implemented due to "unforeseen events."  ECF No. 68 at 1.  Given the District's failure to implement the Compact and the uncertainty about when or if that will happen, the parties agree that Brokamp's claims remain live.  *See* ECF Nos. 65, 68.  Thus, the Court now resolves the parties' cross-motions.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   Analysis

Brokamp claims that the District's licensure requirement violates the First Amendment both as applied to her and as facially overbroad.  She challenges two provisions of the D.C. Code: section 3-1201.02(15B), which defines professional counseling, and section 3-1205.01(a)(1), or the "practice act," which requires a license to practice professional counseling in the District.  ECF No. 1 ¶¶ 96, 107.  The Court finds that the licensure requirement is unconstitutional as applied to Brokamp, even under intermediate scrutiny.  And having decided Brokamp's as-applied claim in her favor, the Court need not reach her overbreadth claim.

### A.   Brokamp's As-Applied Challenge

To succeed on her as-applied challenge, Brokamp "must show that the [law] [is] unconstitutional as applied to [her] particular speech activity."  *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014).  The Court first considers her standing to challenge the relevant provisions of the D.C. Code before turning to the merits.

#### 1.   Brokamp Has Standing to Pursue an As-Applied Challenge to the District of Columbia's Licensure Requirement

Under Article III of the Constitution, federal courts "may only adjudicate actual, ongoing controversies," *Honig v. Doe*, 484 U.S. 305, 317 (1988), of which "the core component of standing is an essential and unchanging part," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The alleged injuries must be particular to the plaintiff; she may not raise a "generally available grievance."  *Lance v.*

*Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (citation omitted).  And standing "is not dispensed in gross."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).  That is, a plaintiff "must have standing to seek each form of relief requested in the complaint."  *Id.*

Brokamp satisfies all three elements of standing as to the two provisions of the District's licensing requirement that she challenges: section 3-1201.02(15B), which defines professional counseling, and section 3-1205.01(a)(1), which requires a license to practice professional counseling in the District.  *See* ECF No. 1 ¶¶ 96, 107.  No doubt Brokamp suffers injury, professional and financial, from her inability to practice in the District without a license.  Brokamp represents that she has had to repeatedly turn down potential clients because they are physically located in the District, and that, were there no licensure requirement in the District, she would advertise and provide her services here.  The licensure requirement therefore places a cost on her both if she does not comply (through the loss of clients) and also if she does (through the burdens and fees that come with applying).  There is also no doubt that Brokamp's injury is traceable to the statutory provisions she challenges; all agree she is a professional counselor as defined by section 3-1201.02(15B) and therefore subject to the licensure requirement in section 3-1205.01(a)(1).  ECF No. 38-1 ¶¶ 24, 64–74, 176, 182.  Last, her injury would be straightforwardly redressed by a favorable ruling enjoining the enforcement of these two D.C. Code provisions against her, which would allow her to counsel clients in the District.  With standing established, the Court proceeds to the merits.

### 2. The District of Columbia's Licensure Requirement Violates the First Amendment as Applied to Brokamp

The First Amendment prohibits the enactment of laws "abridging the freedom of speech."  U.S. Const. amend. I.  What qualifies as abridging the freedom of speech is often difficult to determine.  Many laws affect speech in some way, but "it has never been deemed an abridgment of

the freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Additionally, "[t]here are certain well-defined and narrowly limited classes of speech," such as "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words," that, while speech, do not fall within the First Amendment's aegis. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). Thus, the first step when assessing whether regulations on speech pass constitutional muster is to determine "whether [the activity at issue] is speech protected by the First Amendment." *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (alteration in original) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

If the activity at issue qualifies as protected speech, the second step is to determine the appropriate level of heightened scrutiny to apply. *Green*, 54 F.4th at 745. More burdensome or invidious restrictions on speech, including most content-based regulations that "distinguish favored speech from disfavored speech on the basis of the ideas . . . expressed," receive "strict scrutiny" and "can be justified only if [they are] narrowly tailored to a compelling government interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643, 653 (1994) ("*Turner I*") (cleaned up). Lesser restrictions on speech, such as content-neutral regulations that "serve[] purposes unrelated to the content of expression," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), receive "intermediate scrutiny" and "will be sustained . . . if [they] advance[] important governmental interests unrelated to the suppression of free speech and do[] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) ("*Turner II*")

The third step is to apply the level of scrutiny that matches the type of regulation at issue. *Green*, 54 F.4th at 745. Content-neutral regulations are subject to intermediate scrutiny, which requires that the law be "narrowly tailored to serve a significant governmental interest," though not necessarily "the least restrictive or least intrusive means" of achieving that interest. *Ward*, 491 U.S. at 791, 798. Content-based regulations are subject to the more stringent framework of strict scrutiny and "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Under strict scrutiny, the narrow tailoring must be narrower than under intermediate scrutiny—the law must be "the least restrictive available means" for achieving its interest. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 823 (2000).[2]

This three-step framework applies no differently to speech uttered by so-called profession-als.[3] In the past, some courts, including the D.C. Circuit, "except[ed] professional speech from the rule that content-based regulations of speech are subject to strict scrutiny." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, 585 U.S. 755, 767 (2018) (collecting cases); *see Nat'l Ass'n for Advancement of Multijurisdictional Prac. v. Howell ("NAAMJP")*, 851 F.3d 12, 20 (D.C. Cir.

---

[2] The D.C. Circuit's three-step framework laid out in *Green* does not account for regulations that are content-based yet do not receive strict scrutiny, which notably includes regulations on commercial speech, in other words, "speech proposing a commercial transaction," such as advertising. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–565 (1980). *Green* did not involve commercial speech and so the Circuit had no reason to comment on the commercial speech doctrine. 54 F.4th at 742–43 (explaining that the speech at issue is "computer code"). Though *Green*'s sweeping pronouncements on the scrutiny applied to content-based regulations may be imprecise at times, its framework is useful and applicable here.

[3] As the Supreme Court characterized it, "professional speech" was typically defined as any speech by "individuals who provide personalized services to clients and who are subject to a generally applicable licensing and regulatory regime" that is "based on their expert knowledge and judgment" or that is "within the confines of the professional relationship." *NIFLA*, 585 U.S. at 767 (cleaned up).

2017) (reasoning that "regulations on entry into a profession, as a general matter, are constitutional if they have a rational connection with the applicant's fitness or capacity to practice the profession" (cleaned up)).  But the Supreme Court has since clarified that "professional speech" is not "a separate category of speech."  *NIFLA*, 585 U.S. at 767; *see also Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026) ("Our precedents have expressly rejected the . . . notion that 'professional speech' represents some 'separate category of speech' subject to 'diminished constitutional protection.'" (quoting *NIFLA*, 585 U.S. at 767)).  The Court thus assesses the D.C. licensure provisions starting at step one.

### a.    The Licensure Law Regulates Brokamp's Speech

The first question is whether Brokamp's professional counseling activities are best characterized as *speech*—that is, "communicating a message," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)—or whether they are merely *conduct*, though that conduct may incidentally involve speech.  If the former, her activity would be shielded by the usual First Amendment protections; if the latter, they would be "afforded less protection."  *NIFLA*, 585 U.S. at 768.  The answer is not clear in all cases.  Fortunately, it is in this one.

Brokamp's activity regulated by the licensure law is protected speech, not conduct that only incidentally involves speech.  The two challenged licensure provisions, D.C. Code § 3-1201.02(15B) (defining "professional counseling") and § 3-1205.01(a)(1) (requiring licenses for "professional counseling"), mandate that Brokamp obtain a license to practice professional counseling in the District.  Because the Court is considering Brokamp's challenge as applied to her, it looks to the burden on the specific professional counseling activities she wishes to engage in.  *See Chiles*, 146 S. Ct. at 1022.  And here, Brokamp's counseling practice consists essentially of speaking to her clients—nothing more.  *See* ECF No. 1 at 5 ¶ 23; ECF No. 38-1 at 1 ¶ 3.  The Supreme

Court has recently concluded that such "talk therap[y]" qualifies as speech. *Chiles*, 146 S. Ct. at 1023. There is no basis to conclude differently here. "While the First Amendment protects many and varied forms of expression, the spoken word is perhaps the quintessential form of protected speech. And that is exactly the kind of expression in which Ms. [Brokamp] seeks to engage." *Id.*

The District contends that because Brokamp's speech occurs within her broader practice of diagnosing and treating her patients through "a professional relationship," her speech is merely incidental to her professional conduct. ECF No. 29 at 23–24. The District points out that the D.C. Code's definition of the "[p]ractice of professional counseling" applies "when someone *practices a profession*," not "when just anyone has conversations about certain subjects," and that "the scope of practice of a typical 'professional counselor'" includes how one "sets up shop, takes on clients, provides professional services, works in a clinical setting, and more." ECF No. 38 at 10–11 (emphasis in original). In making this argument, the District relies heavily on caselaw that predates the Supreme Court's decisions in *NIFLA* and *Chiles*.[4] *See* ECF No. 29 at 18–28; ECF No. 38 at 8–17. So it must, because this exact counterargument was rejected in both cases. A counselor's "speech does not become conduct just because the State may call it that. Nor does her speech become conduct just because it can also be described as a 'treatment,' a 'therapeutic modality,' or anything else." *Chiles*, 146 S. Ct. at 1023. Nor does her speech become conduct because it is

---

[4] In particular, the District argues that the D.C. Circuit's decision in *NAAMJP* remains binding on this Court because it has not been overruled. *See* ECF No. 29 at 13–14. It is true that "district judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule[s] it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). Controlling precedent may be "effectively overruled" without express mention too if a later Supreme Court decision "eviscerates" its reasoning. *Perry v. MSPB*, 829 F.3d 760, 764 (D.C. Cir. 2016). The Court need not address *NAAMJP*, however, as the regulation at issue in that case—bar admission requirements for attorneys—is far afield from the regulation at issue in this one. *See NAAMJP*, 851 F.3d at 16. Even assuming *NAAMJP* remains good law, the Court takes *Chiles*, which deals with restrictions on professional counselors, to be more analogous and therefore controlling on the outcome here.

delivered in the context of her job as a professional counselor. *See id.* at 1022 (characterizing "spoken training and expert advice" from "lawyers" and "doctors" as protected speech (discussing *Holder*, 561 U.S. at 16, 21–22)); *see also NIFLA*, 585 U.S. at 767. Whatever complexities under the First Amendment may arise in other fact patterns, here Brokamp seeks to "communicat[e] a message" to her clients. *Holder*, 561 U.S. at 28. When she speaks, that is protected speech.

This conclusion does not call into question the nature of licensing regulations for medical professionals who undertake physical procedures on their patients or prescribe medicine—in other words, that regulate professional conduct. Generally, the practice of medicine is "subject to reasonable licensing and regulation by the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Consistent with the states' general regulatory authority, some courts have recently affirmed that they are "more likely to view a licensing regime limiting who may engage in certain professional conduct as conduct-focused for purposes of the First Amendment analysis where the conduct carries legal, health, economic, or public-safety-related consequences, such as in the realms of law, medicine, accounting, and engineering." *360 Virtual Drone Servs.*, 102 F.4th 263, 274 (4th Cir. 2024). So licensing regulations on conduct-focused areas of medical practice do not regulate speech protected by the First Amendment. But after *Chiles*, talk therapy is not one such area. *See Chiles*, 146 S. Ct. at 1023–24.

b.   <strong>The Licensure Law Does Not Survive Intermediate Scrutiny</strong>

Because the licensing regime here regulates protected speech, the Court now proceeds to step two: determining what level of heightened scrutiny to apply. The parties dispute whether the licensure regulations are subject to strict scrutiny as a content-based regulation of speech or intermediate scrutiny as a content-neutral one. Members of the Supreme Court have also highlighted

13

the possibility, unaddressed by the *Chiles* majority, that licensure requirements may receive inter-mediate scrutiny despite being content based.  *See Chiles*, 146 S. Ct. at 1031 (Kagan, J., concur-ring) (positing that when it comes to "laws regulating speech in doctors' and counselors' offices," the key difference may not be between content-based and content-neutral, but between "viewpoint-based and viewpoint neutral." (quotation omitted)).  The Court need not linger long at this second step, however, and will assume that intermediate scrutiny is proper.  *See Edwards*, 755 F.3d at 1001, 1009 (assuming intermediate scrutiny applied before holding the law unconstitutional).  It may do so because the licensure requirement as applied to Brokamp's speech does not survive even that lesser degree of scrutiny.[5]

Now for step three: applying the chosen level of scrutiny.  A law "survives intermediate scrutiny if it '[1] advances important governmental interests unrelated to the suppression of free speech and [2] does not burden substantially more speech than necessary to further those

---

[5] Previously, in denying the District's motion to dismiss, the Court subjected the District's licensure requirement to strict scrutiny as a content-based regulation of speech, reasoning that the licensing requirement only applies to Brokamp's speech if she speaks about certain topics—certain content—such as her clients' mental, emotional, or behavioral issues.  *See* Minute Order of March 7, 2022.  In doing so, the Court relied on case law suggesting that a law may be subject to strict scrutiny, even if it is facially content-neutral, if it "cannot be justified without reference to the content of the regulated speech.'" *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791) (internal quotation marks omitted) (holding city sign ordinance unconstitutional).  But since that decision, the Supreme Court has cautioned that not just "*any* examination of speech or expression inherently triggers heightened First Amendment concern." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (emphasis in original).  "Rather, it is regulations that discriminate based on 'the topic discussed or the idea or message expressed' that are content based." *Id.* at 74–75 (quoting *Reed*, 576 U.S. at 171).  Presented with another ordinance governing a city's signage—one treating signs differently depending on whether they were on- or off-premises—the Supreme Court rejected the idea that "a regulation cannot be content neutral if it requires reading the sign at issue." *Id.* at 69.  And in holding that the ordinance was content-neutral, the Supreme Court emphasized that the expressive message on a sign was relevant to the ordinance "only to the extent that it informs the sign's relative location," and "[a] sign's substantive message itself is irrelevant." *Id.* at 71.  In light of *City of Austin* and the lack of any need to resolve which level of scrutiny is appropriate, the Court applies intermediate scrutiny.

interests.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495–96 (2025) (quoting *Turner II*, 520 U.S. at 189).  The government defending the constitutionality of the law bears the burden of satisfying both requirements.  *See Playboy Ent. Grp.*, 529 U.S. at 816.

### i.   The District Has Not Shown its Licensure Law Furthers a Substantial Interest

First, the District must show that the licensure law furthers important non-speech govern-mental interests.  "[T]he District's asserted interests" cannot merely be "substantial in the ab-stract."  *Edwards*, 755 F.3d at 1003.  Instead, "the District must prove the challenged regulations directly advance its asserted interests" by demonstrating that there is a "direct causal link between the restriction imposed and the injury to be prevented."  *Id.* (citing *United States v. Alvarez*, 567 U.S. 709, 725 (2012)).  And it will not do to gesture vaguely at possible injuries lurking around the corner.  The burden of intermediate scrutiny "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

According to the District, "[t]he law is intended to further interests in public health and safety as well as professional standards . . . encompass[ing] an interest in mental health specifi-cally" and in "protecting [] citizens from deception when it comes to medical issues."  ECF No. 29 at 34 (internal quotation marks and citations omitted).  "[B]y only permitting practitioners with sufficient education and training to provide mental health services, the licensure law helps ensure that District residents receive treatment from competent providers."  *Id.* at 35.  The District also cites safety concerns—that "substandard or improper treatment can result in physical and psycho-logical harm"—and explains that the education requirements and long clinical supervision period serve these interests as well.  *Id.* at 36 (citations omitted).  The District also highlights its standards

of conduct that impose "obligations to maintain client confidentiality, avoid conflicts of interests, and protect clients." *Id.* (citing 17 DMCR §§ 6609.4, 6609.5, 6609.12). And it claims that "[l]icensure confirms to members of the public that, by seeking care from [a licensed professional counselor], they are receiving care from a person who meets relevant standards," particularly for "vulnerable populations" who "may be easily preyed upon." *Id.* at 38 (citations omitted).

None of these high-level justifications establish a causal link between the licensure regulation and the injury it purportedly addresses—perhaps because it is unclear that any such injury exists. After a substantial time for discovery, the District cannot identify any evidence of low-quality care or unethical conduct by unlicensed professional counselors in the District. *See* ECF No. 34 at 43–44. In fact, the opposite. Brokamp highlights that when the practice act portion of the licensure regulation was adopted, District officials testified that the executive "had received no information which indicated that the public safety was being jeopardized or that consumers needed additional protection in this area," and "that there was no demonstrated public need." ECF No. 35 at 13–14 (internal quotation marks and citations omitted); *see* ECF No. 38-1 at 20–21 ¶¶ 103–105.

The District points to a footnote from the Second Circuit's decision upholding New York's mental health counselor licensing scheme, relying on New York's legislative findings that included "anecdotal and statistical evidence that patients can suffer significant, traumatic damage at the hands of mental health professionals who are unscrupulous, unethical, or untrained." ECF No. 38 at 23 (quoting *Brokamp*, 66 F.4th at 398 n.22) (internal quotation marks omitted). Yet this only strengthens Brokamp's point. While New York "detailed at length findings made by the New York State legislature," the District of Columbia has notably failed to do the same. *Brokamp*, 66 F.4th at 398. And the District cannot simply adopt the New York findings. The portions of the New York legislative history cited by the Second Circuit—and, in turn, the District in this case—

16

are advocacy letters from the ACA and a New York lobbyist.  *See* ECF No. 40-2 at 30, 37–39. The letters largely highlight the importance of mental health treatment, which the Court does not doubt, and statistics rehashed by the District, which the Court does not find sufficient.  Whatever else was before the Second Circuit has not been brought to the attention of *this* Court, and the District has not otherwise shown that genuine harm from unscrupulous, unethical, or untrained counselors is alleviated by the District's practice act.[6]

Failing to provide evidence that the licensure regulation at issue addresses a genuine, non-speculative injury suffered by the public, the District offers up four other considerations in support of its law.  *See* ECF No. 29 at 38–41.  First, the District argues that because many insurers or payors only cover counseling services if provided by licensed professional counselors, and because many healthcare providers require counselors working for them to be licensed, the licensing regu-lation "is a necessary means to promote and preserve District residents' access to care."  ECF No. 29 at 39–40.  But while this this may be a reason to offer the *option* of licensure, the District has not shown it is a reason to *require* it.  Second, the District points to "history and consensus," saying that "many states have licensed professional counselors for decades."  *Id.* at 39 (cleaned up) (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)).  There is some reason to question the sweep of this assertion—California, for example, did not begin licensing counselors until 2009,

---

[6] The lobbyist letter also refers to a former psychiatrist in New York who lost his license in the 1970s for having sexual relationships with his patients and who reportedly continues to practice there as a "psychotherapist."  ECF No. 40-2 at 37.  Again, the District has not provided an example of this happening here.  And more to the point, it has not shown that its practice act would do anything about this problem.  The issue in New York was that the defrocked psychiatrist could still hold himself out using generic labels like "counselor" even after losing his psychiatric license.  *Id.*  The District's licensure regulation does not prohibit this.  *See* D.C. Code §§ 3-1210.03(t) ("Nothing in this subsection shall restrict the use of the generic terms 'counseling' or 'counselor'.").

ECF No. 38-1 at 15 ¶ 80—but in any case, that licensure regimes *in general* might target well-founded concerns, that does not mean that *this* licensure regime does so.  Third, the District notes, more than a quarter of complaints handled by state licensing boards around the country "involved unlicensed practice or other inaccurate representations."  ECF No. 29 at 39.  It is lost on the Court why the high rate of skirting licensure requirements should mean the licensure requirement itself has particular value; if anything, the fact that so many individuals are disobeying their states' licensing requirements suggests that the requirements may not be advancing the states' interests very far.  Finally, the District points out that "licensure laws, including the District's, have been strongly supported by the national professional organization for counselors."  *Id.* at 40.  Although the Court has "no reason to doubt that these groups are composed of educated men and women acting in good faith, their institutional positions cannot define the boundaries of constitutional rights."  *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020).

So "[d]espite the District's seemingly talismanic reliance on these asserted problems," the District can only suggest that unlicensed professionals *might* lurk around every corner and "*might* pose a danger."  *Edwards*, 755 F.3d at 1003 (emphasis in original).  "[N]o evidence exists" they do.  *Id.*  Thus, the District has not carried its burden to show that its licensure laws, D.C. Code §§ 3-1201.02(15B) and 3-1205.01(a)(1), further any substantial interest.  Without that showing, the laws cannot survive intermediate scrutiny.

### ii.      The District Has Not Shown Its Licensure Law Is Sufficiently Tailored

Even if the District had shown that it has a substantial interest in public health and safety furthered by its licensure regulation, the regulation would fail the second requirement of intermediate scrutiny:  that it "does not burden substantially more speech than necessary to further those interests.'"  *Free Speech Coal.,* 606 U.S. at 96 (quotation omitted).  To satisfy this second

requirement, while the law "need not be the least restrictive or least intrusive means of serving the government's interests," the District must show "a close fit between ends and means." *ANSWER Coal. v. Basham*, 845 F.3d 1199, 1213–14 (D.C. Cir. 2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). An unconstitutional gap between ends and means exists where "it is possible substantially to achieve the Government's objective in less burdensome ways." *Edwards*, 755 F.3d at 1009 (citation omitted).

A less-burdensome licensing regime is possible here: the District could simply recognize professional counseling licenses issued by other states like Virginia. The District has not shown that such a regime would achieve its asserted interests less effectively. It does not suggest that licensure in other states is deficient in any way. To the contrary, the District's own expert states that "[w]hile minor differences exist among the states in terms of how they regulate professional counseling, the core requirements are largely the same." ECF No. 29-9 at 8. Indeed, this relative uniformity of state licensing regimes is why the implementation of the Counseling Compact between Virginia and the District was expected to be straightforward. *See* D.C. Code § 3–1281.03(a) (listing what a state must require in its licensing regime to "participate in the Compact"). The District provides little reason to think that Brokamp, with her valid Virginia license to practice professional counselling, would be unqualified to practice here. This clear alternative to the District's chosen regulatory regime throws the distance between its ends and its means into sharp relief.

The District takes a half-hearted stab at justifying its licensing-by-endorsement requirement by (again) pointing to the Second Circuit's reasoning upholding New York's mental health counseling licensure law. That court reasoned that New York's "interest in protecting its residents from incompetent or deceptive counselors warrants the state ensuring, at a minimum, that persons

19

really are licensed and in good standing in another state before exempting them from the state's initial license requirement." *Brokamp*, 66 F.4th at 402. And the District emphasizes that under intermediate scrutiny, the District need not choose the absolute least restrictive means of achieving its interests. Fair enough. But if that "minimum" interest in double-checking another state's licensing work is the only end the District seeks, its licensure-by-endorsement requirement is far too clumsy a way to achieve it.

Contrary to the District's assertions, licensure by endorsement heavily burdens out-of-state licensed counselors like Brokamp. Though less burdensome for applicants than initial licensure, the licensure-by-endorsement process still requires that the applicant have a master's degree in counseling or a related field and have practiced professional counseling for at least five years, or for three years so long as they have a National Certified Counseling credential issued by a national board. D.C. Code § 3-1207.10(c). Applicants for licensure by endorsement must also comply with "requirements the Mayor may establish by rule," *id.*, which currently include "furnish[ing] proof" that they have (1) completed 3,500 hours of professional counseling, 200 of which must be under the supervision of a qualified supervisor; (2) passing a national exam; and (3) submitting transcripts from their graduate program, among other requirements. 17 DCMR §§ 6602, 6603, 6605. The online licensure-by-endorsement application form also appears to require applicants to submit demographic information, provide a government issued identification, undergo a criminal background check, and pay a several hundred-dollar fee, among other requirements. ECF No. 29-17 at 4. This level of burden—hardly minor—could be justified only if there were a corresponding benefit to the public over and above simply recognizing out-of-state licenses, but the District cannot show there is.

Indeed, as the final nail in the coffin, both the current and past state of law in the District show how little these licensure-by-endorsement requirements are needed. The District concedes that the only reason it does not recognize Brokamp's Virginia license is because Virginia does not offer reciprocity with the District. ECF No. 29 at 42 n.6 ("[I]f Virginia offered reciprocity for [licensed professional counselors], District law would recognize Dr. Brokamp's Virginia license, and Dr. Brokamp could treat clients in the District without meeting any other requirements."). The end of promoting the health and safety of District residents cannot be closely tied to the means of its licensing regime if all it would take to render those means unnecessary is a unilateral action from Virginia. Additionally, during the COVID-19 pandemic, the District allowed certain counselors licensed in other jurisdictions to provide telecare to District residents without going through the licensure-by-endorsement process. ECF No. 29-18. The District does not submit any evidence suggesting that this COVID-era regulation resulted in injury to the public.

For all these reasons, the Court finds that the District's licensure requirement burdens substantially more of Brokamp's speech than is needed to further the District's interests, and so sections 3-1201.02(15B) and 3-1205.01(a)(1) of the D.C. Code are unconstitutional as applied to her.

## B.     Brokamp's Overbreadth Challenge

Having found sections 3-1201.02(15B) and 3-1205.01(a)(1) unconstitutional as applied to Brokamp, the Court "shall not go on to inquire whether the statute is overbroad." *United States v. Popa*, 187 F.3d 672, 678 (D.C. Cir. 1999). Application of the overbreadth doctrine is "strong medicine" to be employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The Supreme Court has therefore cautioned that "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily," which "would convert use of the overbreadth doctrine from a necessary means of

21

vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Bd. of Trs. v. Fox*, 492 U.S. 469, 484–85 (1989). And "although the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute . . . we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (citations omitted). So too here.

## IV.     Remedy

Having found provisions of the D.C. Code unconstitutional as applied to Brokamp, the Court turns to the question of what remedy she is due. She requests in her complaint both a "declaratory judgment" and a "permanent injunction." ECF No. 1 at 18. The Court agrees that both are appropriate. The Court already explained why the D.C. Code §§ 3-1201.02(15B) and 3-1205.01(a)(1) are unconstitutional as applied to Brokamp, so it will grant her request for a declaratory judgment reflecting the same under 28 U.S.C. § 2201(a).

The Court will also permanently enjoin the District from enforcing those two provisions against Brokamp moving forward. A plaintiff seeking a permanent injunction "must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006). In addition to prevailing on the merits of her claim, a plaintiff must demonstrate (1) that she has "suffered an irreparable injury"; (2) that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) that the "balance of hardships" tips in her favor; and (4) that "the public interest would not be disserved by a permanent injunction." *Id.* Brokamp satisfies all four factors.

In the context of the First Amendment, the first two factors naturally run together. The violation of First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And, by definition, irreparable injury is something more than mere "economic loss" that would be redressable through legal remedies such as damages. *Wisc. Gas. Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (same). So the restraint on Brokamp's ability to speak has inflicted more than economic loss to her business by removing District residents from her available clientele. It has also deprived her of conversations she can never recover; speech lost today because of an unconstitutional application of a law cannot be restored tomorrow. Brokamp has therefore suffered irreparable injury that cannot be adequately redressed by a remedy at law.

"When the defendant is the government," the third and fourth factors also "merge" and become a single balancing of the equities between the parties. *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023). The District has nothing to place on its side of the balance though—it is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And on Brokamp's side is her own constitutionally protected freedom to speak. The balance of equities tips cleanly in Brokamp's favor too.

The award of a permanent injunction satisfies the *eBay* factors. Thus, in addition to issuing declaratory relief, the Court will enjoin the District from enforcing D.C. Code §§ 3-1201.02(15B) and 3-1205.01(a)(1) against Brokamp.

23

## V.      Conclusion

For all the above reasons, the Court will grant Brokamp's Motion for Summary Judgment as to her as-applied claim, deny the District's Motion for Summary Judgment, and award declaratory and injunctive relief to Brokamp.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: June 24, 2026